UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TLT CONSTRUCTION CORP., <br><br> Plaintiff, <br><br> v. <br><br> SEATING SOLUTIONS RI, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION <br> ) NO. 05-10223-LTS <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

### I.   PRELIMINARY STATEMENT

RI, Inc., d/b/a Seating Solutions ("Seating Solutions" or "Seating"), requests that the Court grant its motion for summary judgment because it never had a contract with the plaintiff, TLT Construction Corp. ("TLT" or "Plaintiff"), and TLT can claim no damages. In April and May of 2004, Seating Solutions submitted price quotations to TLT for the installation of stadium seating systems in connection with high school renovation projects. TLT was the general contractor on these projects. For the next nine months, the parties worked on hammering out final agreements. Their negotiations were not successful. At one point in early July 2004, Seating Solutions signed marked-up copies of contracts that TLT had drafted and returned those contracts to TLT. TLT refused to sign them. TLT chose instead to spend the ensuing months trying to browbeat Seating Solutions into embracing new labor, bonding, and insurance provisions to which Seating had never agreed. The parties' disagreement on these essential terms prevented them from ever entering into a final written contract. This eliminates TLT's contract-based claims.

TLT recognized that it never got beyond an imperfect state of negotiations with Seating Solutions. So it decided that a better strategy would be to claim that it had relied upon Seating's

"pre-bid quotes" in submitting its own bids for the high school projects. Citing *Loranger Constr. Co. v. E.F. Hauserman Co.*, 376 Mass 757, 384 N.E.2d 176 (1978), TLT attempted to force Seating to relent and perform work on the projects even though the parties still had substantial disagreements about important contract terms. When confronted with actual events, though, TLT's *Loranger*-based theory of liability encounters trouble. On one hand, TLT had not received a quote from Seating Solutions before it submitted its bid on one of the projects, Wachusett Regional High School; it did not rely on Seating's bid because it had not received it yet. Seating's original quote for the Reading Memorial High School project, on the other hand, was submitted just one day before TLT was awarded the project. The quoted amount was higher than the price that the parties began negotiating a month later. It was <u>markedly</u> higher than the price TLT ultimately paid to have seating systems installed there. In short, it is questionable whether TLT relied on Seating's "pre-bid quote" for the Reading project. If it did, moreover, TLT suffered no damages as a result of that reliance.

Seating Solutions is entitled to judgment as a matter of law on all of TLT's claims. TLT's claims for breach of contract and breach of the covenant of good faith and fair dealing are without merit because there was no contract that Seating could breach. TLT's reliance claims fail because it is questionable whether TLT relied upon Seating's quotations and, if it did, it suffered no damages. Similarly, TLT's Chapter 93A claims lack merit because it can point to no loss of money or property caused by Seating Solutions and because liability under the statute does not apply where negotiations do not result in an agreement. Summary judgment is appropriate in this action.

## II.   FACTUAL AND PROCEDURAL HISTORY

### A.   Facts

#### 1.   The parties and the projects

TLT, a Massachusetts corporation with its principal office located in Wakefield Massachusetts, is a construction company that has worked on numerous large scale projects in Massachusetts since it was founded in 1976. Proposed Joint Statement of Material Facts, dated

July 1, 2005 ("Facts"), ¶ 1.[1] Seating Solutions, a New York corporation based in Hauppauge, New York, is in the seating system design and construction industry and specializes in the sale, rental, and installation of custom-designed spectator seating at athletic and recreational facilities. Facts, ¶ 2. TLT is the general contractor on construction projects relating to the renovation and expansion of high schools in Reading and Holden, Massachusetts (the "Projects"). Facts, ¶ 3. TLT submitted a bid to serve as the general contractor on a project to construct an addition to Wachusett Regional High School in Holden, Massachusetts (the "Wachusett Project") on January 28, 2004. Facts, ¶ 4. TLT's bid on the Wachusett Project was accepted by the owner, the Town of Holden. Facts ¶ 5. In or about March of 2004, Seating obtained a list of general contractors bidding on the Reading Memorial High School renovation project (the "Reading Project"). Facts, ¶ 6. TLT was one of the general contractors on this list. Facts, ¶ 7. TLT submitted its bid on the Reading Project on April 6, 2004. Facts, ¶ 8. TLT's bid on the Reading Project was accepted by the owner, the Reading School Committee. Facts, ¶ 9.

