UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| TLT CONSTRUCTION CORP., | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | CIVIL ACTION |
|  | ) | NO. 05-10223-LTS |
| SEATING SOLUTIONS RI, INC., | ) | |
|  | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## I.   PRELIMINARY STATEMENT

The Plaintiff, TLT Construction Corp. (hereinafter "TLT"), requests that the Court deny the motion of the Defendant, RI, Inc., d/b/a Seating Solutions (hereinafter "Seating"), for summary judgment, and grant TLT's cross-motion for summary judgment as a contract was formed between the Parties, and Seating, in bad faith and in breach of the contract, repeatedly attempted to increase the price of the contract, refused to perform, and ultimately sought to unfairly leverage TLT, all in violation of M.G.L. chapter 93A.

In July 2004, the Parties agreed that Seating would supply and install stadium seating systems on two public construction projects (hereinafter collectively the "Projects"), known as the renovation of the Wachusett Regional High School in Holden, Massachusetts (hereinafter "Wachusett") and the renovation of the Reading High School in Reading, Massachusetts (hereinafter "Reading"). TLT was the general contractor on the Projects, and, following Seating's submittal of price quotes and some negotiation between the Parties, contracted with

Seating for the work. After Seating signed contracts on the Projects, it refused to perform as agreed, repeatedly attempted to change the contract terms, and conjured up issues where none existed in an attempt to avoid its obligations.

The issues raised by Seating concerning union labor, insurance, and bonding are "red herrings." There was never any dispute to the union labor issue, as TLT specifically agreed to waive the union labor provisions, agreed that Seating would provide its own labor at prevailing wage rates, and did not attempt to force Seating to use union labor after signing of the contract. Also, by the terms of the contracts, bonding was considered an extra, which TLT agreed to pay, and which Seating acknowledged it would provide. The Parties also agreed that Seating would provide insurance at their own rates. The only issue with regard to insurance occurred when Seating failed to submit certificates of insurance as agreed in a timely fashion, and ultimately produced certificates in the name of another company and which otherwise were not in conformity with what Seating had agreed to provide.

Any problems that had to be resolved after execution of the contract occurred because Seating continued to manufacture issues in an effort to wrongfully force further monetary concessions on the part of TLT. In essence, Seating stalled, delayed, and requested increases in the contract price on numerous occasions. Further, to the extent that Seating believed it had just cause to seek an increase, it refused to use the customary and contractually required mechanism for submittal of change orders on public construction projects. Ultimately, Seating refused to perform their contracts, and TLT was forced to purchase the goods and services from a competitor at a higher rate than that at which Seating had contracted to perform the work, but at a lower rate than Seating was demanding as a condition precedent to honoring the contracts that it signed.

## II.  FACTUAL AND PROCEDURAL HISTORY

### A. Facts

#### 1. The parties and the projects

TLT, a Massachusetts corporation with its principal office located in Wakefield, Massachusetts, is a construction company that has worked on numerous large-scale projects in Massachusetts since it was founded in 1976. Proposed Joint Statement of Material Facts, dated July 1, 2005, and Plaintiff's Response to Proposed Joint Statement of Facts, dated July 22, 2005 (hereinafter "Facts"), ¶ 1.[1] Seating, a New York corporation based in Hauppauge, New York, is in the seating system design and construction industry and specializes in the sale, rental, and installation of custom-designed spectator seating at athletic and recreational facilities. Facts, ¶ 2. TLT is the general contractor on construction projects relating to the renovation and expansion of high schools in Reading and Holden, Massachusetts ("Reading" and "Wachusett," respectively, "Projects" collectively). Facts, ¶ 3. These Projects are the subject of this litigation. Facts, ¶ 3. TLT submitted general bids on both Reading and Wachusett, and these bids were accepted by the owners of the Projects, the town of Reading and the town of Holden, respectively. Facts, ¶¶ 4, 5, 8, 9.

#### 2. Seating submits a quote and negotiations begin.

On April 5, 2004, Seating sent a letter to TLT with regard to Reading, submitting a quote of $396,548.87, or $425,120.30 with a fully closed welded deck. Seating admitted to "have worked closely with this architect and [to] have helped them design this bleacher from the very

---

[1] TLT adopts a majority of the Proposed Joint Statement of Facts, dated July 1, 2005 and submitted by Seating along with their motion for summary judgment, with a few qualifications, denials, and additions. All such changes are contained in Plaintiff's Response to Proposed Statement of Facts, and are supported by documentation and the Affidavit of Thomas V. Kostinden.

