UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| TLT CONSTRUCTION CORP., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 05-10223-LTS |
| SEATING SOLUTIONS RI, INC., | ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S
<u>CROSS MOTION</u>**

RI, Inc., d/b/a Seating Solutions ("Seating Solutions" or "Seating") and TLT Construction Corporation ("TLT" or "Plaintiff") never reached a binding agreement. That there was no meeting of the minds is due largely to TLT's insistence upon terms that Seating had not included in its offer. From TLT's perspective, of course, it had nothing to lose. Relying incorrectly upon the reliance doctrine set forth in *Loranger Constr. Co. v. E.F. Hauserman Co.*, 376 Mass 757, 384 N.E.2d 176 (1978), TLT believed that Seating Solutions was bound by the pricing terms in two nonexistent pre-bid quotes. So TLT assumed that it could force Seating to agree to new contract terms without paying a higher price for Seating's services and acted as if it had no obligation to adhere to the firm pricing timetable that Seating established in its offer document. What, in the end, was the worst that could happen? If Seating refused to agree to the new contract provisions or required compliance with the offer deadlines, TLT could simply hire someone else to work on the projects and sue Seating for any price difference. Unsurprisingly, litigation has ensued.

Seating Solutions submits this short reply memorandum in support of its motion for

summary judgment and in opposition to TLT's cross motion.[1]  TLT's summary judgment papers reveal a scramble to make up for the fact that the principal legal theory upon which it based its case has collapsed.  TLT's Memorandum of Law ("Pl. Memo.") and the papers that support it are peppered with facts having no bearing on the resolution of Seating's motion or the cross motion.  It cites inapposite cases.  And it ignores the fundamental principal governing this case:  "When parties contemplate the execution of a final written agreement, a strong inference is made that they do not intend to be bound by earlier negotiations or agreements until the final terms are settled."  *Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404, 415 (D. Mass. 1995).  Summary judgment should enter for Seating Solutions.

**A.    TLT misconstrues applicable law.**

The highlight of TLT's brief is the grudging admission that *Loranger Constr. Co. v. E.F. Hauserman Co.*, 376 Mass 757, 384 N.E.2d 176 (1978) is inapplicable to the facts of this case.  This differs dramatically from TLT's previous statements on this issue.  After Seating Solutions broke off contract negotiations, the plaintiff cited the *Loranger* case and stated that "We have reviewed the bid documents and are of the opinion that they are sufficient to establish binding contractual obligations."  Ex. 26 (September 14, 2004 letter from TLT's counsel to Seating Solutions).  In December, TLT reiterated its view of the facts and law and threatened suit on the *Loranger* theory.  Ex. 34 (December 1, 2004 letter from TLT's counsel to Seating Solutions).  TLT stated that it would "commence civil process . . . should [Seating] have the temerity to remain intransigent . . . ."  *Id.*  As to *Loranger*, TLT stated that "[i]n the event of litigation I suggest becom[ing] 'sufficiently knowledgeable of the law and cases cited in' our letter of September 14, 2004."  *Id.*  TLT now agrees that the bid documents did <u>not</u> establish a contract.  The confidence with which TLT espouses its new theory of liability is reminiscent of the certitude with which it advanced its old theory.  Neither theory, though, has merit.

The caselaw that TLT marshals in support of its new theory of liability does not govern

---

[1] In its order of May 9, 2005, the Court permitted Seating Solutions to file a short reply brief if it wished to do so.

