UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ | |
| TLT CONSTRUCTION CORP.,   ) | |
|     Plaintiff,          ) | |
|                 ) | |
|       v.            ) | CIVIL ACTION |
|                 ) | NO. 05-10223-LTS |
| SEATING SOLUTIONS RI, INC.,   ) | |
|     Defendant.       ) | |
|                 ) | |
| _____) | |

SOROKIN, M. J.

The parties cross-move for summary judgment based upon the undisputed facts before the court. The motions present essentially one question: whether the parties formed a contract binding the defendant to supply bleachers for two projects for which the plaintiff was the general contractor.

I.     **BACKGROUND**

Plaintiff TLT Construction Corporation ("TLT") is a Massachusetts company that performs large-scale construction projects. Proposed Joint Statement of Material Facts ("Facts") ¶ 1.[1] TLT is the general contractor on renovation/ expansion projects for Reading Memorial High School ("the Reading Project") and Wachusett Regional High School in the town of Holden ('the Wachusett Project")(collectively "the Projects"). Defendant Seating Solutions RI, Inc.

_____

[1] Unless otherwise noted, these facts are drawn from the parties' undisputed facts as found in the Joint Statement of Facts, Plaintiff's Response to Proposed Joint Statement of Material Facts ("Plaintiff's Facts"), and Defendant's Response to Plaintiff's Proposed Additional Facts ("Defendant's Facts").

("Seating," the "subcontractor") is a New-York based corporation that "specializes in the sale, rental, and installation of custom-designed spectator seating at athletic and recreational facilities." Facts ¶ 2.

In April of 2004, as TLT was preparing its bid for the Reading Project, Seating submitted a proposal to perform the installation of the bleachers, to TLT and to other contractors bidding on the Reading Project. In its proposal, Seating noted that "[w]e have worked very closely with this architect and have helped them design this bleacher from the very first steps." Ex. 1.[2]  TLT's bid to become the general contractor for the Reading Project was accepted by the Reading School Committee in April of 2004.

On May 10, 2004, TLT asked Seating for a quote encompassing both the Reading and Wachusett Projects, and further asked that the quote be in by May 12, 2004. Facts ¶ 12. On May 12, Seating offered a combined price of $567,678.00 (Ex. 3); TLT replied that the price was too high. On May 17, "in an effort to close the deal," Seating offered a revised quote for $480,000.00 for both projects, "contingent on a letter of intent being received tomorrow [May 18] and an AIA contract being executed by Friday." Ex. 4.

With that price, the parties then negotiated additional terms throughout May 17 via fax and telephone. TLT responded that while "a letter of intent is not an issue," TLT could not have the contracts drafted and executed by Seating's proposed time frame. Ex. 5. Seating agreed to accept a letter of intent, and to allow TLT two weeks to draft and execute a contract; "[a]fter the allotted time, we can no longer hold our price, based on the current aluminum and steel market."

---

[2]  The parties together use the Exhibits filed by Defendant and augmented by Plaintiff. Where appropriate, Plaintiff designated its exhibits which relate to those submitted by Defendant with an "A" or "B; otherwise, the exhibits are in numerical order.

Ex. 6.  TLT immediately responded: "We are pleased to inform you that TLT. . . will be drafting contracts for your execution" for the Wachusett and Reading Projects for an "agreed aggregate amount" of $480,000.00.  Ex. 7.  TLT indicated that the contracts  "should be received at your place of employment within 7-10 business days." Id.

The parties thus had an agreement in principle by May 17, 2004; they then turned to hammering out the details.  On or around May 21, 2004,  TLT sent to Seating a separate standard, form contract for each project, requesting that Seating return them within five days accompanied by certificates of insurance, payment and performance bonds and other documentation. Exs. 9 (the "cover letters"), 15 (the "Reading Contract") & 16 (the "Wachusett Contract")(collectively, "the contracts").  TLT also sent manuals for both Projects along with the contracts, which included detailed specifications for both projects. Exs. 15A (the Reading Project Manual) and 16A (collectively, the "Project Manuals").  The "Agreement, General Conditions, Drawings Specifications, Alternates and Addenda . . . obligations and responsibilities" of the manuals were incorporated into the subcontractor agreements by a provision of each contract. Exs. 15 and 16 at Art. 4.  Additionally, both contracts contained "time is of the essence" clauses. Id., Art. 4 ¶ 14.

