UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TLT CONSTRUCTION CORP., | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION |
| | ) NO. 05-10223-LTS |
| RI, INC. d/b/a SEATING SOLUTIONS | ) |
| Defendant. | ) |

### **DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

RI, Inc., d/b/a Seating Solutions ("Seating" or "Seating Solutions") hereby submits the following proposed findings of fact and conclusions of law:[1]

#### I.   PROPOSED FINDINGS OF FACT

**A.   The Parties and the Projects.**

1.   TLT Construction Corp. ("TLT"), a Massachusetts corporation with its principal office located in Wakefield Massachusetts, is a construction company that has worked on numerous large scale projects in Massachusetts since its founding in 1976.

2.   Seating, a New York corporation based in Hauppauge, New York, is in the seating system design and construction industry and specializes in the sale, rental, and installation of custom-designed spectator seating at athletic and recreational facilities.

3.   TLT submitted a bid to serve as the general contractor on a project to construct an addition to Wachusett Regional High School in Holden, Massachusetts (the "Wachusett Project") on January 28, 2004.  TLT also submitted a bid for the Reading Memorial High School renovation project (the "Reading Project").  Both bids were accepted.

---

[1] Seating Solutions reserves the right to supplement and revise this submission at the conclusion of trial.

**B.     Seating submits quotes and the parties negotiate.**

4.     On April 5, 2004, Seating sent a quote to TLT for the Reading project that was $396,548.87 for a semi-enclosed I-Beam unit, or $425,120.30 with a fully closed welded deck. Trial Exhibit ("Trial Ex.") 1 (Reading High Quote). Several weeks, proposals, and counterproposals later, on May 17, 2004, Seating sent TLT a quote stating that the total price for both projects would be $480,000. Seating stated that the quote was contingent upon a letter of intent being received on the following day and a standard AIA contract being executed by May 19, 2004. Trial Ex. 4 (Reading High Quote). Scott Suprina and Marc Ligator of Seating Solutions testified at trial that the Reading quote was for a semi-enclosed deck.[2] The Wachusett quote was for a fully closed welded deck.

5.     After receiving this quote, TLT responded by facsimile on the same day and stated that (i) it needed a cost breakdown for both projects; (ii) a bond was being offered by Seating's competitors; (iii) TLT was working on getting the "no retainage" request approved; and (iv) that a letter of intent would have to suffice and that a contract could not be executed in the tight timeframe. Trial Ex. 5 (Facsimile from TLT to Seating Solutions).

6.     Seating sent TLT a letter in response stating that the cost of the Reading Project would be $283,026.00 delivered and installed, that the cost of the home bleacher for the Wachusett Project would be $159,283.00 delivered and installed, and that the cost of the visitor bleacher for the Wachusett Project would be $37,691.00 delivered and installed. The total price quoted for both projects was therefore $480,000.00. Seating also informed TLT that this pricing did not include a bond and that Seating would allow TLT two weeks to draw up and execute a contract before it had to change its pricing structure. Trial Ex. 6 (Letter from Seating Solutions to TLT). Later in the day, TLT sent Seating a facsimile agreeing to total contract price of $480,000.00 for the Projects. Trial Ex. 7 (Facsimile from TLT to Seating Solutions). TLT did

---

[2] Where references to trial testimony are included in these proposed findings, they are based upon the parties' anticipated testimony at trial.

2

not comment upon the bonding issue or the two week execution deadline.

