05-10223

# United States Court of Appeals
## For the First Circuit

———— ————

No. 06-2214

TLT CONSTRUCTION CORP.,

Plaintiff, Appellee,

v.

RI, INC., d/b/a Seating Solutions,

Defendant, Appellant.

————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, <u>U.S. Magistrate Judge</u>]

————

Before

Lynch, <u>Circuit Judge</u>,

Stahl, <u>Senior Circuit Judge</u>,

and Howard, <u>Circuit Judge</u>.

————

<u>Terry Klein</u>, with whom <u>Henshon Parker Vyadro P.C.</u> was on brief, for appellant.
<u>James G. Grillo</u>, with whom <u>Patrick J. Sullivan</u> and <u>Heaftiz & Sullivan</u> were on brief, for appellee.

————

April 19, 2007

————

**STAHL, Senior Circuit Judge.** This diversity case arises out of a common situation in commercial dealings: the failure of negotiations and the resulting bad blood between the parties. Here, after a protracted -- and ultimately failed -- nine-month negotiation between a general contractor and a potential subcontractor, the general contractor brought suit against the subcontractor for breach of contract, claiming that at some point during the negotiations a binding contract had been formed. After cross-motions for summary judgment on the question of contract formation, the district court ruled in favor of the general contractor. Because we hold that no contract was formed, we reverse.

## I. Background

TLT Construction Corp. ("TLT"), a Massachusetts company, was the general contractor on renovation and expansion projects for Reading Memorial High School in Reading, Massachusetts (the "Reading Project"), and Wachusett Regional High School in Holden, Massachusetts (the "Wachusett Project"). In April 2004, as TLT was preparing its bid for the Reading Project, RI Inc., d/b/a Seating Solutions ("Seating"), a New York company specializing in selling and installing spectator seating for athletic facilities, submitted a bid to TLT to install bleachers for the Reading Project as a subcontractor. In its proposal, Seating stated, "We have worked very closely with this architect and have helped them design this

-2-

bleacher from the very first steps." On the record before us, it does not appear that Seating's bid was a filed sub-bid, nor does TLT makes such a claim. See Mass. Gen. Laws ch. 149, § 44F.

On May 10, 2004, TLT, having been awarded both the Reading and the Wachusett Projects, requested that Seating submit a new quote that would include both projects. On May 12, Seating quoted a price of nearly $568,000 for both. TLT responded that the price was too high, and Seating replied on May 17 with a revised quote of $480,000. Seating said that the price was "contingent on a letter of intent being received [May 18] and an AIA contract being executed by Friday." TLT responded that day, seeking clarification of a few terms, including whether or not bonding was included in the quote, since a bond was required and had been included in the quotes from Seating's competitors. Seating responded later that day that bonding was not included in the quote, and that it did not feel bonding was necessary, since it would be paid in progress payments. TLT replied, "We have a deal if we can split the bond" and if TLT could have retainage of 5% (Seating had originally proposed no retainage). TLT also said that it would not be able to draft a contract in Seating's time frame, but that it could provide a letter of intent. Seating agreed to accept a letter of intent, and granted TLT two weeks to draft and execute a final contract, but said that it could not hold the price

-3-

any longer than that.  On the record before us, it appears that no letter of intent was ever sent.

Rather, four days later, on May 21, 2004, TLT sent Seating a draft contract,[1] along with manuals and specifications, and asked that the contract be signed and returned within five days, along with payment and performance bonds and certificates of insurance.  The contract package included standard bond forms.

The record becomes more opaque at this point.  It appears that a revised draft contract may have been sent on June 7, but that draft does not appear in the record.[2]  A handwritten notation on the cover letter to the May 21 draft contract shows that the same cover letter may have been resent on June 7, with the only change being that a previous line asking for return of the payment and performance bonds had been excised.  The record contains no response from Seating with respect to either contract until TLT contacted Seating on June 21 to request return of the signed contract.

On June 22, Seating wrote to TLT to say that it had several issues with the draft contract.  First, Seating said that it had understood that no bonding would be required, and that there

---

[1]TLT actually sent two contracts, one for each project. Because the differences between the contracts are not relevant to this appeal, we treat them as one contract for simplicity.

[2]We are assuming that the draft contract in the record dated May 21 is the May 21 draft contract, not the June 7 revised draft.