2.   **Seating submits quotes and the parties negotiate.**

On April 5, 2004, Seating sent a quote to TLT for the Reading project that was $396,548.87, or $425,120.30 with a fully closed welded deck. Facts, ¶ 10, Ex. 1 (April 5 quote). Seating sent similar quotes to J&J Contractors, Inc., Peabody Construction Co., the Morganti Group, Inc., and Eastern Contractors, Inc. *See id*. When Seating submitted its quote for the Reading project it was unaware that TLT had also been awarded the contract on the Wachusett Project. Facts, ¶ 11. On May 10, 2004, TLT requested that Seating Solutions provide a quote for bleacher packages for both of the Projects and stated that the quote needed to be prepared by May 12, 2004. Facts, ¶ 12, Ex. 2 (Request for quote). Two days later, Seating sent TLT a quote for the Projects for a total price of $567,678.00. Facts, ¶ 13, Ex. 3 (May 12 quote). In response,

---

[1] It is reasonably anticipated, based upon discussions of counsel, that TLT will adopt and agree to the Proposed Joint Statement of Facts when it submits its opposition to this motion on July 22, 2005. In the event that TLT does not so agree, Seating Solutions is prepared to verify each statement of fact contained herein with an affidavit of a person with knowledge.

TLT informed Seating that the price of $567,678.00 was too high. Facts, ¶ 14. On May 17, 2004, Seating sent TLT a quote stating the total price for both projects would be $480,000, but that the quote was contingent upon a letter of intent being received on the following day and a standard AIA contract being executed by May 19, 2004. Facts, ¶ 15, Ex. 4 (May 17 quote).

After receiving this quote, TLT responded by facsimile on the same day by stating that (i) it needed a cost breakdown for both projects; (ii) a bond was being offered by Seating's competitors; (iii) TLT was working on getting the "no retainage" request approved; and (iv) that a letter of intent would have to suffice and that a contract could not be executed in the tight timeframe. A true copy of this facsimile is attached hereto as Exhibit 5. Facts, ¶ 16, Ex. 5 (May 17 facsimile). Seating sent TLT a letter in response stating that the cost of the Reading Project would be $283,026 delivered and installed, that the cost of the home bleacher for the Wachusett Project would be $159,283.00 delivered and installed, and that the cost of the visitor bleacher for the Wachusett Project would be $37,691.00 delivered and installed. Facts, ¶ 17, Ex. 6. (May 17 letter). The total price quoted for both projects was therefore $480,000.00. *See id.* & Ex. 6. Seating also informed TLT that this pricing did not include a bond and that Seating would allow TLT two weeks to draw up and execute a contract before it had to change its pricing structure. *See id.* After receiving the letter described in Paragraph 17, TLT sent Seating a facsimile agreeing to total contract price of $480,000.00 for the Projects. Facts, ¶ 18, Ex. 7 (May 17 facsimile). At approximately the same time, TLT sent Seating a facsimile stating that "[w]e have a deal if we can split the bond." *See id.* & Ex. 8 (May 17 facsimile).

3. **Negotiations go sour.**

On or about May 21, 2004, TLT sent Seating contracts for the Projects and requested that they be signed and returned within five days. Facts, ¶ 19, Ex. 9 (May 21 letter). The contracts sent by TLT were not standard AIA contracts. Facts, ¶ 20. On June 4, 2004, TLT contacted Seating and requested that Seating return signed copies of the contract, a certificate of insurance, and payment and performance bonds for the Reading Project. Facts, ¶ 21. Later that month, TLT sent another request that Seating return signed contracts and certificates of insurance to

4

TLT. Facts, ¶ 23, Ex. 11 (June 21 letter). The following day Marc Ligator of Seating ("Ligator") sent Chris Cormier of TLT ("Cormier") a letter attaching the certificate of insurance and raising specific concerns regarding the retainage requirement in the contract sent by TLT, the time frame for submittals, whether TLT was requiring union labor on the Projects, and Seating's need for additional information in the General Contract so that it could be aware of the contract scope. Facts, ¶ 24, Ex. 12 (June 22 letter).

On June 25, 2004, TLT sent Seating a letter notifying it of problems with the certificates of insurance that Seating provided for the Projects. Facts, ¶ 25. Ligator responded by stating that Seating could not alter certain aspects of its insurance certificate and would have to charge TLT a higher price if TLT required an umbrella insurance policy. Facts, ¶ 26, Ex. 13 (June 28 letter). The following day, TLT responded to Ligator's letter stating that neither of the insurance issues would be a problem and requested that Seating mark up and return the contracts that it had. A true copy of this letter is attached hereto as Exhibit 14. Facts, ¶ 27, Ex. 14 (June 29 facsimile).