first steps." Facts, ¶ 10; Ex. 1.[2] On May 10, 2004, TLT responded, requesting that Seating provide a quote for bleacher packages for both Wachusett and Reading by May 12, 2004. Facts, ¶ 12; Ex. 2. Seating supplied a quote on the Projects of $567,678.00. Facts, ¶ 13; Ex. 3. On May 17, 2004, Seating revised their quote, and sent TLT a letter stating that the total price for the Projects would be $480,000. Facts, ¶ 15; Ex. 4. In response by facsimile transmission the same day, TLT requested a cost breakdown of the quote for the Projects, asked Seating to clarify whether a bond was included, as its competitors were including one, and informed Seating that they would work on getting approval of a "no retainage" request and that a letter of intent would have to suffice as contracts probably could not be executed so quickly. Facts, ¶ 16; Ex. 5. Seating replied via facsimile transmission on the same day with a breakdown of the quote, pricing Reading at $283,026 delivered and installed, and Wachusett at $196,974 ($159,283 for the home bleacher and $37,691 for the visitor bleacher). Facts, ¶ 17; Ex. 6. Seating also clarified that a bond was not included in the quote, and that Seating would accept a letter of intent and allow two weeks to draw up and execute contracts, citing concern for changing prices in the aluminum and steel market. Facts, ¶ 17; Ex. 6.

3.  **The parties negotiate issues of labor, bonding, and insurance, and reach an agreement.**

About May 21, 2004, TLT sent contracts to Seating for both Projects, asking that they be signed and returned within five days. Facts, ¶ 19; Ex. 9. On June 22, 2004, Mark Ligator ("Ligator") replied to TLT raising some questions with regard to retainage, the provision of bonding, the use of union labor, and the scope of work. Facts, ¶ 24; Ex. 12. Ligator's letter also attached certificates of insurance. Facts, ¶ 24; Ex. 12. On June 25, 2004, TLT informed Seating of certain deficiencies in the insurance certificates. Facts, ¶ 25. TLT's primary issue with the

---

[2] *Exhibits 1-38* are attached to Defendant's Proposed Joint Statement of Facts, dated July 1, 2005; *Exhibits 15A, 16A, 16B, and 39-41* are attached to Plaintiff's Response to Proposed Joint Statement of Facts, dated July 22, 2005.

4

insurance certificates was that they were not in Seating's name, but in the name of Outdoor Aluminum, a third-party entity that provided manufacturing services for Seating. Facts, ¶ 24; Ex. 12; Affidavit of Thomas V. Kostinden (hereinafter "Kostinden"), ¶ 11. On June 28, 2004, Ligator replied seeking clarification on insurance issues, explaining that certain modifications of the certificates and an umbrella insurance policy would require additional expense on the part of TLT. Facts, ¶ 26; Ex. 13. TLT responded to Ligator via facsimile transmission on the following day, informing Seating that the insurance issues were "not a problem," and requesting that Mr. Ligator "mark up and return the contracts" in his possession. Facts, ¶ 27; Ex. 14.

On or about July 5, 2004, Seating returned to TLT marked up contracts for the Projects, eliminating the requirement for union labor (Seating would provide its own labor at prevailing wage rates), deleting the requirement for performance and payment bonds, specifying that "Seating Solutions standard insurance limits apply to this contract," and stating that shop drawings would be received within six weeks of the execution of the contracts. Facts, ¶ 28; Exs. 15, 16. In so signing, under Article 4(1), Seating bound themselves to TLT by the terms of the general conditions of the underlying contracts. Facts, ¶ 28a; Exs. 15, 15A, 16, 16A.

On July 12, 2004, Ligator sent a letter to TLT informing them that there would be a cost increase of $128,350 if Seating was required to use union labor. Facts, ¶ 30; Ex. 16B. TLT was not requesting that Seating use union labor, and was not forcing Seating to do so. Facts, ¶ 30a; Exs. 15, 16; Affidavit of Kostinden, ¶ 6. Also in the letter of July 12, 2004, Ligator told TLT that that Seating "will bond [the Projects] and pass the cost along to [TLT] as an add-on to the contract." Facts, ¶ 30; Ex. 16B. Ligator also stated in this letter that Seating reserved the right to have Outdoor Aluminum provide the bonding for the contracts. *See id.* TLT accepted these terms for bonding. Facts, ¶ 35a; Affidavit of Kostinden, ¶¶ 7, 13.

### 4. Seating begins efforts to alter the terms of the contracts as agreed to.

After returning the signed contracts, Seating asked that TLT forward cleaned-up versions of the contracts to Seating to replace the contracts executed with handwritten mark-ups, and TLT sent clean versions on July 21, 2004. Facts, ¶¶ 30b, 31; Ex. 17; Affidavit of Kostinden, ¶ 5. Seating, however, did not return any signed copies of the contracts, despite requests by TLT that Seating do so. Facts, ¶¶ 32, 33; Ex. 18. TLT also continued to request the submittal of insurance certificates by Seating in conformity with the signed contracts. Facts, ¶ 33; Ex. 18.