2

this action. In *Situation Management Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 724 N.E.2d 699 (2000), the Court found that the parties had reached a meeting of the minds on essential terms because the parties "had continuously been doing business together for fifteen years [and] the terms of the parties' prior . . . agreements had been substantially the same over the entire course of their business dealings." 430 Mass. at 879, 724 N.E.2d at 703. Seating Solutions and TLT had never done business before and could not agree on, among other things, bonding, insurance, and price terms. Facts, ¶¶ 28, 31, 37, 38, 46; Exs. 16 & 17.[2]

*McCarthy v. Tobin*, 429 Mass. 84, 706 N.E.2d 629 (1999) is also inapposite. In that case, the parties exchanged draft contracts and the plaintiff agreed to sign a draft sent by the defendant's lawyer. *See id.*, 429 Mass. at 86, 706 N.E.2d at 631. The facts here are quite different. Seating Solutions sent a revised contract to TLT that made changes to terms regarding union labor, bonding, insurance, and shop drawings. Facts ¶ 28. TLT never signed these drafts and refused to change the provisions concerning bonding, insurance, and shop drawings, Facts ¶ 29; *compare* Exs. 16 & 17, all the while demanding that Seating Solutions execute contracts that included provisions to which it had never agreed.

As noted previously, TLT's insistence upon signed contracts confirms that the parties' negotiations had not ripened into binding agreements. *See Gel Sys. Inc. v. Hyundai Eng'g & Constr. Co., Inc.*, 902 F.2d 1024, 1027 (1st Cir. 1990); *Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404, 415 (D. Mass. 1995); *Tull v. Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 630, 389 N.E.2d 447, 450 (1979). TLT never addresses the absence of a contract

---

[2] As predicted, TLT has misconstrued *Lafayette Pl. Assocs. v. Boston Redevelopment Auth.*, 427 Mass. 509, 517, 694 N.E.2d 820, 826 (1998), *cert. denied*, 427 Mass. 509 (1999), in two ways. First, TLT posits that because the parties had "provided for such a situation," Pl. Memo. at 11, Seating's refusal to employ union labor was not a deal-breaker. Unlike the parties in the Lafayette case, however, Seating and TLT had never agreed on a formula that would account for the increased cost of using union carpenters. *See id.*, 427 Mass. at 516, 694 N.E.2d at 825. Seating informed TLT that union labor would cost more money. Facts, ¶ 30. TLT never agreed to pay the increased sum. Second, TLT's statement that Seating Solutions could have dealt with increased labor costs via the change order process, Pl. Memo. at 11, incorrectly presupposes that the parties had reached a contract in the first place. They had not.

executed by both of the parties in this case.  Instead TLT cryptically states that "the formation of the contracts required only the meeting of contractual terms and the intent of the parties to be bound by those terms."  Pl. Memo at 16.  This concession is telling.  Retreating to the abstract concept of a meeting of the minds is quite a contrast from TLT's vigorous insistence that "you need to get the contracts signed and returned . . . .  Get the paperwork back to me no later than 12-23-04."  Ex. 37 (emphasis supplied).  Seating Solutions did not sign the drafts, which, as a matter of law, prevented contracts from coming into existence.

TLT's Chapter 93A claim is without merit precisely because there was not a contractual obligation in this case – known or otherwise.  The three cases that TLT cites in support of its Chapter 93A claim all involved parties that had entered into contracts.  *See Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 50 (1st Cir. 1998) ("In June of 1989, [plaintiff] and [defendant] entered into the first in a series of agreements."); *Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 12 (1st Cir. 1985) ("From its inception, [defendant] was . . . a customer of [plaintiff's.]"); *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 453, 583 N.E.2d 806, 810 (1991) ("This case arises from two agreements (agreements), dated August 1, 1983, between [the plaintiff] and [the defendant] . . . .").  Seating and TLT, in contrast, never finalized their agreement as is noted at length elsewhere.  Were the Court to the determine that there was a contract, moreover, TLT has not presented sufficient evidence to lead the Court to conclude as a matter of law that Seating Solutions knowingly acted in disregard of supposed obligations.  All of Seating's conduct, and the documents depicting that conduct, reveal that Seating did not believe that it had entered into a contractual relationship with TLT.