On June 4, 2004, TLT wrote to Seating, asking for the return of a signed contract, certificates of insurance and a payment and performance bond for the Reading Project.  Facts ¶ 21.  On June 21, 2004, TLT reiterated this request, noting the urgency of the matter: "[i]t is imperative that you return signed contracts and insurance certificates to this office at once.  The Awarding Authority is holding bid security until these documents are secured." Ex. 11.  That same day, TLT also sent the "final notice" for Seating to submit its  "schedule of values."  Ex.

10.

On June 22, Seating sent copies of its insurance to TLT, writing that TLT "and the owner can be named [on the certificates], which should be acceptable." Ex. 12. These certificates did not comply with TLT's insurance requirements, however, as TLT informed Seating on June 25, 2004. Facts ¶ 25.

Seating also continued the negotiations between the parties on June 22, writing that it needed to "clarify" a few terms before it could sign the contracts. Ex. 12. First, bonding had been the subject of ongoing negotiation between the parties, beginning on May 17 when TLT had sought confirmation that Seating's quote included a bond. Ex. 5. Seating then replied that bonding was not included because Seating would be paid by progress payments, rendering bonding unnecessary. Ex. 6. TLT had refused to exclude bonding altogether, however; instead, on May 17, TLT offered to split the bond and reduce retainage from 10% to 5% of the contract price. Ex. 8. Despite this offer, both contracts required "Payment and Performance Bond[s]" and full retainage. Exs. 15 and 16. On June 22, Seating noted that it thought that the parties had agreed to 10% retainage in lieu of bonding. Ex. 12.

Next, both contracts also required that the "Exclusive use of union carpenters and apprentices [be] included" in the price. Ex. 15, pg.1; Ex. 16, pg. 3. In its June 22 letter, Seating also raised this issue, writing that its price was based upon Seating's prevailing wage rather than union labor wages. Ex. 12. The parties do not seem to have discussed union labor previously, as Seating further noted, "we were never informed that this was a union project," but offered that, "[i]f necessary we can make contact with the local union and advise you of our cost increase." Id.

-4-

Seating also requested a copy of "the complete section referred to in article 2 to ensure our complete knowledge of our scope" in its June 22 letter. Id. Lastly, Seating noted that its quote "specifically excluded any taxes, permits, [and/or] bonds of any extraneous fee." Id. The parties appear to have continued negotiating these issues via correspondence that is not included in the record.[3]

Finally, on June 28, 2004, Seating's Marc Ligator ("Ligator") wrote that he had "a few comments, then I think we can get this thing executed." Ex. 13. In this letter, Ligator agreed to the contracts' insurance terms "except for two points." Ex. 13. First, Seating's insurer would not allow Seating to alter the language of its insurance certificate's cancellation provision; Seating informed TLT that it had called its underwriter to see if it could alter the certificates, if so, under what circumstances, and "if possible," Seating "will comply." Id. TLT accepted this change by writing "no problem" on Ligator's letter. Ex. 14. Secondly, Seating informed TLT that it would have to charge TLT "a higher price if TLT required an umbrella insurance policy." Ex. 13. TLT agreed that Seating could provide insurance at its own rates, again writing "no problem" next to this issue on Ligator's letter. Ex. 14.

Additionally, Seating proposed that it would produce "stamped engineered drawings in 6 weeks from the date we receive our executed contract back. However, the drawings will be done to specifications and drawings you supply," and Seating further noted that any changes after stamping would incur an additional cost. Ex. 13. TLT did not comment on these terms. Id.

---

[3] TLT faxed Seating's June 22 letter back, with its comments on these issues and Seating may have sent an additional fax, though these documents are not in the record. See Ex. 13 (Seating noting receipt of "my letter. . . with notes, which was faxed back to me" and "Regarding my fax, which was marked up with notes").

Seating raised no other issues that might prevent the subcontractor from getting "this thing executed." Id.  Instead, Ligator closed his letter stating, "As there were no additional references to other comments, once I have the final word" on the insurance issues, "do you [TLT] **wish for me to mark up and return the contracts I have, or will you send a new contract to execute?**" Id. (emphasis added).  TLT sent back Seating's letter with the "no problem" notations on it and a "yes" next to the "mark up and return" language, thereby agreeing that Seating should mark, execute and return the contracts with the changes Seating proposed.  Ex. 14.