7. On or about May 21, 2004, TLT sent Seating contracts for the Projects and requested that they be signed and returned within five days. Trial Ex. 9 (Letter from TLT to Seating Solutions). The contracts sent by TLT were not standard AIA contracts. On June 7, 2004, TLT sent Seating Solutions new copies of the contracts and told them to disregard the copies it had sent on May 21, 2004. *See id.*

8. On or about July 5, 2004, Seating returned signed paperwork for the Projects to TLT that (i) redacted provisions requiring Seating to obtain payment and performance bonds;[3] (ii) added a provision stating that "Seating Solutions standard insurance limits apply to this contract"; (iii) added a provision stating that shop drawings would be received within six weeks of the execution of the contract; (iv) deleted a provision requiring that it pay for permits and fees; and (v) deleted a provision requiring Seating to use union carpenters and apprentices. Trial Exs. 15 & 16 (Marked-up Reading and Wachusett Contracts). The price for the work on the Reading Project was $283,026.00. Trial Ex. 15 (Reading Contract). The price for the work on the Wachusett Project was $196,974.00. Trial Ex. 16 (Wachusett Contract).

9. TLT did not return signed copies of the marked-up paperwork. On or about July 21, 2004, TLT sent unmarked versions of the contracts to Seating for the Projects. Trial Exs. 17 & 39 (Revised Wachusett and Reading Contracts). While these unmarked drafts did not include provisions requiring union labor, TLT did not make any of Seating's other requested changes. *See id.*

10. Mr. Suprina testified at trial that after a conversation with the Reading project architect in late July, he concluded that Reading job would probably require and I-Beam unit with a fully enclosed, welded deck. The original quote contemplated a combination of angle-

---

[3] At trial, Mr. Ligator testified that he redacted these provisions because Seating Solutions is not a "bonded" company. Any time that a party requests that Seating Solutions provide performance or payment bonds, Seating Solutions arranges to have the bonds provided by its supplier, Outdoor Aluminum.

frame and I-Beam elements and a semi-enclosed deck. Mr. Suprina informed Mr. Ligator of this change in work scope and instructed him to seek a higher contract price because installation of a fully enclosed deck requires more labor and materials than does installation of a semi-enclosed deck. Mr. Ligator did so after checking with Seating's supplier, Outdoor Aluminum, and determining how much he needed to increase the quoted price. Mr. Ligator stated that Seating had not yet placed an order with Outdoor Aluminum. Standard Seating practice is to place the order for materials within forty-eight hours of reaching agreement on a job.

11. On August 13, 2004, Seating sent TLT a letter stating that while Wachusett Project pricing would remain the same, "Regarding Reading, there are hundreds of pages of addendums and in review and discussing options with regards to gray areas we have found that although not necessary, the architect will require an I-Beam unit. Therefore, we must increase our delivered and assembled price by $19,236.00." Trial Ex. 19 (Letter from Seating Solutions to TLT).

12. Five days later, on August 18, 2004, Seating provided TLT with a certificate of insurance for its supplier Outdoor Aluminum and stated that bonding would not be an issue. Trial Ex. 20 (Facsimile from Seating Solutions to TLT). Mr. Ligator testified at trial that the bonding issue was resolved by agreeing that the contract would be made out to Outdoor Aluminum, which would provide the bonds as "extras" to the contracts. In other words, TLT agreed to increase the contract price by the cost of obtaining performance and payment bonds. The contract documents make it clear that TLT and Seating expected bonding cost would be two percent of the total $480,000.00 price. Trial Ex. 15 & 16 (marked-up paperwork). With bonding resolved, TLT personnel testified at trial that they subjectively believed that a legally binding contract existed. Marc Ligator of Seating Solutions, however, testified at trial that he did not believe that the parties had agreed upon a final contract price.

**C.    Negotiations fall apart.**

13. Seating Solutions and TLT went back and forth as to the justification for a price increase and whether Seating Solutions needed to seek that increase as part of the change order

4

process. Trial Exs. 21-24 (Letters to and from TLT and Seating Solutions). Finally, on August 30, 2004, Seating Solutions contacted TLT and stated that it was withdrawing all quotes and proposals that it had provided up to that date. Trial Ex. 25 (Letter from Seating Solutions to TLT). TLT referred the dispute to its attorney.