-4-

would be a 10% retainage in lieu of bonding.   Second, Seating
wanted to clarify the timing for submission of shop drawings.
Third, Seating said that its quote was made using prevailing wages,
not union labor, and if TLT were to require union labor (as the May
21 draft contract did), then there would be a price increase.
Fourth, Seating noted that the quote was exclusive of taxes,
permits, and fees.   This letter was apparently returned to Seating
with notations by TLT, but that response is not in the record.

On June 28, Seating wrote to TLT, responding to TLT's
notations to Seating's June 22 letter, saying that after "only a
few comments" it could "get this thing executed."   First, Seating
said that its insurance company would not make a certain change to
the language on the certificates that TLT had presumably requested.
Second, it said that an umbrella policy was cost-prohibitive.
Third, it requested a six-week time frame for return of engineered
shop drawings.   On June 29, TLT accepted the first two changes, but
did not reply to the third.   TLT also requested that Seating mark
up the original contract with these changes and return it to TLT.

On July 5, Seating returned a marked-up version of the
May 21 draft contract.   The changes covered five areas.   First,
Seating struck all language related to payment and performance
bonds and struck out the bonding forms that had been attached.
Second, Seating struck the language requiring union labor.   Third,
Seating struck the language requiring that insurance coverage be

-5-

"in the same Limits as required by the Owner's contract of the general contractor," and inserted language that Seating's "standard insurance limits to apply to this contract."    Fourth, Seating struck the language making it responsible for permits and fees (though it kept the language making it responsible for taxes). Fifth, Seating added language saying that it would provide shop drawings within six weeks of receiving the executed contract.  With these changes, Seating signed the draft contract and returned it to TLT.  TLT neither signed nor returned this version of the contract.

The next writing in the record, perhaps after some verbal communication between the parties, is a July 12 letter from Seating to TLT.    The letter provided a break-down of additional cost if union labor was to be required.  Then the letter continued:

> Regarding the bonding, it was agreed that 10% retainage would be held in lew [sic] of bonding.  We will bond this and pass the cost along to you as an add-on to the contract. When bonding is required we reserve the right, depending on our current bonding capacity at that time[,] to have our factory supply the required bonds.

The letter closed, "If all is acceptable please forward new contracts for us to execute."

On July 21, TLT sent a new draft contract to Seating.[3] The draft no longer required union labor, but it was otherwise unchanged with respect to Seating's July 5 edits.

On July 29, TLT wrote to Seating to request the return of the signed contracts. On August 13, Seating wrote to say that its price would have to increase by $19,236 to account for an I-beam that it had not realized was in the plans.

On August 18, Seating provided a certification of insurance from Outdoor Aluminum, an affiliated company that ran Seating's factory, asking if it was "acceptable." In addition, the letter said, "Per our conversation, bonding will not be an issue. They [Outdoor Aluminum] bond many projects [for] us and unless there is something out of the ordinary all will be done."

On August 19, TLT wrote back to challenge the price increase, saying that Seating had the specifications showing the I-beam when it made the bid. At that point, relations deteriorated. Over the next few months, the parties continued to try to reach agreement, but with decreasing levels of cooperation. TLT ultimately had the work performed by another company, at a cost of $514,160.

In December 2004, TLT brought suit in Massachusetts state court for breach of contract and violation of the Massachusetts

---

[3] Only the contract for the Wachusett Project is in the record, so we assume that its terms mirror the July 21 draft contract for the Reading Project.

consumer protection law, Mass. Gen. Laws ch. 93A, § 11. Seating removed the case to the United State District Court for the District of Massachusetts on February 3, 2005. The parties agreed to have the case tried by a magistrate judge. The parties then cross-moved for summary judgment on the issue of contract formation. The district court held that a contract existed and that Seating had breached.[4] The court awarded damages of $34,160.[5] Seating now appeals.

## II. Discussion

We review the district court's grant of summary judgment de novo, with all reasonable inferences resolved in favor of Seating. See Fenton v. John Hancock Mut. Life Ins. Co., 400 F.3d 83, 87 (1st Cir. 2005). Although the question of contract formation is typically a question for the factfinder, and would thus be subject to clear error review, see Crellin Tech., Inc. v Equipmentlease Corp., 18 F.3d 1, 7 (1st Cir. 1994), where "the evidentiary foundation for determining the formation of the parties' contract [is] either undisputed or consist[s] of writings," contract formation is instead a question of law for the court, Lambert v. Kysar, 983 F.2d 1110, 1114 n.4 (1st Cir. 1993);

---

[4]The court also denied summary judgment on the 93A claim. Following a bench trial, the court found that Seating had not violated 93A. That claim is not relevant to this appeal.