In early July, Seating returned signed contracts for the Projects to TLT that (i) redacted provisions requiring Seating to obtain payment and performance bonds; (ii) added a provision stating that "Seating Solutions standard insurance limits apply to this contract"; (iii) added a provision stating that shop drawings would be received within six weeks of the execution of the contract; and (iv) deleted a provision requiring Seating to use union carpenters and apprentices. Facts, ¶ 28, Exs. 15 & 16 (Contracts). TLT never returned signed copies of Exhibits 15 and 16. Facts, ¶ 29. On July 12, 2004, Seating informed TLT that the total cost increase on the Projects that would result from the requirement that union labor be used would be $128,350.00. Facts, ¶ 30. On July 21, 2004, TLT sent a new draft contract to Seating for the Wachusett Project. Facts, ¶ 31, Ex. 17 (Contract). Seating did not return signed copies of the contract draft sent on July 21, 2004. Facts, ¶ 32.

Later in the month, TLT sent Seating another letter requesting that Seating return signed contracts and certificates of insurance to Seating. Facts, ¶ 33, Ex. 18 (July 29 letter). On August

5

13, 2004, Seating sent TLT a letter stating that while Wachusett Project pricing would remain the same, Seating would increase its delivered and assembled price for the Reading Project by $19,236.00 due to addenda to project specifications and the architect's insistence upon an I-Beam unit. Facts, ¶ 34, Ex. 19 (August 13 letter). On August 18, 2004, Seating provided TLT with a certificate of insurance for its supplier Outdoor Aluminum and stated that bonding would not be an issue. Facts, ¶ 35, Ex. 20 (August 18 letter). The following day, TLT stated that it did not believe that the price increase for I-Beam construction was justified because the original quotes provided by Seating included I-Beam units. Facts, ¶ 36, Ex. 21 (August 19 letter). Seating responded by stating that existing specifications were vague and contradictory, and that in clarifying the inconsistencies, Seating determined that it needed to increase its offered price. Facts, ¶ 37, Ex. 22 (August 20 letter). On August 23, 2004, TLT sent Seating a letter stating that if it wished to increase the contract price it should submit a request for a change order. Facts, ¶ 38, Ex. 23 (August 23 letter regarding contract price). Also on August 23, 2004, TLT sent Seating a letter stating that Seating had not met the insurance certificate requirements for the Projects. Facts, ¶ 39, Ex. 24 (August 23 letter regarding insurance certificates).

    **4.    The parties cease, restart, cease, restart, and finally cease negotiations.**

On August 30, 2004, Seating contacted TLT and stated that it was withdrawing all quotes and proposals that it had provided up to that date. Facts, ¶ 40, Ex. 25 (August 30 letter). Approximately one week later, TLT's counsel sent Seating a letter stating that refusal to proceed by Seating would be actionable. Facts, ¶ 41, Ex. 26 (September 7 letter). Ligator responded to TLT's counsel on September 14, 2004. Facts, ¶ 42. He stated that Seating would be happy to proceed based upon its "pre-bid" quote, which was higher than $480,000.00 for both projects. Facts, ¶ 42, Ex. 27 (September 14 letter).

The parties reopened negotiations in October of 2004. Facts, ¶ 43. On October 20, 2004, Seating sent TLT a letter stating that it would be willing to proceed on both projects for a total price of $488,043.00. Facts, ¶ 44, Ex. 28 (October 20 letter). Two days later, Matt Henry of TLT ("Henry") sent Ligator a letter requesting an explanation for the approximately eight

thousand dollar increase in the price above the figure quoted by Seating in May of 2004. Facts, ¶ 45, Ex. 29 (October 22 letter requesting explanation). Ligator responded by stating that old pricing had expired and that the price quoted was based upon Seating's review of the Projects with current costs in mind. Facts, ¶ 46, Ex. 30 (October 22 letter regarding price expiration). Later on October 22, 2004, Ligator sent a letter to TLT stating that Seating's pricing was based on using its own employees at prevailing wage and stating that if union labor would be required it would be TLT's responsibility to absorb any cost increase that resulted. Facts, ¶ 47, Ex. 31 (October 22 letter regarding union labor). On October 26, 2004, Ligator requested that TLT send Article No. 2 of the general conditions of the contract between TLT and the Reading School Committee. Facts, ¶ 48, Ex. 32 (October 26 letter). TLT provided Seating with the requested information on October 27, 2004. Facts, ¶ 49.