Ligator sent TLT a letter on August 13, 2004, noting that new contracts should be made out to Outdoor Aluminum, Seating's factory in Alabama. Facts, ¶ 34; Ex. 19. In this letter, Ligator noted that Seating would be required to increase its price for Reading by $19,236 due to the architect's requirement of an I-beam.[3] Facts, ¶ 34; Ex. 19. On August 18, 2004, Ligator sent a facsimile transmission to TLT with a certificate of insurance, and once again emphasized that "bonding will not be an issue." Facts, ¶ 35; Ex. 20. Bonding had not been an issue, as TLT had agreed with Seating that TLT would pay for the bonds provided by Seating or Outdoor Aluminum as an extra to the contracts. Facts, ¶ 35a; Exs. 16B, 20; Affidavit of Kostinden, ¶ 13. On August 19, 2004, TLT informed Seating that it did not believe that the price increase for I-beam construction was justified based on the specifications and Seating's own quotes, which included Seating's representation that it worked closely with the architect on the design of the Reading seating systems (see footnote 3). Facts, ¶ 36; Ex. 21. In response, Seating stated that the specifications were confusing, and that Massachusetts code compliance was stringent, but that "inconsistencies" had been worked out and Seating would require the price increase. Facts, ¶ 37; Ex. 22. TLT responded on August 23, 2004, informing Ligator that Seating would have to follow

---

[3] In the quote sheet that Seating submitted to TLT on April 5, 2004, Seating stated that it had worked on the design of the bleachers at Reading, and specifically mentioned the use of an I-beam. Facts, ¶ 10; Ex. 1. Seating's May 17, 2004 quote of $480,000 for both projects also refers to a "beam grandstand" at Reading. Facts, ¶ 15; Ex. 4.

6

the General Conditions, which state that all changes in work due to "inconsistency, error, or omission" in the contract documents must be "ordered as provided in Article 7," governing change orders. Facts, ¶ 34a, 38; Ex. 15A (Reading General Conditions §§ 3.2.1, 5.3.1, 7.1.1, 7.1.2, 7.1.3, 7.2.1), 23. TLT sent another letter to Seating the same day, informing them that there were certain deficiencies in the insurance certificates, all of which were required by the terms of the contracts as endorsed by Seating and unrelated to prior negotiations between the Parties regarding rates. Facts, ¶ 39, 39a; Exs. 15, 15A (Reading General Conditions §§ 5.3.1, 11.1.1, 11.1.2, 11.1.3), 16, 16A (Wachusett General Conditions §§ 5.3.1, 11.1.1, 11.1.2, 11.1.3), 24; Affidavit of Kostinden, ¶ 10. Specifically, Seating failed to list TLT, the owners and architects as additional insureds, to include a hold-harmless agreement, to include the Project names, and to verify coverage in Massachusetts. Facts, ¶ 39; Exs. 20, 24. TLT was also concerned that the certificates were in the name of Outdoor Aluminum, not Seating. Facts, ¶ 39a; Affidavit of Kostinden, ¶ 11-12.

### 5. Seating refuses to perform the contract work as agreed.

On August 30, 2004, Seating contacted TLT and stated that it was withdrawing all quotes and proposals that it had provided up to that date. Facts, ¶ 40; Ex. 25. On September 7, 2004, TLT's counsel sent Seating a letter stating that refusal to proceed would be actionable.[4] Facts, ¶ 41; Ex. 26. Ligator responded to TLT's counsel on September 14, 2004 stating that Seating would proceed under its "pre-bid" quotes, which were significantly higher than the prices listed on the contracts as previously agreed to. Facts, ¶ 42; Ex. 27. Subsequently, Seating continued its efforts to alter the terms and prices of the contracts that it had signed, with TLT attempting to enforce the already signed contracts as agreed. Facts, ¶¶ 44-56; Exs. 28-38. Seating's final offer

---

[4] This letter reflects the mistaken impression at the time of TLT's counsel that all quotes had been submitted prior to bidding by TLT, but accurately reflects TLT's insistence that their contract had been breached. See Ex. 26.

was to perform the work at a price of $580,000, which they said was "the best pricing" that TLT would get for the work. Facts, ¶ 56a; Ex. 39. TLT was ultimately forced to contract with the Gallivan Company, Inc. to perform the scope of the work that Seating had previously agreed to perform, paying $514,160 for both Projects. Facts, ¶ 57, Exs. 40, 41. Seating's breach of the signed contracts resulted in damages to TLT of $34,160. *See* Facts, ¶ 28, 57; Exs. 15, 16, 40, 41.