TLT, finally, misunderstands the role of affidavits in the context of a summary judgment motion.  Rule 56 states that affidavits can demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[A]ffidavits may not be employed to resolve disputed factual issues. They may be used only to determine whether any issues actually are in dispute."  WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2738 (2005).  In his affidavit, Thomas Kostinden makes a number

of categorical statements based on his conclusion that Seating and TLT had reached an agreement.  *See* Affidavit of Thomas Kostinden ("Kostinden Aff."), ¶¶ 9, 10, 12, 13, 14, 15, 17, 18 & 19.  The Court's task is to determine whether TLT's negotiations with Seating Solutions resulted in binding contractual obligations.  Mr. Kostinden's statements presuming the parties did have a contract are of little use in this context.  Mr. Kostinden's unsupported allegations that Seating Solutions "stalled" and "repeatedly attempted to increase the price and change the terms", Kostinden Aff., ¶¶ 15 & 18, are also immaterial.  TLT's problem with Seating Solutions appears to be that it sought, through contract negotiations, to protect its business interests.  Its cross motion lacks merit.  Summary judgment should enter for Seating Solutions.

**B.     TLT ignores and misconstrues material facts and documentary evidence.**

TLT's opposition and cross motion are plagued by repeated attempts to divert the Court from attending to material facts.  TLT prefers, instead, to weave immaterial and disputed facts into a web of questionable inferences and unlikely conclusions.  Its principal rationale, that it relied upon a pre-bid price quotation from Seating Solutions, is in tatters.  TLT therefore grasps for any potentially promising factual shreds in the hope that it will survive Seating's motion for summary judgment.  The new arguments upon which TLT has settled are without merit and do not defeat summary judgment.

From the outset, TLT has decided against a cooperative and conciliatory approach and chosen instead to pressure Seating Solutions into adopting unnegotiated and unfair contract terms.  TLT had at least three clear opportunities to finalize a contract with Seating Solutions, but failed to do so each time:

- **Not sending AIA contracts.**  In April of 2004, Seating Solutions stated that it could hold its pricing terms for two weeks while TLT prepared a standard AIA contract.  Seating's Proposed Joint Statement of Material Facts ("Facts"), ¶¶ 15 & 17; Exs. 4 & 6.  TLT did not send Seating Solutions standard AIA contracts, Facts at ¶ 20, electing instead to send contracts including unfair terms to which Seating Solutions had never agreed.  Facts, ¶¶ 19, 28.

- **Not signing the executed contracts.**  In July of 2004, Seating Solutions returned signed contracts to TLT, redacting provisions that had not been negotiated.  Facts, ¶ 28.  TLT could have finalized a contract with Seating by

5

>   signing these marked-up copies. For reasons that remain unclear, TLT did not do so. Facts, ¶ 29.
>
> - **Not sending "clean" contracts.** Later in July, Seating Solutions requested that TLT send "clean" contracts – meaning contracts that removed the portions that it redacted in the executed documents that it sent to TLT. Plaintiff's Response to Proposed Joint Statement of Material Facts ("Pl. Facts"), ¶ 31, Ex. 16B. TLT did not send "clean" contracts. It only deleted provisions relating to union labor, but continued to insist upon provisions regarding bonding, insurance, and shop drawings. *Compare* Exs. 16 & 17.

TLT nonetheless foists all blame upon Seating Solutions, claiming that it attempted "to delay performance of the contract work and to increase the contract price show[ing] that they were using delays as leverage in order to extort further concessions from TLT." Pl. Memo. at 19. Though its own actions prevented the consummation of an agreement, furthermore, TLT states on at least <u>ten</u> different occasions in its memorandum of law that Seating Solutions breached the purported contract. *See* Pl. Memo at 1, 5, 7, 9, 10, 11, 12 & 17. Seating could not breach a contract that did not exist.[3]