Then, Seating made 5 changes to the contracts.  TLT had expressly agreed to two of these changes which were described in the June 28th letter. Ex. 14.  First, Seating crossed out the insurance limit language of Art. 4 ¶ 4 and wrote in that "Seating Solutions standard insurance limits to apply to this contract," as the parties had agreed.  Ex. 15 and 16.  Second, Seating added that "shop drawings will be provided within 6 weeks of receiving fully executed contract" to Art. 4 ¶ 8. Ex. 15, 16.

Seating made 3 additional changes to terms that Ligator had not raised in his June 28 letter.  First, Seating excised all bonding terms, crossing out all sections in both contracts relating to bonds and crossing out the bond forms included with each contract.  Ex. 15 and 16.  Second, Seating crossed out the provisions requiring union labor.  Id.  Third, Seating crossed out the requirement that the subcontractor pay for all "permits, [and] fees." Id.  In all other respects, Seating agreed to the terms of TLT's form contracts.  Seating's changes were each initialed by Lisa Saprisa, who then signed the contracts on behalf of Seating on July 5, 2005, and returned them to TLT.  Exs. 15 and 16.

Subsequently, TLT and Seating agreed on bonding terms.  Shortly after Seating signed

the contracts that it had modified to exclude bonding altogether, the parties agreed that TLT would hold 10% of the contract as retainage, which Seating would then bond; Seating would pass along the cost of obtaining bonding to TLT "as an add-on to the contract." Ex. 16B. In its letter spelling out these terms, Seating further noted that, "[w]hen bonding is required we reserve the right, depending on our current bonding capacity at that time to have our factory [Outdoor Aluminum] supply the required bonds," and closed, "If all is acceptable forward new contracts for us to *execute*." Ex. 16B. TLT accepted these terms and Seating acknowledged that the issue was settled in its August 18 letter: "Per our conversation [today], bonding will not be an issue" because Seating's factory, Outdoor Aluminum, "bond[s] many projects fro [sic] us and unless there is something out of the ordinary all will be done." Ex. 20.

The parties also agreed to exclude the union labor requirement. On July 12, Seating reminded TLT that its quoted price did not include union labor and advised TLT that, if Seating had to use union labor instead of paying its own employees at its prevailing wage, there would be a total price increase of $128,350.00. Ex. 16B. This was consistent with Seating's modifications to the contracts; Seating had expressly excluded the cost of union labor from the contract price before signing the contracts. Exs. 15 & 16. The uncontradicted evidence demonstrates that TLT was not requiring that Seating use union labor. Affidavit of Thomas V. Kostinden ("Kostinden Aff.") ¶¶ 5- 7. As for the third change, the parties had no further discussion regarding responsibility for the payment of the permits and fees.

Ultimately, Seating did not provide the bleachers for either of the two projects. TLT argues that once Seating signed the contracts, they were bound to perform and yet refused to,

thereby breaching the contract between the parties.[4]  Seating maintains that the parties never

came to agreement on material terms, and therefore never formed a contract.

## II.    DISCUSSION

Summary judgment should be granted when the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits...show that there is no genuine

issue as to any material fact." Fed. R. Civ. P. 56(c).  "The movant has the 'initial responsibility

of informing the district court of the basis for its motion, and identifying those portions' of the

record showing the absence of a genuine dispute of material fact." Great Northern Ins. Co. v.

Paino Assoc.'s, 364 F. Supp.2d 7, 14 (D. Mass. 2005)(quoting Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986).  Then, the non-moving party must "demonstrate that every essential element of

its claim or defense" remains at issue despite the moving party's showing.  Price v. General

Motors Corp., 931 F. 2d 162, 164 (1st Cir. 1991). The court must "view the record in the light

most favorable to the nonmoving party, and [must] draw all reasonable inferences in the

nonmoving party's favor."  LeBlanc v. Great American Ins. Co., 6 F.3d  836, 841 (1st Cir. 1993).