14.     Both Mr. Suprina and Mr. Ligator testified at trial that they did not believe at any time that they had reached a final, binding agreement with TLT. Each testified that they believed that they were still in the process of negotiating a contract price, and that TLT's repeated assertions that the parties had reached an agreement were bargaining tactics. Mr. Suprina, furthermore, testified that there was uncertainty as to the scope of Seating's work on the Reading Project. Though an earlier proposal had made the distinction, Seating's $480,000.00 proposal did not specify whether the unit would be semi-enclosed. In July, however, it appeared that the architect would require a fully closed deck. Nobody at Seating Solutions, finally, placed an order for materials with Outdoor Aluminum for the Reading or Wachusett Projects.

15.     On September 7, 2004, TLT's counsel sent Seating a letter stating that refusal to proceed by Seating would be actionable. Trial Ex. 26 (Letter from counsel to Seating Solutions). Counsel stated, incorrectly, that TLT had relied upon Seating Solutions' quotations during the bidding process and that Seating Solutions was therefore bound by that quotation. *See id*. Ligator responded to TLT's counsel on September 14, 2004. He stated that Seating would be happy to proceed based upon its "pre-bid" quote, which was markedly higher than $480,000.00 for both projects. Trial Ex. 27 (Letter from Seating Solutions to counsel).

16.     The parties reopened negotiations in October of 2004, but could not resolve their price dispute. Throughout this period, the record is clear that Mr. Ligator did not believe that Seating Solutions had entered into a binding agreement with TLT. Trial Exs. 28, 30, 31 (Letters from Seating Solutions to TLT). The only evidence to the contrary is a facsimile dated October 26, 2004 in which Ligator requests that TLT send him a copy of Article 2 of "our contract." Trial Ex. 32 (Facsimile from Seating Solutions to TLT). There is no evidence, however, that Ligator returned signed paperwork to TLT at this point, or that TLT signed the marked-up

paperwork returned by Seating Solutions at the beginning of July. While counsel represented in his letter of December 1, 2004, (Trial Ex. 34) (Letter from counsel to Seating Solutions), that the parties had reached resolution, Mr. Ligator testified at trial that he did not believe this was the case because Mr. Kostinden had not agreed to a fifty percent deposit of the contract price.

**D.    TLT files suit and hires the Gallivan Company.**

17.    In December, TLT's counsel again became involved. Seating Solutions was still not willing to proceed with performance of the subcontract according to TLT's terms. TLT, on the other hand, was not willing to pay the price proposed by Seating Solutions. Trial Exs. 34-38 (Correspondence between Seating Solutions, counsel, and TLT). TLT filed this suit in Malden District Court on December 28, 2004.

18.    In January, Seating Solutions contacted TLT and offered to work on the Projects in exchange for a payment of $580,000.00. Trial Ex. 43 (Letter from Seating Solutions to TLT). In this letter from Mr. Suprina, he stated "Please keep in mind that we have no contract. We have never finalized negotiations. . . . I know that if you review your records you will find we never had a deal." *See id.*

19.    TLT did not accept this offer and chose instead to proceed with the Gallivan Company, Inc. ("Gallivan"). Trial Exs. 44-45 (Gallivan contracts with TLT). Gallivan agreed to perform work on the Reading project for a total contract price of $316,800.00 and on the Wachusett project for $197,360.00. *See id.* The total price for both projects was therefore $514,160.00. Gallivan marked up Reading and Wachusett contracts, and TLT's President, Thomas Kostinden, signed the contracts and initialed the changes. Trial Exs. 44-45. To date, TLT has paid Gallivan $285,741.00 for work on the Reading project. Trial Ex. 46 (TLT payment record). The Wachusett project is not yet underway, so TLT has made no payments to Gallivan for that work.