[5]We note that, including the original 93A claims, the amount in controversy originally pleaded satisfied the jurisdictional requirement. See 28 U.S.C. § 1332.

see Mass. Eve & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 229 (1st Cir. 2005); Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F.3d 2, 9-10 (1st Cir. 2005).   Here, both parties moved for summary judgment on the basis of undisputed facts.[6]

Under Massachusetts law of contract, it is well established that "the fact that parties contemplate the execution of a final written agreement effects a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled." Rosenfield v. U.S. Trust Co., 290 Mass. 210, 195 N.E. 323, 325 (1935); see McCarthy v.

---

[6]TLT argues, in so many words, that the fact of cross-motions for summary judgment meant that the parties had submitted the case as a "case stated," and thus that clear error review should apply. See Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 643 (1st Cir. 2000).   In a case stated, the parties waive trial and present the case to the court on the undisputed facts in the pre-trial record.   The court is then entitled to "engage in a certain amount of factfinding, including the drawing of inferences." United Paperworkers Int'l Union Local 14 v. Int'l Paper Co., 64 F.3d 28, 31 (1st Cir. 1995).   Such findings would then be subject to clear error review.   Id. at 32.   However, in cases where the parties have not explicitly presented their case to the court as a case stated, we must "inquire into the intentions of the parties and the district court judge."   Garcia-Ayala, 212 F.3d at 644. Such an inquiry should be done "quite carefully," id. at 644 n.44, for such cases are "somewhat unusual," United Paperworkers, 64 F.3d at 31.   The fact that cross-motions were filed is not dispositive. Jewelers, 410 F.3d at 10.   Here, we see no indications beyond the filing of cross-motions that the parties intended this to be a case stated.   Indeed, a bench trial on the 93A claim followed the resolution of the contract claim.   Furthermore, it's not clear that a different standard of review would apply here, since the question we face is a legal one, see id. at 9-10, and thus still subject to de novo review, United Paperworkers, 64 F.3d at 32.

-9-

Tobin, 429 Mass. 84, 706 N.E.2d 629, 632 (1999). "If, however, the parties orally agree to the essential terms of the transaction, it may be inferred that they intended to bind themselves at that time and that the 'writing to be drafted and delivered is a mere memorial of the contract, which is already final by the earlier mutual assent of the parties to those terms.'" Novel Iron Works, Inc. v. Wexler Constr. Co., 26 Mass. App. Ct. 401, 528 N.E.2d 142, 146 (1988) (quoting Rosenfield, 195 N.E. at 325); see McCarthy, 706 N.E.2d at 632. "It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 724 N.E.2d 699, 703 (2000). "The parties must, however, have progressed beyond the stage of 'imperfect negotiation.'" Id. (quoting Lafayette Place Assocs. v. Boston Redev. Auth., 427 Mass. 509, 694 N.E.2d 820, 826 (1998)); see Rosenfield, 195 N.E. at 326.

In a case such as this, with faxes, phone discussions, and multiple draft contracts going back and forth over nearly eight months, it is worth taking a step back to recall that "[t]here is no surer way to find out what parties meant, than to see what they have done." Pittsfield & N. Adams R.R. Corp. v. Boston & Albany R.R. Co., 260 Mass. 390, 157 N.E. 611, 614 (1927) (quoting Brooklyn Life Ins. Co. of N.Y. v. Dutcher, 95 U.S. 269, 273 (1877)) (internal quotation marks omitted); see T.F. v. B.L., 442 Mass.

522, 813 N.E.2d 1244, 1248 (2004). With this in mind, we note two things about the instant case.