On November 1, 2004, Ligator sent a letter to Kostinden stating that Seating needed a firm delivery date. Facts, ¶ 50. The letter stated that Seating would need a fifty percent deposit with a balance up to $450,000.00 due upon delivery of material. *See id.* & Ex. 33 (November 1 letter). The following month, TLT's counsel sent Ligator a letter representing that Ligator and Kostinden had reached a resolution on terms on November 9, 2004 and that Kostinden expected the contracts to be endorsed and returned together with bonds. Facts, ¶ 51, Ex. 34 (December 1 letter). On December 6, 2004, Ligator sent a facsimile to TLT's counsel again offering to honor any "pre-bid" proposal that it made to TLT, which was higher than $480,000.00 for both projects. Facts, ¶ 52, Ex. 35 (December 6 letter from Ligator). TLT's counsel sent Ligator a response requesting that he execute and forward contracts for both projects in the amount of $450,000.00, as well as providing payment and performance bonds. Facts, ¶ 53, Ex. 36 (December 6 letter from counsel). Later in the month, Thomas Kostinden of TLT sent a facsimile to Ligator demanding that Seating send signed contracts, insurance certificates, and performance and payment bonds to TLT. Facts, ¶ 54, Ex. 37 (Dec. 15 facsimile). Ligator responded and offered to meet with TLT in early January of 2005 to requote the project. Facts, ¶ 55, Ex. 38 (December 17 letter). The parties were unable to resolve their differences in early

January. Facts, ¶ 56. TLT ultimately paid Gallivan Company, Inc. $316,800.00 for the scope of work on the Reading Project that had been the subject of the negotiations with Seating. Facts, ¶ 57.

**B.     Procedural History**

In late December of 2004, TLT filed this action in the District Court of Malden, Middlesex County, Massachusetts. *See* Complaint, dated December 28, 2004. In the statement of damages attached to its complaint, TLT claimed damages of $250,000.00. *See* Statement of Damages, dated December 27, 2004. Seating Solutions filed a notice of removal with this Court on February 3, 2005. *See* Notice of Removal, dated February 3, 2005. The parties agreed to refer the case to a magistrate on April 7, 2005, and the case was so referred on April 15, 2005.

### III.     DISCUSSION

**A.     The Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218 (1st Cir. 2004) (same). A genuine issue exists when "the evidence on the point is such that a reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving party." *Blackie v. State of Maine*, 75 F.3d 716, 721 (1st Cir. 1996). A factual issue is "material" if it "has the potential to alter the outcome of the suit under the governing law." *Id.* at 721. "[C]onclusory allegations, improbable inferences, and unsupported speculation," however, are insufficient to establish a genuine dispute of fact. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

The burden initially rests with the party seeking summary judgment to demonstrate that "no genuine issue of material fact exists." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995), *cert. denied*, 515 U.S. 1103 (1995). The nonmovant must then put forth "specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy

issue." *Triangle Trading Co. v. Robroy Ind., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999). Factual disputes must be resolved in a "light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995), *cert. denied*, 516 U.S. 1113 (1996).

**B.  TLT and Seating Solutions did not enter into a contract because they could not agree on essential terms and did not intend to be bound by preliminary negotiations.**

Seating Solutions and TLT never entered into a contractual relationship. They negotiated for months but the negotiations did not produce a final agreement. They could not ultimately agree on the price that TLT would pay Seating for work on the Reading Project. The absence of a final written agreement between the parties supports the conclusion that they did not intend to be bound by earlier negotiations. Because there was no contract, TLT's claim for breach of contract is without merit.

Many cases since *Rosenfield v. United States Trust Co.*, 290 Mass. 210, 212, 195 N.E. 323 (1935) have considered the question of when negotiations mature into formal contractual arrangements. In the *Rosenfield* case, the plaintiff, a jewelry shop operator, and the defendant, owner of a building on Winter Street in Boston, disputed whether negotiations of a lease agreement had ripened into a contract. The court held that they had not. *See id.* at 217, 195 N.E. at 326. The defendant had made incriminating statements such as "the deal was closed". *Id.* at 216, 195 N.E. at 325. The court was convinced that contract had not been finalized because several important terms – including the appearance of the storefront, cost of build-out, payment of heat, and payment of water taxes – remained to be determined. *See id.* "An agreement to reach an agreement," the court stated, "is a contradiction in terms and imposes no obligation on the parties thereto." *Id.* This principle is now firmly established. *See Lafayette Place Assocs. v. Boston Redevelopment Auth.*, 427 Mass. 509, 517, 694 N.E.2d 820, 826 (1998) ("We adhere to the principle that an agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto.") (internal punctuation marks omitted), *cert. denied*, 427 Mass.

9

509 (1999);[2] *Air Tech. Corp. v. General Elec. Co.*, 347 Mass. 613, 626, 199 N.E.2d 538, 548 (1964) ("A purported contract which is no more than an agreement to agree in the future on essential terms, or one which does not adequately specify essential terms, ordinarily will be unenforceable.").