**B.     Procedural History**

On December 28, 2004, TLT filed this action in the District Court of Malden, Middlesex County, Massachusetts, claiming damages of $250,000.[5] Complaint, Statement of Damages. Seating filed a notice of removal with this Court on February 3, 2005. Notice of Removal. The parties agreed to refer the case to a magistrate on April 7, 2005, and the case was so referred on April 15, 2005. Seating filed its motion for summary judgment, proposed joint statement of material facts, and memorandum in support of motion for summary judgment on July 1, 2005. Defendant's Motion for Summary Judgment, Proposed Joint Statement of Material Facts, Memorandum in Support of Defendant's Motion for Summary Judgment (hereinafter "Defendant's Memorandum").

### III.     DISCUSSION

**A.     Seating entered into contracts with TLT in July 2004, but subsequently failed to follow the terms of the contracts, and ultimately refused to perform.**

As a preliminary matter, TLT recognizes that this case is not covered by the principles set out in *Loranger Constr. Co. v. E.F. Hauserman Co.*, 376 Mass. 757 (1978), which holds that a subcontractor is liable for the damages that may be incurred by a general contractor due to the general contractor's reliance on quotes provided by the subcontractor prior to submittal of a general bid on a project. *Loranger*, 376 Mass. at 760-61. Here, TLT was not damaged by

---

[5] TLT estimated its original claim of $250,000 for damages based on a preliminary search for replacement contractors before contracting with Gallivan Co. to perform the work.

reliance on Seating's pre-bid quotes, but by reliance on the contracts that Seating signed on or about July 5, 2004. Exs. 1, 15 & 16.

It is widely held that to create an enforceable contract, "there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 (2000); *McCarthy v. Tobin*, 429 Mass. 84, 87 (1999); *Rosenfield v. United States Trust Co.*, 290 Mass. 210, 216 (1935). The controlling consideration involved is whether the parties intended to be bound by the terms of the contract. *McCarthy*, 429 Mass. at 87; *Situation Mgmt. Sys.*, 430 Mass. at 878. When a party signs a contract, they are indicating their intention to be bound to the terms of the contract. *See McCarthy*, 429 Mass. at 88. A few non-material terms left for further negotiation and specification will not prevent the enforceability of an executed contract. *McCarthy*, 429 Mass. at 87; *Lafayette Place Assocs. v. Boston Redevelopment Auth.*, 427 Mass. 509, 518 (1998) ("If parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding"); *Situation Mgmt. Sys.*, 430 Mass. at 878 ("It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract").

Seating and TLT entered into a contractual relationship whereby Seating agreed to provide and install aluminum bleachers on the Projects at Reading and Wachusett at a price of $480,000.00, when Seating signed the contracts in July of 2004. Facts, ¶ 28; Exs. 15, 16. *McCarthy*, 429 Mass. at 88. The contracts provided for Seating "to be bound to [TLT] by the terms of the Agreement, General Conditions, Drawings, Specifications, Alternates and Addenda, and to assume to [TLT] all the obligations and responsibilities that [TLT], by those documents,

assumes toward the Owner[s]." Exs. 15, 16 (Reading and Wachusett Contracts, Article 4(1)). The contracts also provided for TLT "to be bound to [Seating] by all the obligations that the Owner[s] assumes to [TLT] under the Agreement, General Conditions, Drawings, Specifications, Alternates, and Addenda, and by all the provisions thereof affording remedies and redress to [TLT] from the Owner[s]. Exs. 15, 16 (Reading and Wachusett Contracts, Article 4(18)). By virtue of the language, "the provisions of the contract between [the General Contractor] and the town [are] incorporated into the subcontract." *Mass. Elec. Sys., Inc. v. R.W. Granger & Sons, Inc.*, 32 Mass.App.Ct. 982 (1992). Therefore, in signing the contracts, Seating bound itself to TLT under the terms of the General Conditions. *See Mass. Elec. Sys.*, 32 Mass.App.Ct. at 982; *McCarthy*, 429 Mass. at 88.

Under the terms of those agreements, Seating would provide insurance at its own rates, and supply certificates according to the terms of the General Conditions of the Projects and according to the documents attached to the contracts. Exs. 15, 15A (Reading General Conditions §§ 5.3.1, 11.1.1, 11.1.2, 11.1.3), 16, 16A (Wachusett General Conditions §§ 5.3.1, 11.1.1, 11.1.2, 11.1.3). Further, Seating removed the requirements for union labor from the contracts, and TLT agreed with this change. Facts, ¶¶ 28, 30a; Exs. 15, 16; Affidavit of Kostinden, ¶ 6. Seating also removed bonding provisions, and agreed to provide bonding through Outdoor Aluminum and to bill TLT for the cost as an extra to the contracts. Facts, ¶¶ 30, 35, 35a; Exs. 16B, 20; Affidavit of Kostinden, ¶¶ 7, 13.