Nor was it Seating's obligation to preserve the terms of the offer that it made to TLT in May of 2004. Seating made it clear that the contract price proposed to TLT was contingent upon the execution of a standard AIA contract within two weeks from May 17, 2004. Facts ¶¶ 15, 17. Instead of sending an AIA contract, however, TLT sent a contract that it had drafted and included new terms that had not been the subject of negotiation. Facts, ¶¶ 20 & 28. TLT tried to have it both ways: it attempted to bind Seating Solutions to the price terms of its offer, ignored other portions of the offer, and attempted to browbeat Seating Solutions into agreeing to entirely new terms. A telling example of this tactic is TLT's demand that Seating Solutions use union labor on the Reading Project. Facts ¶ 28, 30. TLT nonetheless claims that it was "not requesting that Seating use union labor," Pl. Memo at 5, and that the use of "union labor . . . was never an issue." Pl. Memo at 11. Union labor most assuredly <u>was</u> an issue. TLT made it an issue when it included this term, which it had never bargained for, in the draft contract it sent to Seating

---

[3] The contentions that (i) Seating "breached" the insurance provisions of the contract, Pl. Memo at 10, 12 – 13; and (ii) that "Seating failed to follow the contractually-required methods established for dealing with changes in the work" are thus to no avail. Both presume the existence of a contract.

Solutions.

TLT's claim that it relied upon the signed contracts that Seating Solutions returned in early July of 2004, *see* Pl. Memo at 9, is belied by the record. Quite the contrary: TLT continued to negotiate a favorable deal. Rather than signing the contracts, TLT returned new contracts that did not incorporate Seating's requested alterations. Facts and ¶ 29; Compare Exs. 16 & 17. TLT demanded that Seating execute these purportedly "clean" contracts on at least five separate occasions. Facts ¶¶ 33, 41, 51, 53 & 54. For this reason, the suggestion that "TLT's conduct after execution of the contract and present suit indicate its acceptance of the contracts," Pl. Memo at 16, is without merit. Indeed, TLT quietly admits in its brief that it did not assent to the removal of bonding provisions from the contracts. As it states "Seating removed the requirement for union labor from the contracts, and TLT agreed with this change." Pl. Memo at 10. The brief continues: "Seating also removed bonding provisions . . . ." *Id*. Conspicuously absent is a statement that TLT had agreed to the change the bonding terms as Seating requested; this is because TLT had not agreed to Seating's terms but decided nonetheless to insist that Seating execute contracts including terms to which it had not agreed.[4] Refusing to make requested term changes and attempting to force Seating to sign contracts without those changes does not evidence acceptance; it evidences continued negotiation.[5]

TLT's deal strategy was transparent: it was free to keep haggling over deal provisions, but Seating Solutions was not. Negotiations in this climate were obviously unsuccessful. Seating decided not to sign the contracts and, ultimately, not to do business with TLT on the

---

[4] TLT's claim that it had agreed to Seating's bonding terms, Pl. Memo. at 5 & Affidavit of Thomas Kostinden at ¶ 13, conflicts with clear documentary and should be disregarded.

[5] TLT's claims regarding the open terms demonstrate that its own motion for summary judgment lacks merit. TLT alleges that Seating "conjured up issues where none existed" and that "the issues . . . concerning union labor, insurance, and bonding are 'red herrings." Pl. Memo at 2. "A few non-material terms left for further negotiation and specification," TLT states, "will not prevent the enforceability of an executed contract."[5] Pl. Memo at 9. It is not clear whether TLT disagrees the bonding, insurance, and pricing terms were essential contract terms. That disagreement could only be resolved by a jury after trial on the merits.

Reading or Wachusett projects. The lack of a contractual relationship between the parties dooms TLT's claims. Seating Solutions respectfully requests that the Court grant its motion for summary judgment.

Dated:   July 28, 2005

                                      RI, INC. d/b/a SEATING SOLUTIONS

                                      By its attorney,

                                      /s/          Terry Klein
                                    THE LAW OFFICE OF TERRY KLEIN
                                    Terry Klein, BBO# 652052
                                    1558 Dorchester Avenue, Ste. 202
                                    Dorchester, Massachusetts  02122
                                    Telephone: (617) 825-8175
                                    Facsimile: (617) 507-6454

### CERTIFICATE OF SERVICE

     I hereby certify that a true copy of the above document was served upon the attorneys of record for each other party by first class mail on July 28, 2005.

                                      /s/          Terry Klein