When, as here, both parties move for summary judgment, the court "evaluate[s] each motion

separately, being careful to draw inferences against each movant in turn."  Griggs-Ryan v. Smith,

904 F.2d 112, 115 (1st Cir. 1990).

**A. The Contract Claim**. It is black letter law that "to create an enforceable contract, there

must be agreement between the parties on material terms of that contract, and the parties must

have a present intent to be bound by that agreement."  Situation Mgmt Sys., Inc. v. Malouf, 430

---

[4]  TLT is not relying upon the theory that it relied, to its detriment, on Seating's pre-bid
quote to calculate its general contracting price.  Plaintiff's Memorandum of Law (Doc. No.15),
pg. 8.

Mass. 875, 703 (2000).  The fact that the parties contemplate the future execution of a formal

contract gives rise to a "'strong inference' that the parties do not intend to be bound until the

formal document is hammered out." <u>Gel Systems Inc. v. Hyundai Engineering & Construction

Co., Inc.</u>, 902 F.2d 1024, 1027 (1st Cir. 1990).  Nonetheless, where "the parties have agreed upon

all material terms, it may be inferred that the purpose of a final document which the parties agree

to execute is to serve as a polished memorandum of an already binding contract."  <u>Goren v.

Royal Investment Inc.</u>, 516 N.E.2d 173,175 (Mass. App. Ct. 1987).  Similarly, "[i]t is not

required that all terms of the agreement be precisely specified" so long as the parties have

"progressed beyond the state of 'imperfect negotiation'" and intend to be bound.  <u>Malouf</u>, 430

Mass. at 878 (quoting <u>Lafayette Place Assoc. v. Boston Redevelopment Authority</u>, 427 Mass.

509, 517 (1998)). In deciding whether the parties formed a contract, "[t]he controlling fact is the

intention of the parties."  <u>McCarthy v. Tobin</u>, 429 Mass. 84, 87 (1999).

     Here, TLT and Seating formed a binding contract because the "essential terms of the

bargain were agreed to," and there were "'[m]utual manifestations of assent that are in

themselves sufficient to make a contract," <u>Coan v. Holbrook</u>, 327 Mass. 221, 224 (1951)

(quoting Restatement (First) of Contracts § 26 (1932)).  TLT authored the terms of the contracts

and sent them to Seating for execution, thereby manifesting its intent to be bound by those terms.

These original contracts included the essential terms of: (1) the price of $480,000 for the two

projects; (2) the specific details of the job to be performed for that price, as found in the Project

Manuals, "Agreement, General Conditions, Drawings, Specifications Alternates and

Addenda,"(<u>id</u>. at Art. 4 ¶ 1, 15A, 16A); and (3) a change order process to "narrow present

uncertainties to rights and obligations."  <u>McCarthy</u>, 429 Mass. at 87; Exs. 15, 15A; 16, 16A.

When Seating received the contracts, it objected to terms in the contracts with which it did not agree and which prevented Seating from signing the contracts as written. See Ex. 12 (on June 22, Seating writes, "I have reviewed your contracts and wanted to discuss a few points with you, which needs to be clarified"); Ex. 13 (six days later, Seating cites only insurance and drawings issues when writing "I have only a few comments, then I think we can get this thing executed"). By its June 29, 2004 written response to Seating's June 28th letter, TLT expressly assented to the terms that Seating had identified as the "only. . .few" that needed to be resolved before it could "get this thing executed." Ex. 14. TLT reaffirmed its intent to be bound by its contracts as amended, as soon as possible, by its request that Seating mark up the contracts and execute them. Ex. 13, 14. Seating manifested its intent to be bound by the modified contracts by signing them. Ex. 15 & 16. "[B]y signing" the contracts, moreover, Seating expressly acknowledged "that time is of the essence." Exs. 15 and 16, Art. 14. At this point, the parties' "negotiations. . .bespeak finality." Novel Iron Works, Inc. v. Wexler Construction Co., Inc., 528 N.E.2d 142, 147 (Mass. App. Ct. 1988). When Seating modified and executed the contracts at TLT's behest, "[t]he parties were well beyond 'imperfect negotiation' and working out the 'rudiments of. . .[their] deal. The preliminaries had been completed, the essential terms of the agreement had been reached, and the parties thereafter engaged in activities consistent with their agreement" Id. (quoting Tull v. Mister Donut Dev. Corp., 389 N.E.2d 447 (Mass.App.Ct. 1979)).