## II.   PROPOSED CONCLUSIONS OF LAW

A.   **TLT has not met its burden as to the Chapter 93A claim.**

    1.   **TLT has the burden of proof.**

20.   TLT has the burden of proof on the Chapter 93A claim. *Cleary v. Cleary*, 427 Mass. 286, 297, 692 N.E.2d 955, 962 (1998) ("Under G.L. c. 93A, § 2, the plaintiff must show that the defendant has engaged in an unfair or deceptive actor practice in the conduct of ... trade or commerce.") (internal punctuation marks omitted).

    2.   **Seating Solutions did not act unfairly or deceptively.**

21.   A breach of contract itself is not a violation of Chapter 93A. *See Chambers Steel Engraving Corp. v. Tambrands, Inc.*, 895 F.2d 858, 861 (1st Cir. 1990) ("The mere breach of a contract, without more, even if one existed, would not violate ch. 93A."); *City of Revere v. Boston/Logan Airport Assocs.*, LLC, 416 F.Supp.2d 200, 209 (D. Mass. 2005) ("[E]ven intentional, breach is insufficient in itself to constitute an unfair or deceptive trade practice under Chapter 93A."); *Madan v. Royal Indem. Co.*, 26 Mass. App. Ct. 756, 762, 532 N.E.2d 1214, 1217 (1989) ("[T]he mere breach of a contract, without more, does not amount to a c. 93A violation."), *rev. denied*, 404 Mass. 1103, 536 N.E.2d 1093 (1989); Michael C. Gilleran, *The Law of Chapter 93A* § 9.1 at 227 (1989) ("Where the nature of the breach constitutes a mere breach of contract, without more, such conduct will not constitute a 93A violation.").

22.   An intentionally extortionate breach of contract, on the other hand, does satisfy the strict requirements of Chapter 93A. In other words, "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474, 583 N.E.2d 806, 821 (1991) (emphasis supplied). *See also Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 50 (1st Cir. 1998) (same); *Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 12 (1st Cir. 1985) (same). Still, "Mere resistance to a just claim is not the stuff of c. 93A." *Boston Pilots v. Motor Vessel Midnight Gambler & E. Coast Excursions, Inc.*, 357 F.3d 129, 134 (1st Cir. 2004); *Framingham Auto Sales, Inc. v. Workers'*

*Credit Union*, 41 Mass. App. Ct. 416, 418, 671 N.E.2d 963, 965 (1996) (same). "A 93A claim is based on unfairness or deception, not a mere difference of opinion: a good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made." *McAdams v. Massachusetts Mut. Life Ins. Co.*, 391 F.3d 287, 304 (1st Cir. 2004) (internal quotation marks omitted).

23. Courts have stated the elements of an intentional breach of contract claim under Chapter 93A in different ways. The First Circuit has stated that a section 11 violation may exist where there is a "refusal to pay [that is] a wedge to gain advantage in an on-going commercial relationship []or a coercive act inviting increasingly hollow detrimental reliance by the [plaintiff] on hollow assurances to pay." *Boston Pilots*, 357 F.3d at 134 (citation omitted). There, the court described the *Anthony's Pier Four* case as one in which "the owner made a lousy deal and had to get more money to be satisfied." *Id.* at 135 (internal punctuation marks omitted) (emphasis supplied). In the *Dooyang* case, the Court affirmed a Chapter 93A verdict where the defendant's "wrongful purpose was to extract a favorable settlement from [the plaintiff] for less than the amount [the defendant] knew that it owed by repeatedly promising to pay, not doing so, stringing out the process, and forcing [the plaintiff] to sue." *See Dooyang*, 147 F.3d at 55-56 (emphasis supplied). Similarly, the Massachusetts Appeals Court has stated that there must be an "ulterior motive [or] coercive or extortionate objective." *Framingham Auto Sales, Inc.*, 41 Mass. App. Ct. at 418, 671 N.E.2d at 965.