First, at no point did either party behave as if it had a contract. Indeed, negotiations continued for nearly six months after the date TLT claims a contract was formed. TLT does not appear to have taken any action in reliance on a contract having been formed. See Novel Iron Works, 528 N.E.2d at 146-47 (party successfully asserting contract formation was told it was the general contractor, came up with drawings and specifications, solicited bids from subcontractors, was authorized to purchase materials, obtained a building permit, etc.). TLT appears to have first approached litigation from a theory of a general contractor's reliance on a subcontractor's bid. See Loranger Constr. Co. v. E.F. Hauserman Co., 376 Mass. 757, 384 N.E.2d 176, 179 (1978). It ultimately pursued the contract theory after it became clear that Loranger did not apply.

Second, the record shows that obtaining signed contracts was important to TLT. TLT repeatedly pressed Seating for executed contracts, stating that it would not proceed with the project without them. This suggests that the parties did not intend to be bound before executing a final written agreement. See Rosenfield, 195 N.E. at 325; see also Salem Laundry Co. v. N.E. Teamsters & Trucking Indus. Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987) ("Parties can agree on every term in a contract, yet not be bound

-11-

until they sign a written agreement, if they so indicate."); Bates v. Southgate, 308 Mass. 170, 31 N.E.2d 551, 553 (1941) ("Even though previous oral conversations would be enough in themselves to establish an oral contract the parties may, nevertheless, by mutual understanding postpone the culmination of their negotiations into a contract to the later preparation and delivery of a written instrument."); Tull v. Mister Donut Dev. Corp., 7 Mass. App. Ct. 626, 389 N.E.2d 447, 451 (1979) ("Businessmen would be undesirably inhibited in their dealings if expressions of intent and the exchange of drafts were taken as legally binding agreements.").

Neither of these points necessarily precludes a holding that a contract had formed. But neither will a failed negotiation, even one that causes damage to one or both parties, be necessarily a breach of contract.

Both parties acknowledge that the negotiations were drawn out and involved a series of offers and counteroffers. Seating argues that this is all it was, and that no offer was ever accepted, because each response was only a counteroffer. The May 21 draft contract was an offer, and Seating's return of it on July 5 with excisions was a counteroffer. This was followed by the July 21 draft contract from TLT, which, since it embodied different terms from the edited July 5 draft, was yet another counteroffer.

TLT argues that the July 5 edited draft that Seating returned actually embodied terms already agreed to in faxes and

-12-

discussions, and the draft was thus an acceptance of TLT's offer. But we do not see from the record how this could be, since there is no record evidence that any of the five issues raised by the July 5 edits had previously been agreed upon. Seating had raised the issues of permits and fees, bonding, union labor, and timing of shop drawings prior to returning the draft contract on July 5, but the record shows no response from TLT on these issues before July 5. Furthermore, the issue of insurance limits had not been raised previously at all. The issues of permits and fees, insurance limits, and timing of shop drawings went completely unaddressed between July 5 and July 21, and the original terms remained in the supposedly "clean" July 21 draft contract that TLT sent to Seating, despite Seating's excision of those terms on July 5.

On the issue of bonding, TLT itself argues (contrary to its assertion that the July 5 agreement is binding), that the bonding issue was not agreed upon until July 12. In a letter sent by fax on that day, Seating, according to TLT, dropped its insistence on having progress payments with 10% retainage in lieu

-13-

of bonding, and instead agreed to bond the project.[7]  We see it differently.

It is a reasonable inference -- and we take all reasonable inferences in favor of Seating -- that this was still just a step in the negotiation, rather than a final acquiescence. Seating notes that it understood that "it was agreed that 10% retainage would be held in [lieu] of bonding," thus acknowledging a continuing dispute on the issue.  Furthermore, the letter also states that "[w]hen bonding is required we reserve the right . . . to have our factory supply the required bonds."  With this last sentence Seating seems to acknowledge that bonding may or may not be required.  The letter also brings up, for the first time in the record, a request that the bonding be done through Seating's factory.  Given the importance of bonding in the construction industry, such a request could be a material change in terms, making the July 12 letter just another counteroffer.  There is no

---

[7]The district court viewed the July 12 letter as consistent with the July 5 excisions.  The court stated that "in lieu of bonding, TLT would hold 10% retainage, which Seating would then bond through its factory, Outdoor Aluminum."  First, we note that this is not consistent with the fact that the bonding language remained in the July 21 draft contract; either the language is in, or it is out -- it cannot be both.  Second, we believe that the district court's finding is internally inconsistent.  One cannot say that there is both bonding, and retainage "in lieu of bonding." It does not make sense to say that a party will bond a retainage. Therefore, we believe that the most that can be said of the July 12 letter is that it represented Seating's acquiescence on the issue of retainage and agreement to bond the project instead.  TLT takes essentially this position, in contrast to the district court's finding.