The rule set forth in the Rosenfield case has two important corollaries. First, where a conflict regarding material terms remain unresolved, no contract exists. *Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404, 418 (D. Mass. 1995) ("[T]he parties' failure to agree on material terms militates against the finding of a contract."); *JRY Corp. v. LeRoux*, 18 Mass. App. Ct. 153, 172, 464 N.E.2d 82, 94 (1984) ("Before an enforceable agreement arises, all its essential terms must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined.") (internal punctuation marks omitted), *rev. denied*, 392 Mass. 1103, 466 N.E.2d 522 (1984); *Tull v. Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 630, 389 N.E.2d 447, 450 (1979) ("With final terms still to be hammered out, the parties could not be bound.") Second, where the parties contemplate entering into a written agreement but have not yet done so, there is a reasonable inference that they do not yet intend to be bound. *Gel Sys. Inc. v. Hyundai Eng'g & Constr. Co., Inc.*, 902 F.2d 1024, 1027 (1st Cir. 1990) ("Normally the fact that parties contemplate the execution of a final written agreement effects a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled."); *Mass Cash Register, Inc.*, 901 F. Supp. at 415 ("When parties contemplate the execution of a final written agreement, a strong inference is made that they do not intend to be bound by earlier negotiations

---

[2] TLT may pounce upon the *Lafayette* case and claim that it supports the argument that it had a contract with Seating Solutions. This argument is unavailing. The parties in *Lafayatte* had signed a detailed "Tripartite Agreement" and three "supplemental agreements". *Lafayette*, 427 Mass. at 510-13, 694 N.E.2d at 820-23. There is no such signed agreement in this case. In addition, the agreements in Lafayette "specified formulae and procedures that would determine a price under . . . several contingencies." *Id.*, 427 Mass. at 516, 694 N.E.2d at 825. Here, TLT and Seating Solutions could not agree on price and did not agree upon a formula that could resolve their disagreement. Facts, ¶¶ 26, 30 & 47.

or agreements until the final terms are settled.") (internal quotation marks omitted); *Tull*, 7 Mass. App. Ct. at 630, 389 N.E.2d at 450 ("Normally the fact that parties contemplate the execution of final written documents justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled.").

Seating Solutions and TLT could not reach a final agreement in this case. Negotiations between the parties stopped and restarted on three separate occasions. Facts, ¶¶ 40, 43, 50, 55 & 56. The parties initially agreed that the price for the Projects would be $480,000.00. Facts, ¶¶ 15-18. Seating Solutions explicitly made this price contingent upon the timely receipt (i) of a letter intent; and (ii) of a "standard AIA contract." Facts, ¶ 15. Though TLT stated that a "letter of intent is not an issue," Facts, ¶ 16, it never sent a formal letter of intent to Seating Solutions.[3] TLT also would not provide Seating Solutions with a "standard AIA contract", electing instead to send contracts including entirely new terms to which Seating Solutions had never agreed. Facts, ¶¶ 19, 20, 24, & 26. Specifically, Seating Solutions would not agree to TLT's terms regarding the bonding of the project and the requirement that Seating employ union labor on either of the projects. Facts, ¶¶ 24, 26, 28, 30 & 47.[4] If TLT insisted upon the new terms, Seating stated that it would have to increase the price on the projects. Facts, ¶¶ 26, 30 & 47. Rather than using union labor, which would have significantly increased its costs, Seating's quote was based upon the reasonable assumption that it would be able to pay its own employees at prevailing wages to perform the work. Facts, ¶ 30, 47.

Seating therefore made handwritten changes to TLT's contracts to reflect the actual terms of its agreement with TLT, signed the contracts, and returned them to TLT in mid-July of 2004.

---

[3] Any suggestion by TLT that the unsigned, bare-bones facsimile from Seating Solutions, Facts ¶ 18, Ex. 7, constitutes a formal letter of intent is without merit.

[4] Issues also arose concerning the project architect's inclusion of addenda to existing project specifications that increased costs. Facts, ¶ 34, 37. TLT disagreed that a cost increase was necessary based on the new specifications. Facts, ¶ 36, 38. Another problem related to whether Seating was carrying an appropriate insurance policy for the projects. Facts, ¶¶ 23, 25-28, 35.