Following this agreement, Seating failed to supply proper certificates of insurance according to the contract documents, and indeed failed to provide any certificates of insurance in their own name at all, in breach of the contracts. Facts, ¶¶ 25, 35, 39, 39a; Exs. 15, 15A, 16, 16A, 18, 20, 24; Affidavit of Kostinden, ¶¶ 10-12. Seeking to coerce TLT into paying more money for

the base contract work, Seating repeatedly attempted to renege on the terms of the contracts as agreed, raising issues such as union labor, which is not disputed and was never an issue, and bonding, which was an extra to the contracts that Seating itself acknowledged on several occasions was "not an issue," and in any event was not a disputed material term that would prevent formation of the contracts. See *McCarthy*, 429 Mass. at 87; *Lafayette Place Assocs.*, 427 Mass at 518; Facts, ¶¶ 24, 30, 30a, 35, 35a; Exs. 12, 16B; Affidavit of Kostinden, ¶¶ 6, 7, 13.

In marking up the May 21, 2004 contracts, Seating eliminated provisions requiring the use of union carpenters and apprentices, noting that Seating would provide their own labor and pay prevailing wage rates. Facts, ¶ 28; Exs. 15, 16. In the subsequent months, as Seating attempted to void the contracts to which it had agreed, Seating repeatedly raised this issue, noting that there would be a substantial price increase if they were required to provide union labor, and that TLT would be responsible for this increase. Facts, ¶ 30; Ex. 16B. However, TLT was not requiring that Seating use union labor. Facts, ¶ 30a; Affidavit of Kostinden, ¶ 6. This was not an issue for TLT, as they had already waived any union labor requirements, and was manufactured by Seating as a pretext for non-performance. *See id.*

Further, assuming, arguendo, that TLT did insist that Seating use union labor, it still would not preclude enforcement of the contracts as written, as the Parties had provided for such a situation. *See Lafayette Place Assocs.* at 517-18; Facts, ¶¶ 30, 47; Exs. 16B, 31. Seating delivered to TLT quotes of the costs associated with procuring such labor, and informed TLT that they would be responsible for the cost increases in this contingency. *See id.* Had this contingency been raised, Seating could have followed the change-order procedures as provided for in the contracts and laid out in the Projects' specifications, and submitted the price increases for compensation. Exs. 15A (Reading General Conditions §§ 3.2.1, 4.3.7, 5.3.1, 7.1.1, 7.2.1),

16A (Wachusett General Conditions §§ 4.4.1, 5.3.1, 7.2.1, 7.2.2.2). Article 3 of the Reading General Conditions states that "any necessary change shall be ordered as provided in Article 7," which states that "changes in the work may be accomplished after execution of the contract, and without invalidating the contract, by change order." Ex. 15A (Reading General Conditions §§ 3.2.1, 7.1.1). However, Seating never sought to avail itself of these provisions. Facts, ¶ 34b; Affidavit of Kostinden, ¶ 21.

Seating also argues that there were unresolved issues with regard to bonding, and that this prevented the two sides from reaching an agreement. Defendant's Memorandum, pp. 11-12. In general, when TLT requires that its subcontractors provide performance and payment bonds, it does so as an extra to contracts. Affidavit of Kostinden, ¶¶ 7, 13. In this case, while there were some negotiations before the contracts were signed, the Parties agreed that TLT would pay for bonding provided by Seating, and Seating stated, after signing the contracts, that they "will bond this and pass the cost along to [TLT] as an add-on to the contract," later confirming that "bonding is not an issue." Facts, ¶¶ 30, 35; Exs. 16B, 20. The Parties had agreed upon how this extra would be handled, which should suffice to reject Seating's argument that bonding prevented the Parties from reaching an agreement. *See id.*; Affidavit of Kostinden, ¶ 13; Defendant's Memorandum, pp. 11-12.

In the aftermath of the July 5 contract, the issue of insurance was raised on several occasions by TLT, but the issues did not involve further negotiations. Facts, ¶¶ 35, 39, 39A; Exs. 24, Affidavit of Kostinden, ¶¶ 10-12. Rather, the issues involved Seating's failure to comply with the agreements that the Parties had reached with regard to insurance. *See id.* Seating agreed to provide insurance at its own rates, and informed TLT that if higher rates were required for the Projects, TLT would be responsible for paying the additional costs. Facts, ¶ 26; Ex. 13. TLT was

aware of this, and informed Seating before Seating signed the contracts that this was "not a problem." Facts, ¶ 27; Ex. 14.