The subsequent agreements of the parties on the issues of bonding and union labor are consistent with the changes that Seating made before it signed the contract. Therefore, even if no contract had formed until TLT and Seating reached agreement on the additional terms that Seating made before signing the contracts, the parties did come to terms on these additional

-10-

matters, thereby forming a binding contract. By deleting the terms relating to bonding and union labor, Seating indicated that it did not agree that these terms were included in the $480,000.00 price. Consistent with this, the parties subsequently confirmed that bonding was an addition to the contract, and therefore not part of the original contract price. Ex. 16B. Similarly, once Seating eliminated the union labor requirement, there is nothing in the record suggesting that TLT disagreed with the change. In its July 12 letter to TLT, Seating confirmed that, if TLT wanted Seating to use union labor, there would be an additional cost of $128,350.00. Ex. 16B. TLT's uncontradicted affidavit states it was not insisting on union labor as part of the contract. Kostinden Aff. ¶¶ 5- 7. Seating has not meaningfully disputed this assertion; it offers no evidence that TLT insisted on union labor once Seating crossed that requirement out and signed the contracts. See Defendant's Response to Plaintiff's Proposed Additional Material Facts, ¶ 30a (arguing TLT "attempted to require. . . union labor" in contracts TLT sent on May 21, but citing nothing further). The resolution of these terms are consistent with the contracts that Seating signed on July 5. Accordingly, the parties had a contractual agreement, to which they intended to bound, on the material terms of price, specifications, insurance and the change-order process; the agreements also included bonding terms (and the type of labor to be used).[5]

Nonetheless, Seating argues that the parties did not form a contract because they "could not agree on essential [bonding,] labor, insurance, and price terms." Defendant's Memorandum of Law in Support of Summary Judgment, ("Defendant's Mem."), pg. 12. The record shows that the parties did come to terms on these issues, however.

---

[5] TLT disputes that the type of labor was a "material term." The parties agreed to prevailing wage rather than union labor, irrespective of whether or not the term was material.

First, the record shows that the parties did agree to bonding terms and that Seating itself acknowledged that bonding was not an issue.  Ex. 20 (Letter from Seating to TLT dated August 18, 2004).  Seating excised bonding terms from the contracts before signing them; shortly thereafter, the parties agreed to bonding terms as an add-on to the contract.  Exs. 15 & 16.  On July 12, Seating confirmed the bonding agreement: in lieu of bonding, TLT would hold 10% retainage, which Seating would then bond through its factory, Outdoor Aluminum.  Plaintiff's Facts, Ex. 16B Seating would then pass the cost of obtaining the bond onto TLT "as an add-on to the contract."  Id.  As an "add-on" to the contract, bonding was therefore not part of the total original contract price of $480,000.00, which is consistent with Seating's refusal to provide bonding at that original price.  Id.; Ex. 15, 16. On August 18, Seating itself acknowledged that, per its conversation with TLT, "bonding will not be an issue." Facts, Ex. 20

Secondly, there is nothing in the record suggesting that TLT required union labor after Seating removed that requirement from the contract.  While the contracts required union labor, there is no indication that TLT disagreed with Seating's excising this term, nor is there any evidence that TLT "hound[ed" Seating to try and "force" the subcontractor into acquiescing to union labor. Def. Mem., pg. 12.  To the contrary, after Seating informed TLT that using union labor would result in a cost increase of $128,350.00 (Plaintiff's Facts, Ex. 16B), there is nothing in the record to show that the parties ever discussed the issue again, and TLT affirmatively asserts that it did not require Seating to use union labor.  Kostinden Aff. ¶ 6 (citing July 21 Wachusett Contract).  Seating offers no evidence to the contrary.

As to insurance, the parties came to agreement on the only two issues that Seating raised, insurance limits and cancellation language; and, they did so *before* Seating signed the contracts.

Ex.15 & 16.  In fact, Seating modified the contracts to reflect the parties' agreement on these issues prior to signing.  Id. These are the only "insurance" issues upon which the parties negotiated, and the record is clear that parties agreed to terms on these issues.  Id.

Seating's failure to comply with the contracts' *other* insurance requirements is not evidence that the parties did not agree to these other requirements.  Rather, Seating's signature on contracts which included these requirements, without modification or any negotiation from Seating, is evidence that Seating agreed to these terms, then did not perform as it had promised. Ex. 15 and 16.