24. The common theme in these cases is that the defendant must have subjective knowledge of its legal obligation and subjective knowledge that it can use a breach of that obligation to obtain a benefit from the plaintiff for which it did not originally negotiate. The classic example of this is the *Anthony's Pier Four* case. There, the parties were in the process of developing Fan Pier, upon which this Court now sits. *See Anthony's Pier Four, Inc.*, 411 Mass. at 453, 583 N.E.2d at 810. The defendant became upset upon learning "that another harborfront deal had been far more lucrative for the landlord than the Fan Pier promised to be for [the defendant]." *Id.* at 458, 583 N.E. 2d at 813. At this point, the parties had been in a commercial

relationship for three years. *See id*. at 459, 583 N.E.2d at 813. One of the defendant's attorneys called plaintiff's counsel and stated that "[the defendant] was very unhappy with the deal that he had made back in 1983." *Id*. The defendant himself attended a meeting and stated that "he had made a lousy deal and he needed more money." *Id.* at 460, 583 N.E. 2d at 814. In seeking to extract a better deal from the plaintiff, the defendant claimed that he had never approved Fan Pier development plans and proceeded to purposefully withhold that approval. *See id*. at 461-62, 583 N.E.2d at 814-15. This claim was inconsistent with the defendant's previous actions, including joint appearances with the plaintiff before the news media and public agencies. *See id*. at 456, 583 N.E.2d at 812.

25.   Here, the parties did not have a well-developed or long-standing commercial relationship. That is significant when compared with the principal authority upon which TLT relies. *See Dooyang*, 147 F.3d at 50-52 (plaintiff consulting firm provided two years of services before defendant breached obligation to pay bills for services and "repeatedly promised to pay the outstanding . . . invoices, though it had not intent to do so"); *Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 12-13 (1st Cir. 1985) (defendant refused to pay for soft drink products already delivered); *Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 42-43, 648 N.E.2d 435 (1995) (defendant engaged in unfair conduct following conclusion of five year contract term); *Anthony's Pier Four, Inc.*, 411 Mass. at 461-62, 583 N.E.2d at 814-15 (*see* discussion of facts in ¶ 25, *supra*); *Community Builders, Inc. v. Indian Motocycle Assocs., Inc.*, 44 Mass. App. Ct. 537, 692 N.E.2d 964 (1998) (defendants delayed payment for three years' worth of consulting services).

26.   The Court finds that there is no violation of the statute in this case. After reviewing the exhibits and testimony offered at trial, the Court concludes that neither Marc Ligator nor Scott Suprina had the subjective belief that their negotiations with TLT had ripened into a binding contract. The parties had a legitimate, good faith dispute as to whether the May 2004 price quotation was binding upon Seating Solutions. This distinguishes Seating Solutions' conduct from that of the defendants in the cases cited in ¶ 26.

9

27. Here, the record contains a significant amount of evidence beyond Messrs. Ligator and Suprina's testimony supporting their contention that they did not believe that a contract existed between Seating Solutions and TLT. For example:

- Seating Solutions returned signed paperwork to TLT in early July 2004. Seating Solutions deleted, among other things, a provision stating that "PERFORMANCE AND PAYEMNT BONDS REQUIRED". On July 21, 2004, TLT sent new contracts to Seating Solutions, but those contracts did not redact the bond requirement, or any other provisions other than the union labor requirement. Trial Exs. 15-17, 39 (Reading and Wachusett paperwork).

- On August 30, 2004, Seating Solutions sent a letter to TLT stating that "[a]s we have not been able to reach agreeable terms, we are withdrawing all of our quotes and proposals to date." Trial Ex. 25 (Letter from Seating Solutions to TLT).

- On September 14, 2004, Seating Solutions sent a letter to TLT's counsel stating that "[a]ll past pricing has expired." Trial Ex. 27 (Letter from Seating Solutions to TLT).

- On October 22, 2004, Seating Solutions sent a letter to TLT stating "All old pricing has expired . . . ." Trial Ex. 30 (Letter from Seating Solutions to TLT).