-14-

evidence of this issue being discussed further between the parties until August 18.

TLT claims that "it is [the July 5] contract[] which TLT seeks to enforce. All of the Parties' subsequent communications merely entailed hammering out minor details." While "[a] written contract, signed by only one party, may be binding and enforceable even without the other party's signature if the other party manifests acceptance," Haufler v. Zotos, 446 Mass. 489, 845 N.E.2d 322, 331 (2006), we see no manifestation of acceptance here. The only communication in the record from TLT following the receipt of the July 5 draft contract is the July 21 draft contract, which on its face does not accept all of the terms of the July 5 draft contract. In addition, there is no evidence in the record that TLT took any actions that could be construed as manifesting acceptance. Furthermore, TLT's position that the July 5 draft contract should be binding is contrary to TLT's assertion that the inclusion of the bonding language in the July 21 agreement reflected the agreement of the parties, an agreement purportedly made after July 5. The position that the July 5 draft was binding and the position that bonding was required cannot be reconciled.

The only issue that appears to have actually been resolved during this period was the issue of union labor. Seating said that its bid was calculated using non-union wages, and that a union requirement would raise the price of the project. TLT

removed the union labor requirement from the July 21 draft contract -- the only one of Seating's five requested changes that TLT made. But because there is nothing in the record showing an agreement on this issue prior to July 5, it is a reasonable inference that the July 5 excision of union terms was an offer, with the July 21 draft being TLT's acceptance (of that term alone).[8]

Thus, summary judgment in favor of TLT should not have been granted. Furthermore, even taking all reasonable inferences in favor of TLT, we hold that no contract was formed.[9] As we discussed above, there is no evidence in the record that the parties came to an agreement prior to July 5 on any of the issues raised by Seating in the July 5 draft contract. The later removal of the union language may lead to an inference that an agreement on that issue had been reached earlier, but there was still no agreement on bonding until July 12 at the earliest. Therefore, the July 5 draft cannot be viewed as an acceptance of an offer. Furthermore, by July 12, the issues of insurance limits, permits and fees, and timing of shop drawings were still unresolved. Indeed, their inclusion in the July 21 draft can only lead to the

---

[8]The affidavit of Thomas V. Kostinden, the president of TLT, does not indicate when TLT agreed not to require union labor.

[9]The parties agree that there are no material facts in dispute. Seating moved for summary judgment below and argued on appeal that it was entitled to an entry of judgment because the evidence could only lead to the conclusion that there was no contract. We agree.

-16-

conclusion that the issues had not been agreed upon.  While we do not hold that each of these terms individually was necessarily material, the fact that four out of five requested changes to the contract were not made, coupled with the fact that having a signed, written contract was clearly important to both parties, leads us to hold that there was no meeting of the minds before Seating changed its offer price on August 13.

Our decision today is in part a result of the complexity of the negotiations, which is reflected in some inconsistencies in the district court's opinion.  For example, the district court said at various points that: there was "an agreement in principle" on May 17, 2004; that the parties were beyond "imperfect negotiation" and that "[t]he essential terms of the agreement had been reached" as of July 5; and that the parties agreed to bonding terms on July 12.  These three findings show the confusion of the process and in a sense are contradictory.  Because the district court does not pinpoint with precision the point at which the contract was formed, we are inclined to view with some skepticism its conclusion.

Furthermore, the district court found that the insurance issue had been agreed to prior to July 5.  But the evidence for this, a June 28 letter, does not deal with insurance limits at all. The parties only discuss the language in the certificates and the necessity of umbrella insurance.  Finally, the district court explains the non-inclusion in the July 21 draft of Seating's

-17-

requested language on permits and fees, insurance limits, and timing of shop drawings as "apparent mistakes in editing." This despite the fact that, on the record before us, none of these three issues was ever discussed.

### III. Conclusion

For the foregoing reasons, we reverse the summary judgment order of the district court and remand with instructions that summary judgment be entered in favor of Seating.

**Reversed and remanded.**  Each side to bear its own costs.