Facts, ¶ 28. TLT did not execute these contracts, Facts, ¶ 29, electing instead to hound Seating Solutions and force it to sign contracts with bonding, labor, and pricing provisions that Seating Solutions opposed. Facts, ¶¶ 33, 39, 41, 51, 53 & 54.[5] The execution of a final, written agreement was obviously of great importance to TLT; its representatives contacted Seating Solutions requesting signed contracts and insurance information at least seven times. Facts, ¶¶ 21, 23, 33, 41, 51, 53 & 54. Because the parties contemplated, but never executed, a final written agreement, *Gel Sys. Inc.*, 902 F.2d at 1027; *Mass Cash Register, Inc.*, 901 F. Supp. at 415; *Tull*, 7 Mass. App. Ct. at 630, 389 N.E.2d at 450, and could not agree on essential labor, insurance, and price terms, *See Mass Cash Register, Inc.*, 901 F. Supp. at 418; *JRY Corp.*, 18 Mass. App. Ct. at 172, 464 N.E.2d at 94; *Tull*, 7 Mass. App. Ct. at 630, 389 N.E.2d at 450, no contract existed between Seating Solutions and TLT. Because there was no contract, there could be no breach by Seating Solutions.[6]

C.  **TLT's claim that it relied upon Seating's quote is not a basis for liability because there was no offer or promise and TLT has suffered no damages.**

TLT did not rely upon any price quotations provided by Seating Solutions and, even if it had done so, it would not have suffered any damages. Nor, as a matter of law, were Seating's price quotations offers or promises. Three Massachusetts cases give detailed consideration to the

---

[5] TLT's counsel sent Seating Solutions three letters premising Seating's liability on the reliance principles set forth in *Loranger Constr. Co. v. E.F. Hauserman Co.*, 376 Mass 757, 384 N.E.2d 176 (1978). Facts, ¶¶ 41, 51, 53 & Ex. 7 ("We have reviewed the bid documents and are of the opinion that they are sufficient to establish binding contractual obligations.") (emphasis supplied). As noted in Section III.C, the contentions in these letters were incorrect as a matter of law.

[6] Because there was no contract in existence between the parties, TLT's claim for breach of the covenant of good faith and fair dealing – to the extent that TLT makes this claim – also fails. *See Bateman v. F.D.I.C.*, 112 F. Supp. 2d 89, 96-97 (D. Mass. 2000) ("[S]ince no enforceable contract ... ever materialized, [plaintiff] has no claim for breach of the implied covenant of good faith and fair dealing."); *Miller v. Milton Hosp. & Med. Ctr., Inc.*, 54 Mass. App. Ct. 495, 498, 766 N.E.2d 107, 110 (2002) ("[T]here was no breach of an implied covenant of good faith under the contract because the contract was not in effect at the time of the acts alleged to constitute a breach."), *rev. denied*, 437 Mass. 1104, 772 N.E.2d 589 (2002); *Levenson v. L.M.I. Realty Corp.*, 31 Mass. App. Ct. 127, 131, 575 N.E.2d 370, 372 (1991) (same).

circumstances under which a construction subcontractor can be bound to a contractor based on a price quotation. *See Loranger Constr. Co. v. E.F. Hauserman Co.*, 376 Mass 757, 384 N.E.2d 176 (1978); *Cannavino & Shea, Inc. v. Water Works Supply Corp.*, 361 Mass. 363, 280 N.E.2d 147 (1972); *I & R Mechanical v. Hazelton Mfg. Co.*, 62 Mass. App. Ct. 452, 817 N.E.2d 799 (2004), *rev. denied*, 444 Mass. 1102, 826 N.E.2d 202 (2005). All three of these cases support Seating's position in this case.

In the *Cannavino* case, the Supreme Judicial Court held that a subcontractor could not be bound by prices included in a quotation for valves "sent to the plaintiff and twenty-one other possible general contractors . . . ." *Cannavino*, 361 Mass. at 364, 280 N.E.2d at 148. The plaintiff relied upon the valve prices quoted in the document, but then had to pay a higher price after the defendant would not enter into a contract. *See id.*, 361 Mass. at 364-65, 280 N.E.2d at 147. The court held that the defendant could not be liable under contract or quasi contract theories. *See id.*, 361 Mass. at 365-66, 280 N.E.2d at 149. The basis for this holding was that the defendant's initial letter was "not an offer but a quotation of prices, a request or suggestion that an offer be made to the defendant." *Id.*, 361 Mass. at 366, 280 N.E.2d at 149. The same is true of the April 5, 2004 quotation in this case. Seating sent that quote to at least four contractors other than TLT that were bidding on the Reading Project. Facts, ¶ 10. Seating Solutions cannot be bound to that offer as a matter of law.