Seating agreed to provide insurance certificates at its own rates, but repeatedly failed to provide adequate certificates to TLT. Facts, ¶¶ 26, 28, 28a, 33, 35, 39, 39a; Exs. 13, 15, 15A, 16, 16A, 18, 20, 24. The certificates provided by Seating were in the name of Outdoor Aluminum, even though the contracts were signed by Seating.[6] Facts, ¶¶ 28, 35, 39a; Exs. 15, 16, 20. Additionally, Seating failed to follow procedures required by the contract documents, such as naming TLT, the owners and architects as additional insureds, including standard hold-harmless agreements, identifying the Projects on the certificates, and providing proof of insurance coverage in Massachusetts. Facts, ¶¶ 28, 28a, 35, 39, 39a; Exs. 15, 15A, 16, 16A, 20, 24. The Parties had agreed upon all of these items, and Seating's failure to provide proper certification was not a stall in negotiations, but rather a breach of the contracts. *See* M.G.L. c. 149 § 34A ("Failure to provide and continue in force such insurance as aforesaid shall be deemed a material breach of the contract"); Facts, ¶¶ 26, 27, 28, 28a, 35, 39, 39a; Exs. 13, 14, 15, 15A, 16, 16A, 20, 24.

Before signing the contracts, Seating marked up significant portions, and crossed out attached documents regarding the performance bonds, but did not cross out the documents regarding insurance certification. Facts, ¶ 28; Exs. 15, 16. Included on the second page of the insurance documents for both Projects is a list of required elements for insurance certification, such as the inclusion of TLT, owners and architects as additional insureds, the listing of Project descriptions, and the provision of a standard hold harmless clause. Exs. 15, 16. Further, the General Conditions required Seating to purchase and maintain insurance from "a company or

---

[6] There is evidence to support the idea that Seating was attempting to void the prior contract in order to remove their name from the record altogether. In an August letter, Seating asked TLT to make out new contracts directly to Outdoor Aluminum, rather than to Seating. Ex. 19.

13

companies lawfully authorized to do business in the jurisdiction in which the Project is located." Ex. 15A (Reading General Conditions § 11.1.1); Ex. 16A (Wachusett General Conditions § 11.1.1 – "the Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the Commonwealth of Massachusetts… insurance"). Reading's General Conditions also required that "the Owner shall be added as Additional Insured on all policies." Ex. 15A (Reading General Conditions § 11.1.2); Ex. 16A (Wachusett General Conditions § 11.1.2.d(iii) – "The Owner, Project Manager, and Architect shall be named as additional insureds and as loss payee on all policies"). The General Conditions of both Projects further required that "certificates [of insurance] shall set forth evidence of all coverage required by 11.1.1 and 11.1.2." Exs. 15A (Reading General Conditions § 11.1.3), 16A (Wachusett General Conditions § 11.1.3). Seating's failure to meet these insurance certification requirements was not a part of contractual negotiations, but rather a breach of the contractual terms. *See* M.G.L. c. 149 § 34A; Exs. 15, 15A, 16, 16A.

After the Parties had agreed upon contract terms, Seating attempted to increase the contract price on several occasions, first stating on August 13, 2004, that due to an anticipation that the architect will insist on an I-beam for the Reading Project, Seating would have to increase its price by $19,236.00. Facts, ¶ 34; Ex. 19. However, Seating knew about the requirement of an I-beam as far back as April 5, 2004, when it submitted its first quote. Facts, ¶ 10; Ex. 1 ("Both options are I-beams"); Affidavit of Kostinden, ¶ 16-17. Seating also mentioned the use of a "permanent beam grandstand" in their quote of $480,000 on May 17, 2004. Ex. 4. Seating subsequently argued that "the specifications were vague and contradictory at times," and they were unaware that an I-beam would be required. Facts, ¶ 37; Ex. 22. This argument is belied by

Seating's original proposal, where Seating stated that it was "positive" that it knew "exactly what the architect is looking for." Ex. 1.

If Seating was unaware of the requirement of an I-beam due to "vague and contradictory" Project specifications, Reading's General Conditions required Seating to "carefully study and compare the Contract documents with each other and… at once report to the Architect [or TLT] any error, inconsistency, or omission… [and] any necessary change shall be ordered as provided in Article 7," which required Seating to submit a change order. Ex. 15A (Reading General Conditions § 3.2.1, see § 5.3.1 – subcontractor "to assume toward the Contractor all the obligations and responsibilities which the Contractor, by these documents, assumes toward the Owner and Architect); Ex. 22. "The test for resolving disputes of this kind is the degree of obviousness of the omission, error, or discrepancy in the specifications." *John F. Miller Co., Inc. v. George Fichera Constr. Corp.*, 7 Mass.App.Ct. 494, 498 (1979). If the inconsistency was subtle, and Seating might have missed it despite examining "the specifications reasonably conscientiously, …the burden of the error falls on the issuer of the specifications…or the person relying on them." *Miller*, 7 Mass.App.Ct. at 498. However, if the discrepancy or inconsistency is obvious, then Seating should have "at least ask[ed] for clarification." *Id.* at 499. Even if the specifications concerning the I-beam presented an ambiguity, it is clear that Seating had knowledge of the issue well before it executed the contract documents (Ex. 1), and therefore had a duty to inquire and "ask for clarification" before executing the contract. *See Miller*, 7 Mass.App.Ct. at 499.