Seating did not object to the contracts insurance requirements such as that subcontractors provide "Certificates [of insurance] covering [their] employees with Workmen's Compensation, Public Liability and Property Damage insurance written to insure not only the subcontractor, but also the Owner and the Contractor."  Id., ¶ 6.  A page of each contract described specific "Insurance Requirements for all Subcontractors working on" the project(s), including the kinds of insurance, limits required, coverage, etc.  Ex. 15, pg. 6; Ex. 16, pg. 6.  Seating did not dispute these terms during the parties' negotiations, nor did Seating change these terms in the contracts before it signed them.  Seating's failure to comply with these terms is therefore evidence of breach, rather than of any failure to agree to terms.

Lastly, Seating's allegation that the parties did not agree as to price is wholly unsupported by the record.  On May 17, 2004, the parties agreed that the total cost for the installation of both bleachers would be $480,000.00.  Facts, Ex. 7.  The contracts that Seating eventually modified, and signed, maintained the original prices and, when Seating signed the contracts, it agreed to "be bound by the terms of the agreement, General Conditions, Drawings, Specifications,

Alternates and Addenda . . ." which together provided detailed explanations of the construction to be performed, as well as a process for any price increases that might become necessary due to future uncertainties.  Id., Exs. 15 and 16, Art. 4 ¶ 1.  Thus, when it signed the contracts, Seating agreed to perform the job described by those contracts for $480,000.00 or seek additional funding through the change order process if necessary.

Nonetheless, when Seating first tried to increase its price on August 13, it stated that the increase was necessary because it had "completed review of the specifications and contracts" and determined that the architect's insistence of an I-Beam unit on the Reading Project would cost an additional $19,236.00.  Facts, Ex. 19.  This claim conflicted with the parties' contract price which expressly incorporated the "specifications and contracts."  Id.; Ex. 15, Art. 4; Ex. 16, Art. 4.  Moreover, prior to signing the contracts, Seating informed TLT of issues that would require an increase in price, such as the use of union labor (Ex. 12), "taxes, permits bonds of extraneous fee," (id.), the requirement of an umbrella insurance policy (Ex. 13), any drawing changes "after stamping,"(Id.), etc.  On each of these, the parties either agreed to eliminate the term, i.e. taxes and permits, or treat as an add-on to the contract at an additional cost, i.e. bonding, etc.  When Seating presented its price increase, however, it was not based upon any of these identified and agreed-upon issues.

When TLT responded that Seating's initial quotes for the jobs expressly included I-Beam grandstands so as to preclude the requested price increase, Seating again did not raise concerns stemming from any issues upon which the parties had negotiated.  Rather, Seating answered that "the specifications were vague and contradictory at times. . . [but] We have worked with the architect and have clarified many of these inconsistencies." Facts, Ex. 22.  This statement belied

-14-

Seating's previous assertion in its bid that "We have worked very closely with this architect and have helped them design this bleacher from the very first steps." Ex. 2. It also conflicts with Seating's signature to the contracts, by which Seating agreed to "be bound by the terms of the agreement, General Conditions, Drawings, Specifications, Alternates and Addenda" at the agreed-upon contract price; those documents together provided detailed explanations of the construction to be performed, as well as a process for any price increases that might become necessary due to future uncertainties. Exs. 15 and 16, Art. 4 ¶ 1. To support the increase, Seating also cited, for the first time, "issues involving code compliance in Massachusetts, which are more stringent then most other states. To supply you with the Grandstand to meet the architect entire requirements and Massachusetts code, the price increase is necessary and reasonable." Ex. 22. Seating is not persuasive that the parties did not come to pricing terms, as the record shows that Seating identified additional potential costs which the parties negotiated or excluded *before* agreeing to a contract price based upon the detailed specifications; and, that Seating later tried to use the specifications incorporated in the contract price as the basis for a cost increase.