- On December 17, 2004, Seating Solutions sent a letter to TLT stating that "we never finalize[d] any agreement." Trial Ex. 38 (Letter from Seating Solutions to TLT).

- On January 27, 2005, Seating Solutions sent a letter to TLT stating "Please keep in mind that we have no contract. We have never finalized negotiations. . . . I know that if you review your records you will find we never had a deal." Trial Ex. 43 (Letter from Seating Solutions to TLT).

In the *Dooyang*, *Pepsi-Cola*, and *Anthony's Pier Four* cases, the defendants had subjective knowledge of their legal obligations. *See* ¶¶ 25-26 *supra*. They then sought to shirk performance of those obligations in order to secure an unfair commercial advantage. *See id.*

There is no such evidence here.

28.     Three additional facts weaken TLT's claim that Seating breached a known contractual obligation in this case.  First, Seating Solutions did not place an order with its supplier Outdoor Aluminum for materials.  It obtained quotes, but never placed an order.  Both Mr. Ligator and Mr. Suprina testified that Seating Solutions places orders with Outdoor Aluminum within forty-eight hours of finalizing contract negotiations.  The purpose of doing so is to keep its overhead costs as low as possible.  Aluminum is a commodity and its price has steadily increased in recent years.  Second, TLT never returned a signed version of the marked-up paperwork to Seating Solutions.  Both Mr. Suprina and Mr. Ligator confirmed that they would have considered themselves to be bound had TLT simply returned signed versions of the marked-up contracts (Trial Exs. 15 & 16) that they mailed out in early July.  Instead, TLT returned unsigned contracts and removed only one disputed term (union labor), but included other disputed terms (bonding, insurance, shop drawings, and fees and permitting).  This is in marked contrast to Mr. Kostinden's decision to sign the marked versions of the Reading and Wachusett contracts signed by Gallivan.  (Trial Exs. 44 & 45).  Third, Mr. Suprina testified that the scope of work on the Reading Project was ambiguous.  He stated that the price difference between a semi-enclosed deck combining I-Beam and angle frame elements and an entirely I-Beam unit with a fully enclosed deck would be significant.  Because Seating Solutions had worked with the architect to design the stand, Trial Ex. 1 (Seating Solutions Proposal), Mr. Suprina understood that the architect would permit a semi-enclosed bleacher incorporating both I-Beam and angle frame elements.  In late July 2004, he learned that this was possibly incorrect.  With Seating's work scope unresolved, Mr. Suprina did not believe that his company could be bound.

29.     TLT relies upon the aluminum pricing issue to claim that Seating's conduct was extortionate.  TLT alleges that Seating Solutions was aware that the price of aluminum was increasing.  It suggests that Seating demanded increased compensation because it knew that if TLT was forced to reenter the bleacher marketplace, high aluminum costs would force it to pay

an even higher price than Seating was seeking. Indeed, Seating's correspondence often refers to the increase in aluminum prices. Trial Exs. 6 (Seating Solutions letter to TLT), 33 (Seating Solutions letter to TLT), 43 (Seating Solutions letter to TLT).

30.     The Court nonetheless finds that Seating Solutions did not have an extortionate purpose in seeking an increase in the Reading price. More was at work here than a desire to saddle TLT with the effects of aluminum price increases. Seating's quoted price for the work on the Reading project was $283,026.00. Trial Ex. 15 (Reading paperwork). Its quoted price for the work on the Wachusett project was $196,974.00. Trial Ex. 16 (Wachusett paperwork). On August 13, 2004, Seating sought a ten percent increase in the Reading price, claiming that it had recently become aware of a change in work scope. Trial Ex. 19 (Letter from Seating Solutions to TLT). It did not seek any increase at all in the Wachusett price. Both bleachers were aluminum; one would expect that if the price of raw materials was the sole motivating factor, Seating Solutions would have sought a ten percent increase in the prices for both projects. It did not.