The *Loranger* case, decided five years after the *Cannavino* case, does not change the ultimate result here. In *Loranger*, as in *Cannavino*, the plaintiff "used the defendant's quotation in preparing the bid on the general contract . . . ." *See Loranger*, 376 Mass. at 759, 384 N.E.2d at 178. The key facts in the *Loranger* case that, in the minds of the Court, distinguished it from its previous holding in *Cannavino*, was that the defendant had prepared its quotation for construction work based upon information obtained from the plaintiff's architect. *See id.*, 376 Mass. at 760, 384 N.E.2d at 179. In any event, the quotation upon which the plaintiff in Loranger relied in submitting its bid was for $15,900.00. *See id.*, 376 Mass. at 758, 384 N.E.2d at 178. After defendant rejected that price for reasons that are not explained, the plaintiff was

forced to pay $23,000.00 for the same work. *See id.*

The Appeals Court recently attempted to resolve some of the tensions between the holdings in the *Cannavino* and *Loranger* cases in the *I & R* case. In *I & R*, the defendant's quotation included an error that made its price for boilers significantly less than that of its competitors. *See I & R*, 62 Mass. App. Ct. at 453-54, 817 N.E.2d at 801. The Appeals Court held that the quotation did not constitute an offer or promise because "[a]dvertisements, price quotations, and price lists generally do not constitute offers but are instead usually considered requests for offers or invitations to negotiate." *See id.*, 62 Mass. App. Ct. at 455, 817 N.E.2d at 802. The Appeals Court stated that the key facts in the *Loranger* case were that "there was evidence that the supplier prepared its quotation based on architectural information; gave the quotation to the general contractor directly by telephone; and proposed in its quotation to perform some of the work." *See I & R*, 62 Mass. App. Ct. at 458, 817 N.E.2d at 804.

What distinguishes this case is more fundamental: TLT has not suffered any damages. Seating's April 5, 2004 bid to TLT was for at least $396,548.87 and as much as $425,120.30. Facts, ¶ 10. This was the only bid upon which TLT could have relied in submitting its bid, because the Reading Project was ultimately awarded to TLT on the following day, April 6, 2004. Facts, ¶ 8. The price for the work that TLT ultimately paid was $316,800.00. Facts, ¶ 57. This is at least $79,748.87 less than the bid upon which TLT may have relied that was submitted by Seating Solutions. TLT's reliance upon Seating's April 5 bid, therefore, did not cause it to suffer any economic harm. In *Loranger*, the plaintiff was forced to pay $7,100.00 more than it would have had to pay had the defendant adhered to its promise. *See Loranger*, 376 Mass. at 758, 384 N.E.2d at 178. To prevail on a claim for breach of contract or reliance, the plaintiff must have suffered damages. *See Doyle v. Hasbro*, 103 F.3d 186, 194 (1st Cir. 1996) ("In order to sustain Count I's breach of contract claim, plaintiffs must plead . . . that [they] were damaged."); *Connecticut Inv. Casting Corp. v. Made-Rite Tool Co., Inc.*, 382 Mass. 603, 608-609 (1981) (denying breach of contract counterclaim where buyer could not establish damages); *Loranger*, 376 Mass. at 760, 384 N.E.2d at 179 (noting that application of reliance doctrine limited to

circumstances where "necessary to avoid injustice"); *Vallentine v. Jacobson*, 353 Mass. 769, 770 (1968) (dismissing contract claim because plaintiffs could not prove that defendants had caused substantial injury). TLT has suffered no damages due to Seating's conduct, and its claims fail as a matter of law.

D.  **TLT's Chapter 93A claims fail because it cannot identify any unfair or deceptive conduct and it has suffered no damages.**

TLT cannot succeed on its Chapter 93A claims as a matter of law. TLT and Seating negotiated the price and other key terms over a seven month period. They never reached an agreement. That is an insufficient basis for liability under the statute. More importantly, TLT did not suffer any damages in this action. The only Seating quotation upon which TLT could have relied in submitting its bid for the Reading project was more than TLT ultimately paid for the work. In the absence of a loss of "money or property", there can be no Chapter 93A liability.

The Supreme Judicial Court recently stated that conduct by a person engaged in trade or commerce violates Mass. Gen. Law ch. 93A, § 11 if it is "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Morrison v. Toys "R" Us, Inc.*, 441 Mass. 451, 457, 806 N.E.2d 388, 392 (2004). Previous statements of the requirements of Section 11 that rely upon language of "rascality" and "raised eyebrows" has been disavowed by the Supreme Judicial Court. *See Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 42, 648 N.E.2d 435, 438 (1995) ("We view as uninstructive phrases such as 'level of rascality' and 'rancid flavor of unfairness', in deciding questions of unfairness under G.L. c. 93A.") (citations omitted); *Gilleran* at § 4.8 ("The SJC clearly was signaling that both the eyebrow test and the rancid flavor of unfairness test were to be abandoned.").