If the specifications called for the use of an I-beam, Seating knew, should have known, or at the very least, should have asked for clarification. *See Miller*, 7 Mass.App.Ct. at 499; Exs. 1, 4, 15A (Reading General Conditions §§ 3.2.1, 5.3.1). If Seating did not feel that the specification

clearly called for an I-beam, and it was nonetheless required to use one, it should have submitted a change order for the extra work. Ex. 15A (Reading General Conditions §§ 7.1.1, 7.1.2, 7.1.3, 7.2.1). As a practical matter, if the specification did not call for the use of an I-beam, then it is elementary that Seating simply did not have to provide one for free and Seating cannot use something that it is not bound to provide as a pretext to force monetary concessions and otherwise breach its contractual obligations.

Further, assuming that this or any other change had to be made, Seating did not avail itself of the General Conditions that apply to changes in the work. *See* Ex. 15A (Reading General Conditions, § 4.3.4). The Conditions specifically state that "pending final resolution of a Claim, unless otherwise agreed in writing the Contractor shall proceed diligently with performance of the Contract." *Id.* If Seating had any objections to any aspect of its contract work, it was nonetheless required to continue its work without delaying the project. *See id.* However, Seating failed to follow the contractually-required methods established for dealing with changes in the work. *See id.;* Facts, ¶ 34b; Affidavit of Kostinden, ¶ 16.

Seating further argues that "TLT did not execute [the] contracts" signed by Seating because TLT did not sign the contracts upon receipt. Defendant's Memorandum, p. 12. However, the formation of the contracts required only the meeting of contractual terms and the intent of the parties to be bound by those terms. *See, e.g., McCarthy*, 429 Mass. at 87; *Situation Mgmt. Sys.*, 430 Mass. at 878. Each party was not required to sign the contracts, as they do not fall within the realm of the Statute of Frauds. M.G.L. c. 259 § 1. Furthermore, TLT's conduct after execution of the contract and present suit indicate its acceptance of the contracts, and Seating, the party to be charged here, did in fact sign the contracts. *See McCarthy*, 429 Mass. at 87-88; Facts, ¶ 28; Exs. 15, 16.

**B.     Seating's actions amount to unfair and deceptive conduct, as they continually delayed the Projects in an effort to coerce TLT into paying a higher price for the services promised.**

"Under §§ 2 and 11 of Chapter 93A, it is unlawful for those engaged in trade or commerce to employ 'unfair methods of competition and unfair or deceptive acts or practices' in business transactions with others engaged in trade or commerce." *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47 (1st Cir. (Mass.) 1998); M.G.L. c. 93A §§ 2, 11. Massachusetts courts have held that "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474 (1991), *quoting Wang Laboratories, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 857 (1986). Furthermore, courts have found that a Chapter 93A violation exists when a party uses a breach of contract "to force [another party] to do what otherwise [the other party] would not be legally required to do." *Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. (Mass.) 1985). While a breach of contract, on its own, does not violate Chapter 93A, there is a violation when the breaching party does so in order to extort more favorable concessions, contrary to contractual requirements. *E.g., Pepsi-Cola Metro.*, 754 F.2d at 17-19; *Anthony's Pier Four*, 411 Mass. at 474; *Arthur D. Little*, 147 F.3d at 54-55.

Seating argues that their actions did not amount to unfair and deceptive conduct because there were no contracts, but Seating agreed to contractual terms, and signed the contracts, accepting and binding itself to the terms as written and marked up on the contracts. Facts, ¶ 28; Exs. 15, 16. After signing the contracts, Seating, through its agent Mr. Ligator, attempted to extort further monetary concessions from TLT as it delayed performance of its contractual duties. Facts, ¶¶ 34, 37, 40, 42, 44, 46, 50, 52, 55; Exs. 19, 22, 25, 27, 28, 30, 33, 35, 37.

17

Through these delays, Seating put TLT, under a time constraint to complete its work under general contracts with the towns of Reading and Holden, into a more difficult and weaker position and Seating preyed on this opportunity to leverage TLT and wrongfully attempt to extract a higher price than agreed. Affidavit of Kostinden, ¶ 22; see, e.g., *Pepsi-Cola*, 754 F.2d at 17-19.