Seating claims that other factors prevent a finding that the parties formed a contract. Notably, TLT never signed the contracts. First, Seating argues that the lack of a formal contract document embodying the agreement of the parties and executed by both of them, defeats contract formation here, particularly where TLT consistently sought signed contracts from Seating. Def. Mem., pg. 12; see Gel Sys., 902 F.2d at 1028 (noting, where parties contemplate a final writing, there is " a 'strong inference' that the parties do not intend to be bound until the formal document is hammered out"). All that is necessary for forming a contract, however, is an agreement on the "essential terms of the bargain" and "mutual manifestations" of an intent to be bound by those

-15-

terms. Coan, 327 Mass. at 224 (finding plaintiff's acceptance of defendant's written offer to purchase realty formed contract, despite parties' intent to also sign the "usual purchase and sale agreement" in future).

Here, a final, detailed agreement was hammered out, in contrast to Gel Sys., where the defendant sent a letter of intent that contemplated the execution of a formal contract detailing the parties' agreements.  902 F.2d at 1028; see McCarthy, 429 Mass. at 88 (finding parties were bound by Offer to Purchase, where that document sufficiently detailed the transaction and contained explicit notice of legal obligations created by signing).  Once TLT and Seating progressed from preliminary negotiations to an agreement on price, TLT sent to Seating contracts that provided additional, extensive details of the deal. Ex. 15, 16.  The terms of the agreement were further negotiated, modified and agreed upon by the parties.  Ex. 12, 13, 14, 15, 16.  Seating altered the contracts to reflect the parties' agreement, then bound itself by signing them; TLT, in turn, manifested its intent to be bound by those documents when it asked Seating to mark them up and execute them.  Ex. 14.  In short, the parties had a detailed, written contract rather than "an agreement to reach an agreement" on "fundamental terms" later.  See Rosenfield v. United States Trust Co., 290 Mass. 210, 217 (1935)(finding parties had not formed contract where material terms such as price "were to be settled later by mutual agreement").  While Seating is right that TLT never signed or returned those contracts, this fact in context does not defeat the formation of a binding agreement, as "[m]utual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifested an intention to prepare and adopt a written memorial thereof." Coan, 327 Mass. at 224 (internal citation omitted); see Novel Iron Works, Inc., 528 N.E.2d at 146 (finding parties

formed binding contract despite intent to execute formal written document, because, "[i]t does not, however, follow conclusively from that fact that the parties did not intend to be mutually bound to the terms agreed upon on that date until such time as the formal contract was executed").

Seating points out that in late July, TLT sent to Seating a fresh contract for the Wachusett Project, and that TLT continued to ask Seating to return signed contracts despite receiving the contracts that Seating signed on July 5. The new form contract incorporated the parties' subsequent agreements regarding union labor and bonding but failed to incorporate the parties' earlier agreements on insurance, drawings, etc., which the parties had worked out and incorporated in the July 5 contracts that Seating signed. Ex. 17. Seating contends the foregoing shows that the parties never came to agreement; the record shows, however, that the parties had agreed to terms on these issues and did not renegotiate them while addressing union labor and bonding. Thus, TLT's apparent mistakes in editing the July 21 forms have no bearing on whether the parties had a "present intent to be bound" at the time that the July 5th contract was formed. Truck Center Leasing, Inc. v. Fiumara, 1992 WL 24071, *5 (Mass. App. Div. February 5, 1992) ("we believe the question is not whether the letter of offer contained all the terms of the agreement that could in the abstract bind the parties. It is, rather, whether these parties intended to be bound"); see Malouf, 430 Mass. at 703 ("it is axiomatic that to create an enforceable contract. . . the parties must have a *present* intention to be bound by *that* agreement.")(emphasis added).

Seating also contends that its May 17, 2004 offer price was "expressly contingent" on two conditions: (1) receiving a letter of intent and (2) on the use of AIA contracts. Def. Mem., pg.