31.     The pricing employed by Gallivan on the projects bears upon this issue. Gallivan's quoted price for Reading was $316,800.00 and $197,360.00 for Wachusett. Trial Exs. 44 & 45 (Gallivan Contracts). That amounts to a price increase of twelve percent over Seating's May 17, 2004 quote for Reading and an increase of only .2 percent over its May 17, 2004 quote for Wachusett. If the aluminum costs were the _primary_ factor governing bleacher pricing, one would expect an equal price increase for both projects; there was not. The reason for the increase on the Reading Project was more likely related to the change in specifications noted in ¶ 10 *supra*, which might well have justified a change order had Seating Solutions employed that process. Regardless, Seating had a legitimate justification for seeking a price increase. This was not "a wedge to gain advantage in an on-going commercial relationship . . . ." *Boston Pilots*, 357 F.3d at 134. This was a "good faith business dispute." *McAdams*, 391 F.3d at 304.

### 3. TLT has not proven that the alleged unfair conduct caused a loss of money or property.

32.     Section 11 of Chapter 93A requires TLT to establish that the unlawful conduct

caused an *independent* loss of money or property. *See* Mass. Gen. Law ch. 93A, § 11 (permitting a section 11 claim by "[a]ny person who engages in the conduct of any trade or commerce <u>and</u> who suffers any loss of money or property, real or personal, <u>as a result of</u> the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice . . . .") (emphasis supplied). Cases including both Chapter 93A claims and breach of contract claims pose a special problem. A breach itself is not an unfair or deceptive act. *See Chambers Steel Engraving Corp. v. Tambrands, Inc.*, 895 F.2d at 861. Damages resulting from the breach, therefore, do not satisfy the loss of money or property requirement. *See Lyle Richards, Int'l, Ltd. v. Ashworth, Inc.*, 132 F.3d 111, 115 (1st Cir. 1997) (finding no section 11 violation where the plaintiff "claimed no injury apart from that caused by the alleged breach of contract"); *Dooyang*, 147 F.3d at 56 (noting that the "loss of money or property required under § 11 must stem from [a] deceptive act"); *Callahan v. Harvest Board International, Inc.*, 138 F. Supp. 2d 147, 167 (D. Mass. 2001) (holding that plaintiff cannot succeed on section 11 claim where alleged loss of money or property stemmed from separate breach of contract claim and was not attributable to unfair or deceptive act).

33.   Courts interpreting this provision have given it teeth. Expenditure of fees to bring a breach of contract suit, for example, is not the sort of loss of money or property contemplated by section 11. *See Doering Equip. Co. v. John Deere Co.*, 61 Mass. App. Ct. 850, 858, 815 N.E.2d 234, 241 (2004) ("The expenditure . . . of attorney's fees [to bring suit to recover damages that are unrelated to the unfair act or practice] does not represent a loss of money or property within the meaning of c. 93A, § 11."); *Tech Plus, Inc. v. Ansel*, 59 Mass. App. Ct. 12, 21, 793 N.E.2d 1256, 1264 (2003) ("A plaintiff . . . may not show that she has suffered a loss of money or property within the meaning of § 11 merely by showing that she has incurred attorney's fees and other costs in bringing an action under the statute."), *rev. denied*, 440 Mass. 1108, 799 N.E.2d 594 (2003).

34.   TLT has not established that it suffered any injury other than the cost of cover arising from Seating Solutions' refusal to perform. *See Lyle Richards, Int'l, Ltd.*, 132 F.3d at

13

115.   TLT identified its "base damages" as the cost it incurred in having another contractor install the bleachers on the Projects.  *See* TLT's Automatic Initial Disclosures, at 2.  In its summary judgment memorandum, TLT stated that "Seating's breach of the signed contracts resulted in damages to TLT of $34,160."  TLT Summary Judgment Memorandum at 8.  In the pretrial memorandum, TLT again identified only its cost of cover as its damages in this action.  *See* Joint Pretrial Memorandum at 2.