The parties, after months of sporadic discussions, could not reach an agreement as to the price Seating would be paid for its work on the projects. That is not a basis for liability under

Chapter 93A.[7] *Madan v. Royal Indem. Co.*, 26 Mass. App. Ct. 756, 764, 532 N.E.2d 1214, 1218 (1989) ("Every deal that goes sour does not give rise to a c. 93A claim."), *rev. denied*, 404 Mass. 1103, 536 N.E.2d 1093 (1989); *Teitelbaum v. Hallmark Cards, Inc.*, 25 Mass. App. Ct. 555, 562, 520 N.E.2d 1333, 1337 (1998) (finding no liability under Section 11 where there were "prolonged discussions between the parties . . . which were consistently marked by tentativeness on the defendants' part"); *Pappas Indus. Parks, Inc. v. Psarros*, 24 Mass. App. Ct. 596, 600, 511 N.E.2d 621, 623 (1987) ("It is not . . . immoral, unethical, oppressive, or unscrupulous -- and therefore not unfair or deceptive -- to break off incomplete and imperfect negotiations of a commercial agreement."), *rev. denied*, 400 Mass. 1107, 513 N.E.2d 1289 (1987).

To the extent that TLT is upset that Seating Solutions took the time to ensure that its rights were protected, that does not support its Chapter 93A claim, either. *See Eastern Motor Inns, Inc. v. Ricci*, 565 A.2d 1265, 1274 (R.I. 1989) (applying Massachusetts law and stating that "[i]n the circumstances of this dispute we find that although [defendant-in-counterclaim's] actions might be described as dilatory, this conduct does not rise to the level of rascality that is required to support a chapter-93A claim") (internal quotation marks omitted). TLT had two clear options if it thought that the negotiation process was taking too long: (i) it could cease negotiating with Seating Solutions and look elsewhere for a seating systems subcontractor; or (ii) it could sign the contracts that Seating returned in early July of 2004.[8] Rather than adopting

---

[7] Even if TLT and Seating had reached an agreement, breach of that agreement would not be sufficient to find that Seating had violated Chapter 93A. *See Chambers Steel Engraving Corp. v. Tambrands, Inc.*, 895 F.2d 858, 861 (1st Cir. 1990) ("The mere breach of a contract, without more, even if one existed, would not violate ch. 93A.") *Madan*, 26 Mass. App. Ct. at 762, 532 N.E.2d 1217 ("[T]he mere breach of a contract, without more, does not amount to a c. 93A violation."); Michael C. Gilleran, *The Law of Chapter 93A* § 9.1 at 227 (1989) ("Where the nature of the breach constitutes a mere breach of contract, without more, such conduct will not constitute a 93A violation.").

[8] TLT has from time to time advanced the theory that Seating stretched out negotiations because the price of aluminum was increasing. This contention is belied by the record. If Seating's motivation in acting as it did was the price of aluminum, then it would have increased the price of <u>both</u> Projects, as opposed to proposing an increase only on the Reading Project.

either of these common-sense approaches, TLT decided to push for contract terms that it preferred and, ultimately, to file this suit.

More fundamentally, when the April 5 quotation is compared to the price TLT ultimately paid for the grandstand and bleachers, it becomes clear that TLT has no damages. This dooms its Chapter 93A claim. A business plaintiff proceeding under Section 11 of Chapter 93A must establish that it has "suffer[ed] [a] loss of money or property."[9] Mass. Gen. Law ch. 93A, § 11; *Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*, 331 F. Supp. 2d 8, 10 (D. Mass. 2004) (holding that plaintiffs 93A claim was "unavailing because [it] ha[d] not identified any loss of money or property, real or personal flowing from [the defendant's] conduct"). As noted *supra*, no damages have resulted from Seating's conduct in this case. Seating's initial quote for the Reading project – the only quote upon which TLT could have relied to its detriment – was at least $396,548.87. Facts, ¶ 10. The price of the contract that TLT ultimately made for seating on Reading Project was <u>less</u>: $316,800.00. Facts, ¶ 57. TLT cannot satisfy the requirements of Section 11 and therefore cannot prevail as a matter of law.

### IV.  CONCLUSION

Seating Solutions respectfully requests that the Court grant its motion for summary judgment as there are no material facts in dispute and TLT's claims all fail as a matter of law.

---

Facts, ¶ 34.

[9] Consumer plaintiffs need only establish that he or she has been "injured" due to a violation of Chapter 93A, § 2. Mass. Gen. Law ch. 93A, § 2.

Dated:   July 1, 2005

                       RI, INC. d/b/a SEATING SOLUTIONS

                       By its attorney,

                       /s/ Terry Klein
                       THE LAW OFFICE OF TERRY KLEIN
                       Terry Klein, BBO# 652052
                       1558 Dorchester Avenue, Ste. 202
                       Dorchester, Massachusetts  02122
                       Telephone: (617) 825-8175
                       Facsimile: (617) 507-6454

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorneys of record for each other party by first class mail on July 1, 2005.

/s/ Terry Klein
_____
Terry Klein