Seating's own words point to the games that they were playing on this contract, as it first approached TLT with promises that they were well aware of the requirements and specifications on the Reading Project, and that they were offering the best possible price for completion of the Reading Project:

> We are Seating Solutions, a company that specializes in the design, sales, and installation of quality seating systems and press boxes. **We have worked very closely with this architect, and have helped them design this bleacher from the very first steps. We understand that the specifications may be a bit confusing, but we are positive that we know exactly what the architect is looking for.** We cannot stress enough how important it is to have a good knowledgeable relationship with the architect to ensure that the job is done correctly. We will coordinate with the successful low bidder to marry the bleachers to the pressbox building seamlessly. Please remember that **Seating Solutions will not be undersold on a comparable product.** We will strive to make your job as easy as possible while exceeding all of yours and the architects expectations. We have two decades of experience in this industry and know what it takes to get the job done. **Do not be mislead by other companies who are not familiar with this project, we know how to complete this project in the most cost efficient manner.** There are two different options on this quotation. One is a semi-closed system which meets all 4" criteria but still allows for garbage and other debris to pass through. Option two is a fully closed system which allows for no object to fall through and makes the bleacher completely safe. **Both options are I-beams which allow for a large under stand storage area, or walk through.** Ex. 1 (emphasis added).

Seating presented itself as having intimate knowledge of the requirements and specifications, but later stated that they would have to increase their price by $19, 236.00 in order to provide for I-beams. Exs. 1, 19. Looking at the two documents, it is apparent that Seating was aware of the requirement for the I-beam, and there is no explanation for the requested price increase other

18

than the fact that Seating was looking to extort more money out of TLT for the work it agreed upon, once Seating thought it had TLT "over the barrel" given the time constraints of the Projects. *See* Exs. 1, 19; Affidavit of Kostinden, ¶ 22.

In addition to the I-beam situation, Seating delayed with a wide variety of tactics. Facts, ¶¶ 30, 35, 39a, 40, 44, 46, 50, 56a; Exs. 16B, 19, 20, 25, 28, 30, 33, 39. Seating attempted to have TLT make out new contracts directly with a third party factory, Outdoor Aluminum and submitted all bonding and insurance certificates in the name of Outdoor Aluminum. Facts, ¶¶ 30, 35, 39a; Exs. 16B, 19, 20; Affidavit of Kostinden, ¶ 10. After Seating failed in its attempt to increase the price because of the I-beam requirement, it withdrew all of its "quotes and proposals," subsequently raised their price by $8,043, and refused to provide any explanation for the price increase. Facts, ¶¶ 40, 44, 46; Exs. 25, 28, 30. Seating also attempted to alter the terms of payment and require TLT to pay Seating a 50% deposit with balance up to $450,000 due on delivery. Facts, ¶ 50, Ex. 33. Ultimately, Seating told TLT that TLT would be unable to get the work done for any price less than $580,000. Facts, ¶ 56a, Ex. 39. Accordingly, TLT was forced to obtain a new subcontractor to perform Seating's work at a substantial premium over the $480,000.00 at which Seating had originally agreed to perform, but at a price less than what Seating was demanding as a condition precedent to honoring the contracts as executed. Facts, ¶¶ 28, 56a, 57; Exs. 15, 16, 39, 40, 41.

These repeated attempts on the part of Seating to delay performance of the contract work and to increase the contract price show that they were using the delays as leverage in order to extort further concessions on the part of TLT. *See, e.g., Pepsi-Cola Metro.*, 754 F.2d at 17-19; *Anthony's Pier Four*, 411 Mass. at 474; *Arthur D. Little*, 147 F.3d at 54-55. After signing contracts and forcing TLT to rely on Seating's ability to perform the contract work in a timely

and satisfactory manner, Seating ventured in bad faith to force better terms, in clear violation of Chapter 93A's prohibition against parties engaging in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade and commerce." M.G.L. c. 93A § 2.

## IV.   CONCLUSION

Wherefore, Plaintiff, TLT Construction Corp., respectfully requests that the Court deny Defendant's motion for summary judgment and grant Plaintiff's motion for summary judgment on Counts I and IV. TLT is entitled to $34,160 in damages for breach of contract, plus multiple damages and legal fees at the discretion of the court per the mandate of M.G.L. c. 93A.

Dated: 7\22\5

TLT CONSTRUCTION CORP.,
By its Attorneys,

Patrick J. Sullivan, Esq., BBO# 548752
James G. Grillo, Esq., BBO# 638730
HEAFITZ & SULLIVAN
56 Chestnut Hill Avenue
Boston, MA 02135
(617) 562-1000