11.  Seating further argues that, as TLT did not comply with either condition and instead sent contracts with terms to which Seating "had never agreed," i.e. bonding and labor, Seating was not bound by the price and conditions of those contracts.  Id.  This argument is without merit because Seating waived these conditions by proceeding with the contracts that it did  receive, upon which the parties did reach a final agreement. See McCarthy, 429 Mass. at 89 (finding seller waived deadline requirement when seller caused delay, did not object when deadline passed and continued to deal with buyer's attorney). First, Seating raised no objection to the lack of a letter of intent, nor the form of the contracts when it received the non-conforming contracts. Additionally, Seating never contested the contract price based upon the non-conforming contracts, nor the lack of a letter of intent; instead, Seating opted to negotiate with TLT on the terms to which it objected in the contracts that it received.  See id., Exs. 12(raising insurance, bonding, retainage, labor and scope issues); Ex. 14 (raising insurance and drawings issues). Seating identified the terms which, if required by TLT, would result in an additional cost; the parties agreed that the terms Seating identified would either be excluded, e.g. union labor, or would be an extra to the contract, i.e. bonding.  At TLT's behest, Seating modified the contracts to reflect the agreement reached through those negotiations; Seating did not make any changes to the price of either contract before it signed them. Facts, ex. 15 and 16. Additionally, the two issues that Seating cites as preventing a "final agreement" are issues upon which the parties did reach agreement, i.e. bonding  and union labor.  Seating cannot now complain that the contracts did not conform to its conditions, because Seating waived these conditions by failing to object at the time that it received the non-conforming contracts and further, by signing the contracts it did receive after continued negotiations with TLT.  See McCarthy, 429 Mass. at 89

-18-

Thus, as to Count I, TLT's contract claim, I DENY Defendant's Motion for Summary Judgment and ALLOW Plaintiff's Cross-Motion for Summary Judgment, as I find that a contract existed between the parties which Seating breached by failing to perform.

    **B.  *Seating's Motion to Strike.***  Seating moved to strike from the summary judgment pleadings a document submitted by TLT pertaining to communications between the parties which Seating alleges were settlement discussions.  As the court did not consider, much less rely upon, this document in resolving the cross-motions for summary judgment, I DENY Defendant's Motion to Strike (Docket Doc. # 22) as moot.

    **C.  *93A Claim.***  TLT alleges that, by "signing contracts and forcing TLT to rely on Seating's ability to perform the contract work in a timely manner and satisfactory manner, Seating [then] ventured in bad faith to force better terms," thereby engaging in unfair and/or deceptive trade practices prohibited by M.G.L. c. 93A, §§ 2 & 11 ("c.93A").  Plaintiff's Mem., pg. 19-20. Seating counters that its efforts to protect its rights were not unfair or deceptive.

    For c.93A claims, Massachusetts courts have repeatedly held that mere good-faith disputes or simple breaches of contract do not give rise to c.93A liability.  <u>Arthur D. Little, Inc. v. Dooyang Corp.</u>, 147 F.3d 47, 55 (1st Cir. 1998) (<u>quoting</u> <u>Linkage Corp. v. Trustees of Boston Univ.</u>, 425 Mass. 1, 26 (1997).  A plaintiff must show some something "more" in order to prevail under the statute.  <u>See</u> <u>Arthur D. Little, Inc.</u>,147 F.3d at 52 (upholding c.93A liability against company for "deliberate strategy" of purchasing services without intending to pay for them; promising to pay without intending to do so; and threatening litigation in attempt to "extort" price concessions outside of contract).

    Although I find that the parties did create an enforceable contract, I further find that, for

the purposes of summary judgment, neither party has shown "the absence of a genuine dispute of material fact" as to whether Seating's actions were unfair and/or deceptive.  Great Northern Ins. Co., 364 F. Supp.2d at 14 (internal citation omitted).  The record is insufficient as a matter of law to resolve the questions of intent and state of mind in favor of either party.  Therefore, I DENY the parties' Cross-Motions for Summary Judgment as to the 93A claim (Count IV of the Complaint).

## III.    CONCLUSION

Seating moved for Summary Judgment on all of TLT's claims, arguing that the parties did not form a contract.  As I find that TLT and Seating did form a binding contract, I DENY Seating's Motion for Summary Judgment as to Counts I-III. (Docket. # 11), and for the reasons discussed above, I further DENY Seating's Motion as to Count IV, TLT's c.93A claim.

TLT cross-moved for Summary Judgment on Counts I (breach of contract) and IV (c.93A).  I ALLOW TLT's Motion as to Count I, but DENY the Motion as to Count IV. (Docket # 14).

As noted above, the Motion to Strike (Docket #22) is DENIED as Moot.

The parties are further ordered to appear on January 20, 2006 at 2:15 pm for a Status Conference to address the resolution of the remainder of the case.


So Ordered.

/s/ LEO T. SOROKIN
Leo T. Sorokin
United States Magistrate Judge


Date: December 28, 2005

-20-