      35.   TLT's implication that the loss of money or property requirement is eliminated by paragraph 5 of section 11 is neither persuasive nor supported by any precedent.  This provision states that "the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence regardless of the existence or nonexistence of insurance coverage available in payment of the claim."  The legislature added this language to the statute in 1989.  1989 Mass. Acts ch. 580.  Had the legislature intended to eliminate the loss of money or property requirement from section 11, it surely would have deleted the requirement from the statute's first paragraph.  The holdings of the First Circuit in the *Lyle Richards* case, and Judge Dein in the *Callahan* case, postdate the amendment to paragraph 5 of section 11 and require that the unfair conduct itself cause a loss of money or property.  TLT's claimed loss must be <u>separate</u> <u>and</u> <u>distinct</u> from the loss flowing from the breach of contract.  TLT has provided evidence of no such separate and distinct loss.  This is fatal to its Chapter 93A claim.

**B.**    **There is insufficient evidence to award damages at this time.**

      36.   At trial, TLT introduced evidence stating that it had paid Gallivan $285,741.00 for its work on the Reading project.  Trial Ex. 45 (TLT Payment Records).  TLT admitted, moreover, that work on the Wachusett project has not commenced.  As of this date, then, TLT has paid $2,715.00 more for the Reading bleacher than it expected it would have to pay Seating Solutions for a similar product.

      37.   TLT told Seating Solutions that it would reimburse it for the cost of obtaining bonding for the projects.  The total price for both projects was, again, $480,000.00.  Trial Exs. 15

& 16 (Reading & Wachusett marked-up contracts). The parties recognized that the cost of the bonds would be two percent of the total contract price. TLT thus assured Seating Solutions that it would be paid $9,600.00 to obtain performance and payment bonds. There is no evidence that TLT had a similar arrangement with Gallivan. Thus, the Court must reduce any damages that TLT has suffered in this case by $9,600.00 to reflect payments that TLT would have made to Seating Solutions for bonding expenses. *See, e.g., Louise Caroline Nursing Home, Inc. v. Dix Constr. Corp.*, 362 Mass. 306, 310, 285 N.E.2d 904, 907 (1972) ("It is not the policy of our law to award damages which would put a plaintiff in a better position than if the defendant had carried out his contract."); *Foster v. Bartolomeo*, 31 Mass. App. Ct. 592, 596, 581 N.E.2d 1033, 1035 (1991) ("Principles of contract damages do not have it as their design to put a plaintiff in a better position than if the defendant had performed the contract.").

38.    TLT has proffered evidence of $2,715.00 in damages. That amount is offset by the amount that TLT would have paid Seating Solutions for performance and payment bonds. The Court therefore concludes that TLT has suffered no actual damages in this case.

### III.    CONCLUSION

The Court therefore concludes the following:

(i)    TLT has not satisfied its burden of proving that Seating Solutions acted in an unfair or deceptive manner under Mass. Gen. Laws ch. 93A, §§ 2, 11;

(ii)   TLT has not established that it suffered an independent loss of money or property due to the conduct that it alleges was unfair or deceptive under Mass. Gen. Law ch. 93A § 11; and

(iii)  TLT has not established that Seating's nonperformance on the Projects has caused it to suffer any damages.

          Respectfully Submitted,

          RI Inc. d/b/a SEATING SOLUTIONS

          By its attorney,

          \_\_\_\_/s/_____Terry Klein
          HENSHON PARKER VYADRO, P.C.
          Terry Klein, BBO# 652052
          84 State Street, Suite 760
          Boston, Massachusetts  02109
          Telephone: (617) 367-1800
          Facsimile: (617) 507-6454

Dated:  May 4, 2006

## CERTIFICATE OF SERVICE

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on or before May 4, 2006.

          \_\_\_\_/s/_____Terry Klein