UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TLT CONSTRUCTION CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     CIVIL ACTION |
| | )     NO. 05-10223-LTS |
| RI, INC. d/b/a SEATING SOLUTIONS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MOTION FOR RELEASE OF FUNDS HELD IN LIEU OF BOND**

On April 19, 2007, the First Circuit reversed this Court's summary judgment ruling in favor of TLT Construction Corporation ("TLT") and held that the parties did not have a binding contract. The defendant, RI, Inc. d/b/a Seating Solutions ("Seating" or "Seating Solutions"), therefore requests that the Court order the immediate release of $45,310.94 held in a TD Banknorth Account numbered 824-4746349 (the "Account"), the establishment of which the parties agreed to in lieu of requiring Seating Solutions to obtain a supersedeas bond while the case was on appeal. As further grounds for this motion, Seating Solutions states as follows:

1.      On December 28, 2005, this Court allowed TLT's motion for summary judgment and determined that a contract existed between the parties. The parties proceeded to trial on the issue of whether Seating's conduct violated Chapter 93A. The Court determined that it had not and entered judgment on June 27, 2006. Seating filed a notice of appeal on the issue of contract formation. On October 13, 2006, this Court ordered Seating Solutions to post a supersedeas bond in an amount of at least $45,200.00 while its appeal was pending in the First Circuit. Rather than incur the transaction costs associated with obtaining a bond, the parties agreed to establish a joint interest-bearing bank account with TD Banknorth. A copy of the most recent statement received from the bank is attached as *Exhibit A*. Seating and TLT agreed that the

funds could be released from the Account if (i) both parties assented to their release;[1] or (ii) a court ordered their release. The Account's balance as of the date of this motion is $45,310.94.

2.      The First Circuit has now ruled in Seating Solutions' favor and ordered the Court to enter judgment for Seating Solutions. On April 20, the day after the First Circuit released its opinion and judgment, Seating Solutions contacted TLT and requested that it agree to release the funds held in the TD Banknorth account. A copy of this letter is attached as *Exhibit B*. Instead of agreeing to release the funds, TLT filed a petition for rehearing with the First Circuit on May 2, 2007. A copy of TLT's petition is attached as *Exhibit C*. TLT's motion does not seek wholesale reconsideration of the First Circuit's decision; it only asks that the First Circuit remand the case to this Court for a trial on the contract formation question. Seating believes that the petition lacks merit and should be denied. But even if TLT's last second Hail Mary is successful, the best result it can obtain is another chance to prove its case here.

3.      Seating thus requests the release of all funds held in the TD Banknorth account. Creation of the account was necessary to stay execution upon TLT's judgment. *See* Fed. R. Civ. P. 62(c). That judgment no longer exists, though, and TLT's best conceivable current outcome would be a remand and a new trial. As such, keeping these funds locked up in a Massachusetts bank account and preventing Seating from using them to operate its business is not appropriate. A proposed form of Order is attached as *Exhibit D*.

WHEREFORE, Seating Solutions respectfully requests that the Court:

(i)      Order the release to Seating Solutions of all funds in TD Banknorth Account No. 824-4746349; and

(ii)      Grant Seating Solutions any other relief that it considers proper under the circumstances.

---

[1] The parties initially sought an account that requires both Seating and TLT's counsel to sign any checks that would transfer money from the Account. TD Banknorth informed the parties that such an arrangement was not possible.

Respectfully Submitted,

RI Inc. d/b/a SEATING SOLUTIONS,

By its attorney,


    /s/                          Terry Klein
HENSHON PARKER VYADRO, P.C.
Terry Klein, BBO# 652052
84 State Street, Suite 760
Boston, Massachusetts  02109
Telephone: (617) 367-1800
Facsimile: (617) 507-6454

Dated:  May 3, 2007


### CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

I hereby certify I have conferred with opposing counsel and have attempted in good faith to resolve or narrow the issues raised by this motion.

    /s/                          Terry Klein


### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on or before May 3, 2007.

    /s/                          Terry Klein

*Exhibit A*

# **TD** **Banknorth, N.A.**
Massachusetts

STATEMENT OF ACCOUNT

HENSHON PARKER VYADRO PC
SEATING SOLUTIONS CLIENT TRUST ACCOUNT
IOLTA TRUST ACCOUNT
84 STATE ST STE 760
BOSTON MA 02109

Page:                                    1 of 2
Statement Period:Mar 01 2007-Mar 31 2007
Cust Ref #:          8244746349-009-T-***
Primary Account #:            824-4746349

## IOLTA
HENSHON PARKER VYADRO PC
SEATING SOLUTIONS CLIENT TRUST ACCOUNT
IOLTA TRUST ACCOUNT

Account # 824-4746349

### ACCOUNT SUMMARY

| | | | |
|---|---|---|---|
| Beginning Balance | 45,300.21 | Average Collected Balance | 45,203.57 |
| Other Credits | 110.94 | Interest Paid this Period | 110.94 |
| | | Interest Paid Year-to-Date | 322.11 |
| Other Withdrawals | 100.21 | Annual Percentage Yield Earned | 2.93% |
| Ending Balance | 45,310.94 | Days in Period | 31 |

### DAILY ACCOUNT ACTIVITY

**Other Credits**

| POSTING DATE | DESCRIPTION | SERIAL NO. | AMOUNT |
|---|---|---|---|
| 3/30 | INTEREST PAID | | 110.94 |
| | | Subtotal: | 110.94 |

**Other Withdrawals**

| POSTING DATE | DESCRIPTION | SERIAL NO. | AMOUNT |
|---|---|---|---|
| 3/1 | DEBIT TRANSFER | | 100.21 |
| | DDA TRNSFR | | |
| | DDA INTEREST TRANSFER | 9300300000000888021607 | |
| | | Subtotal: | 100.21 |

### DAILY BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|
| 2/28 | 45,300.21 | 3/30 | 45,310.94 |
| 3/1 | 45,200.00 | | |

Call 1-800-747-7000 for 24-hour Direct Banking service

*Exhibit B*

HENSHON PARKER VYADRO, P.C.

attorneys at law

84 STATE STREET
SUITE 760
BOSTON MA  02109

P 617 367 1800
F 617 367 1877

www.hpvpc.com

Terry Klein
E-mail: tklein@hpvpc.com
Direct fax: (617) 507-6454

April 20, 2007

<u>BY FACSIMILE AND FIRST CLASS MAIL</u>

Patrick J. Sullivan, Esq.
Heafitz & Sullivan, LLP
56 Chestnut Hill Avenue
Boston, Massachusetts  02135
<u>Facsimile</u>: (617) 562-0069

Re:     **TLT Constr. Corp. v. RI Inc. d/b/a Seating Solutions**
        **D. Mass. Civil Action No. 05-10223-LTS**

Dear Pat:

In light of the First Circuit's decision yesterday, please confirm your agreement that the funds currently set aside in the Seating Solutions Client Trust Account may be released.  Recall that the bank is not requiring each of us to sign a check to make withdrawals.  I will therefore withdraw the funds and close the account as soon I receive a written confirmation from you that I am authorized to do so.

I look forward to hearing from you.

Very truly yours,

Terry Klein

cc:     Scott Suprina *(via electronic mail)*

Acknowledged and agreed to:

_____
Patrick J. Sullivan, Esq.

*Exhibit B*

HENSHON PARKER VYADRO, P.C.

*attorneys at law*

84 STATE STREET
SUITE 760
BOSTON MA  02109

P 617 367 1800
F 617 367 1877

www.hpvpc.com

Terry Klein
E-mail: tklein@hpvpc.com
Direct fax: (617) 507-6454

April 20, 2007

BY FACSIMILE AND FIRST CLASS MAIL

Patrick J. Sullivan, Esq.
Heafitz & Sullivan, LLP
56 Chestnut Hill Avenue
Boston, Massachusetts  02135
Facsimile: (617) 562-0069

Re:    **TLT Constr. Corp. v. RI Inc. d/b/a Seating Solutions
        D. Mass. Civil Action No. 05-10223-LTS**

Dear Pat:

In light of the First Circuit's decision yesterday, please confirm your agreement that the funds currently set aside in the Seating Solutions Client Trust Account may be released.  Recall that the bank is not requiring each of us to sign a check to make withdrawals.  I will therefore withdraw the funds and close the account as soon I receive a written confirmation from you that I am authorized to do so.

I look forward to hearing from you.

Very truly yours,

Terry Klein

cc:    Scott Suprina *(via electronic mail)*

Acknowledged and agreed to:

_____
Patrick J. Sullivan, Esq.

*Exhibit C*

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

| | | |
|---|---|---|
| TLT Construction Corp. | ) | |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 06-2214 |
| RI, Inc. d/b/a Seating Solutions | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**Petition of Plaintiff-Appellee, TLT Construction Corp.,
For Panel Rehearing Pursuant to Fed.R.App.P 40**

Now comes the Plaintiff-Appellee, TLT Construction Corp. ("TLT"), and

hereby requests that this Honorable Court grant a re-hearing on its Decision of

April 19, 2007 (Exhibit A) pursuant to Fed.R.App.P. 40.   Just as did the District

Court's decision with which this Court found reversible error, this Court's

decision appears to rest in large measure on its opinion of what it believes the

Parties intended.[1]  However, as a lot of that intent is subjective and cannot readily

be determined from flat pieces of paper, TLT suggests that an evidentiary hearing

in this matter is the only appropriate method to reach a final conclusion.  In

support hereof, TLT respectfully submits that the Court has overlooked and/or

misapprehended the following discrete points:

**1.  The Court inappropriately entered summary judgment against TLT**

---

[1]  This even appear to be the case with the litigation itself.  For instance, it appears that
Footnote 6 on page 9 and Footnote 9 on page 16 of Exhibit A do not necessarily reconcile.

**where disputed issues of fact existed as to whether the issues raised by Seating were "_material_" such to preclude the formation of the contracts until fully and finally resolved.**

This Court decided that no contracts were formed between the Parties where TLT accepted RI, Inc. d/b/a Seating Solutions ("Seating")'s quote on May 17, 2004 (JA 120 and 127) and Seating subsequently signed and returned the contract forms provided by TLT on or about July 5, 2004 (JA 146 and 157), in large part because in the Court's view, negotiations continued regarding certain collateral issues attendant to said contracts. Exhibit A, p. 10-11. However, the formation of a contract merely required a meeting of the minds for **material** contractual terms and the intent of the parties to be bound by those terms. See, e.g., Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878, 724 N.E.2d 699, 703 (2000), McCarthy v. Tobin, 429 Mass. at 87, 84, 706 N.E.2d 629, 632 (1999). Indeed, it is well established that a contract is formed when the parties work out all material terms, i.e. **price, quantity, time for performance,** etc. Novel Iron Works, Inc. v. Wexler Construction Co., Inc., 26 Mass.App.Ct. 401, 410, 528 N.E.2d 142, 147 (1988), McCarthy, 429 Mass. at 87, 706 N.E.2d at 632 (emphasis added). TLT believes that these terms were substantially set with the revised Quote of May 17, 2004 which was accepted in principal by TLT. RA 120. Whether or not this is the case, on the undisputed evidence, as the District Court specifically found, the

2

material terms of **price, quantity, time for performance,** etc. were indeed met at least by July 5, 2004. See JA 59-61, 72-73, 76-80, 82, 144, 146, 157, 180, 183, 185, 187, 189, 203, 460.

In sum, the contracts were made, the material terms were agreed upon, and Seating expressed its intention to be bound by signing the contract. JA 77, 79-80, 84, 147, 157; see e.g., McCarthy, 429 Mass. at 87, 706 N.E.2d at 632. It was TLT's position below and on appeal (and which the District Court found) that the issues raised by Seating (insurance, bonding etc.) were not "material," but instead, simply "details" which the Parties needed to "hammer out." JA 69, see also 43, 94 and 127. Indeed, it cannot be seriously debated that the focus of the contracts was not insurance, bonding, union-labor etc., but instead for supply of building materials for a construction project. See JA 157 and 170. To the extent that this may Court believe that these terms may in fact be "material", then it is respectfully submitted that this clearly presents a question of material fact within the meaning Fed.R.Civ.P. 56 and it is inappropriate to enter judgment against TLT as the law requires the Court to view the evidence in a light most favorable to TLT at the stage of the proceedings presented on Appeal. See Exhibit A, p. 16.

**2. The circumstances as a whole, when viewed in a light most favorable to TLT, demonstrate TLT's reasonable reliance and intent to be bound by the Contracts.**

3

This Court also suggests that TLT did not manifest an intention to be bound by or any similar reliance on the contracts executed by Seating. See Exhibit A, p. 15. However, the undisputed Affidavit of Mr. Thomas V. Kostinden of TLT clearly states that "TLT was under a time constraint to complete its work under the respective general contracts." JA 62, see also JA 135 and 137, wherein TLT put Seating on notice that delays which TLT believed that Seating was causing would affect TLT's ability to administer its own contract. It is also undisputed that aluminum prices were on the rise and that material price increases is what Seating communicated as its basis for continually seeking to re-negotiate the contract price on after July 5, 2004. RA 61. Further, there is nothing in the record to suggest that TLT actively sought to find an alternate supplier until the time that it became readily apparent that Seating would only perform if paid a substantially price increase. See e.g. JA 500 (Mr. Kostinden's Trial Testimony, p. 51, line 10-17) as well JA 462 (Seating set a letter on January 27, 2005, informing TLT that they would only perform the job for a total of $580,000 ($625,000 less $45,000), or $100,000 more than the original agreements, and that "this is the best pricing that you will see from someone who will complete a quality job"). Wherefore, when viewing the evidence in a light most favorable to TLT, it is clear that the issues

4

which Seating raised regarding bonding, insurance and union labor, all of which were eventually resolved, were simply a pretext to string TLT along with the goal of coercing TLT to agree to a price increase. See JA 79-80. In such instance, TLT submits that if anything, attempts to pursue Seating, insisting that it follow the contract provisions (e.g. JA 187) manifest acceptance of the contracts and considerable intent avoid litigation and to mitigate its own damages as required law.[2] See Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 586 (1982) ("The general rule with respect to mitigation of damages is that a plaintiff may not recover for damages that were avoidable by the use of reasonable precautions on his part.").

This Court has made much of the fact that TLT did not sign the July 5, 2004 contracts as well as TLT's requests to execute clean final drafts. See Exhibit A, p. 11. However, TLT notes that when the evidence is viewed in the light most favorable to TLT as required for summary judgment, the "clerical" function of reducing every aspect of the agreement to writing and executing another document should not bar the formation of the contract. See Goren v. Royal Investment Inc., 25 Mass.App.Ct. 137, 140-1, 516 N.E.2d 173, 175-6 (1987) (where "the parties

---

[2] Indeed, had TLT not pursued Seating, it would have been accused of waiving its rights or otherwise similarly not acting as if a contract had been formed. This is a classic Catch 22.

5

have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract") (citations omitted), see also Gel Sys. Inc. v. Hyundai Eng'g & Constr. Co., Inc., 902 F.2d 1024, 1027 (1st Cir. 1990) ("If all material terms which are to be incorporated into a future writing have been agreed upon, it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract already final by the earlier mutual assent of the parties to those terms.") (emphasis added).

The fact remains that it is undisputed that the ultimate issue raised by Seating to derail the performance of the contracts is its insistence that it might unilaterally and without justification raise the price previously agreed to by the Parties. See e.g. JA 45–46, 47, 61, 81, 97.    However, the law is clear that where the contracts themselves clearly provide a mechanism to deal with an issue, it is inappropriate for Seating to seek to avoid its obligations. Lafayette Place Assocs. v. Boston Redevelopment Auth., 427 Mass. 509, 518, 694 N.E.2d 820, 826 (1998) ("If parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding"). Accordingly, consistent with TLT understanding that contracts had been formed, TLT required Seating to utilize the

contract mechanisms already in place to the extent that Seating beleived it had a

basis for a price increase. JA 187. It is undisputed that Seating failed and refused

to do so. JA 96-97.

As the District Court found:

"The contracts which Seating eventually modified, and signed, maintained the original prices and, when Seating signed the contracts, it agreed to "be bound by the terms of the agreement, General Conditions, Drawings, Specifications, Alternates and Addenda . . ." which together provided detailed explanations of the construction to be performed, **as well as a process for any prince increases that might become necessary due to future uncertainties** . . . [Trial Exhibits] 15 and 16, Art. ¶4.1. Thus, when it signed the contracts, **Seating agreed to perform the job described by those contracts for $480,000.00 or seek additional funding through the change order process if necessary.**" JA 79-80 (emphasis added).

The situation may have been different had TLT itself sought price or similar

change, but that is simply not what happened.  See Lambert v. Kysar, 983 F.2d

1111, 1115 (1st. Cir. 1993) (Where one party altered a material term in replying to

an offer, specifically quantity, which "amounted to a rejection of the . . . offer to

sell, and a counteroffer to purchase the lesser quantity.").

Ultimately, all TLT sought was to hold Seating to the terms of the very

contracts which **Seating** itself executed and delivered to TLT. JA 72-73, 76-80,

82, 146, 157. Under such circumstances, TLT submits that it is inappropriate to

enter summary judgment against it on the record before this Court when the facts

are viewed in a light most favorable to TLT as required by law.

WHEREFORE, for the reasons set forth herein, Plaintiff-Appellee, TLT

Construction Corp., hereby requests that this Honorable Court grant a re-hearing

of its Decision of April 19, 2007 (Exhibit A) pursuant to Fed.R.App.P. 40 and

remand this matter for trial of the TLT's contract claims in the District Court.

TLT CONSTRUCTION CORP.,
By its Attorneys,

Dated: 5·2·07

Patrick J. Sullivan, Esq., BBO# 548752
James G. Grillo, Esq., BBO# 638730
HEAFITZ & SULLIVAN
56 Chestnut Hill Avenue
Boston, MA 02135
(617) 562-1000

8

# United States Court of Appeals
## For the First Circuit

———————————

No. 06-2214

TLT CONSTRUCTION CORP.,

Plaintiff, Appellee,

v.

RI, INC., d/b/a Seating Solutions,

Defendant, Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. Magistrate Judge]

———————————

Before

Lynch, Circuit Judge,

Stahl, Senior Circuit Judge,

and Howard, Circuit Judge.

———————————

Terry Klein, with whom Henshon Parker Vyadro P.C. was on brief, for appellant.
James G. Grillo, with whom Patrick J. Sullivan and Heaftiz & Sullivan were on brief, for appellee.

———————————

April 19, 2007

———————————

**STAHL, <u>Senior Circuit Judge</u>.**  This diversity case arises out of a common situation in commercial dealings: the failure of negotiations and the resulting bad blood between the parties. Here, after a protracted -- and ultimately failed -- nine-month negotiation between a general contractor and a potential subcontractor, the general contractor brought suit against the subcontractor for breach of contract, claiming that at some point during the negotiations a binding contract had been formed.  After cross-motions for summary judgment on the question of contract formation, the district court ruled in favor of the general contractor.  Because we hold that no contract was formed, we reverse.

## I. Background

TLT Construction Corp. ("TLT"), a Massachusetts company, was the general contractor on renovation and expansion projects for Reading Memorial High School in Reading, Massachusetts (the "Reading Project"), and Wachusett Regional High School in Holden, Massachusetts (the "Wachusett Project").  In April 2004, as TLT was preparing its bid for the Reading Project, RI Inc., d/b/a Seating Solutions ("Seating"), a New York company specializing in selling and installing spectator seating for athletic facilities, submitted a bid to TLT to install bleachers for the Reading Project as a subcontractor.  In its proposal, Seating stated, "We have worked very closely with this architect and have helped them design this

-2-

bleacher from the very first steps." On the record before us, it does not appear that Seating's bid was a filed sub-bid, nor does TLT makes such a claim. <u>See</u> Mass. Gen. Laws ch. 149, § 44F.

On May 10, 2004, TLT, having been awarded both the Reading and the Wachusett Projects, requested that Seating submit a new quote that would include both projects. On May 12, Seating quoted a price of nearly $568,000 for both. TLT responded that the price was too high, and Seating replied on May 17 with a revised quote of $480,000. Seating said that the price was "contingent on a letter of intent being received [May 18] and an AIA contract being executed by Friday." TLT responded that day, seeking clarification of a few terms, including whether or not bonding was included in the quote, since a bond was required and had been included in the quotes from Seating's competitors. Seating responded later that day that bonding was not included in the quote, and that it did not feel bonding was necessary, since it would be paid in progress payments. TLT replied, "We have a deal if we can split the bond" and if TLT could have retainage of 5% (Seating had originally proposed no retainage). TLT also said that it would not be able to draft a contract in Seating's time frame, but that it could provide a letter of intent. Seating agreed to accept a letter of intent, and granted TLT two weeks to draft and execute a final contract, but said that it could not hold the price

-3-

any longer than that.  On the record before us, it appears that no
letter of intent was ever sent.

Rather, four days later, on May 21, 2004, TLT sent
Seating a draft contract,[1] along with manuals and specifications,
and asked that the contract be signed and returned within five
days, along with payment and performance bonds and certificates of
insurance.  The contract package included standard bond forms.

The record becomes more opaque at this point.  It appears
that a revised draft contract may have been sent on June 7, but
that draft does not appear in the record.[2]  A handwritten notation
on the cover letter to the May 21 draft contract shows that the
same cover letter may have been resent on June 7, with the only
change being that a previous line asking for return of the payment
and performance bonds had been excised.  The record contains no
response from Seating with respect to either contract until TLT
contacted Seating on June 21 to request return of the signed
contract.

On June 22, Seating wrote to TLT to say that it had
several issues with the draft contract.  First, Seating said that
it had understood that no bonding would be required, and that there

---

[1]TLT actually sent two contracts, one for each project.
Because the differences between the contracts are not relevant to
this appeal, we treat them as one contract for simplicity.

[2]We are assuming that the draft contract in the record dated
May 21 is the May 21 draft contract, not the June 7 revised draft.

-4-

would be a 10% retainage in lieu of bonding.  Second, Seating wanted to clarify the timing for submission of shop drawings. Third, Seating said that its quote was made using prevailing wages, not union labor, and if TLT were to require union labor (as the May 21 draft contract did), then there would be a price increase. Fourth, Seating noted that the quote was exclusive of taxes, permits, and fees.  This letter was apparently returned to Seating with notations by TLT, but that response is not in the record.

On June 28, Seating wrote to TLT, responding to TLT's notations to Seating's June 22 letter, saying that after "only a few comments" it could "get this thing executed."  First, Seating said that its insurance company would not make a certain change to the language on the certificates that TLT had presumably requested. Second, it said that an umbrella policy was cost-prohibitive. Third, it requested a six-week time frame for return of engineered shop drawings.  On June 29, TLT accepted the first two changes, but did not reply to the third.  TLT also requested that Seating mark up the original contract with these changes and return it to TLT.

On July 5, Seating returned a marked-up version of the May 21 draft contract.  The changes covered five areas.  First, Seating struck all language related to payment and performance bonds and struck out the bonding forms that had been attached. Second, Seating struck the language requiring union labor.  Third, Seating struck the language requiring that insurance coverage be

-5-

"in the same Limits as required by the Owner's contract of the
general contractor," and inserted language that Seating's "standard
insurance limits to apply to this contract."    Fourth, Seating
struck the language making it responsible for permits and fees
(though it kept the language making it responsible for taxes).
Fifth, Seating added language saying that it would provide shop
drawings within six weeks of receiving the executed contract.  With
these changes, Seating signed the draft contract and returned it to
TLT.  TLT neither signed nor returned this version of the contract.

The next writing in the record, perhaps after some verbal
communication between the parties, is a July 12 letter from Seating
to TLT.  The letter provided a break-down of additional cost if
union labor was to be required.  Then the letter continued:

> Regarding the bonding, it was agreed that 10%
> retainage would be held in lew [sic] of
> bonding.  We will bond this and pass the cost
> along to you as an add-on to the contract.
> When bonding is required we reserve the right,
> depending on our current bonding capacity at
> that time[,] to have our factory supply the
> required bonds.

The letter closed, "If all is acceptable please forward
new contracts for us to execute."

-6-

On July 21, TLT sent a new draft contract to Seating.[3] The draft no longer required union labor, but it was otherwise unchanged with respect to Seating's July 5 edits.

On July 29, TLT wrote to Seating to request the return of the signed contracts. On August 13, Seating wrote to say that its price would have to increase by $19,236 to account for an I-beam that it had not realized was in the plans.

On August 18, Seating provided a certification of insurance from Outdoor Aluminum, an affiliated company that ran Seating's factory, asking if it was "acceptable." In addition, the letter said, "Per our conversation, bonding will not be an issue. They [Outdoor Aluminum] bond many projects [for] us and unless there is something out of the ordinary all will be done."

On August 19, TLT wrote back to challenge the price increase, saying that Seating had the specifications showing the I-beam when it made the bid. At that point, relations deteriorated. Over the next few months, the parties continued to try to reach agreement, but with decreasing levels of cooperation. TLT ultimately had the work performed by another company, at a cost of $514,160.

In December 2004, TLT brought suit in Massachusetts state court for breach of contract and violation of the Massachusetts

---

[3]Only the contract for the Wachusett Project is in the record, so we assume that its terms mirror the July 21 draft contract for the Reading Project.

consumer protection law, Mass. Gen. Laws ch. 93A, § 11. Seating removed the case to the United State District Court for the District of Massachusetts on February 3, 2005. The parties agreed to have the case tried by a magistrate judge. The parties then cross-moved for summary judgment on the issue of contract formation. The district court held that a contract existed and that Seating had breached.[4] The court awarded damages of $34,160.[5] Seating now appeals.

## II. Discussion

We review the district court's grant of summary judgment de novo, with all reasonable inferences resolved in favor of Seating. See Fenton v. John Hancock Mut. Life Ins. Co., 400 F.3d 83, 87 (1st Cir. 2005). Although the question of contract formation is typically a question for the factfinder, and would thus be subject to clear error review, see Crellin Tech., Inc. v Equipmentlease Corp., 18 F.3d 1, 7 (1st Cir. 1994), where "the evidentiary foundation for determining the formation of the parties' contract [is] either undisputed or consist[s] of writings," contract formation is instead a question of law for the court, Lambert v. Kysar, 983 F.2d 1110, 1114 n.4 (1st Cir. 1993);

---

[4]The court also denied summary judgment on the 93A claim. Following a bench trial, the court found that Seating had not violated 93A. That claim is not relevant to this appeal.

[5]We note that, including the original 93A claims, the amount in controversy originally pleaded satisfied the jurisdictional requirement. See 28 U.S.C. § 1332.

see Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412

F.3d 215, 229 (1st Cir. 2005); Jewelers Mut. Ins. Co. v. N.

Barquet, Inc., 410 F.3d 2, 9-10 (1st Cir. 2005). Here, both

parties moved for summary judgment on the basis of undisputed

facts.[6]

Under Massachusetts law of contract, it is well

established that "the fact that parties contemplate the execution

of a final written agreement effects a strong inference that the

parties do not intend to be bound by earlier negotiations or

agreements until the final terms are settled." Rosenfield v. U.S.

Trust Co., 290 Mass. 210, 195 N.E. 323, 325 (1935); see McCarthy v.

---

[6]TLT argues, in so many words, that the fact of cross-motions
for summary judgment meant that the parties had submitted the case
as a "case stated," and thus that clear error review should apply.
See Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 643
(1st Cir. 2000). In a case stated, the parties waive trial and
present the case to the court on the undisputed facts in the pre-
trial record. The court is then entitled to "engage in a certain
amount of factfinding, including the drawing of inferences."
United Paperworkers Int'l Union Local 14 v. Int'l Paper Co., 64
F.3d 28, 31 (1st Cir. 1995). Such findings would then be subject
to clear error review. Id. at 32. However, in cases where the
parties have not explicitly presented their case to the court as a
case stated, we must "inquire into the intentions of the parties
and the district court judge." Garcia-Ayala, 212 F.3d at 644.
Such an inquiry should be done "quite carefully," id. at 644 n.44,
for such cases are "somewhat unusual," United Paperworkers, 64 F.3d
at 31. The fact that cross-motions were filed is not dispositive.
Jewelers, 410 F.3d at 10. Here, we see no indications beyond the
filing of cross-motions that the parties intended this to be a case
stated. Indeed, a bench trial on the 93A claim followed the
resolution of the contract claim. Furthermore, it's not clear that
a different standard of review would apply here, since the question
we face is a legal one, see id. at 9-10, and thus still subject to
de novo review, United Paperworkers, 64 F.3d at 32.

<u>Tobin</u>, 429 Mass. 84, 706 N.E.2d 629, 632 (1999).  "If, however, the
parties orally agree to the essential terms of the transaction, it
may be inferred that they intended to bind themselves at that time
and that the 'writing to be drafted and delivered is a mere
memorial of the contract, which is already final by the earlier
mutual assent of the parties to those terms.'"  <u>Novel Iron Works,
Inc.</u> v. <u>Wexler Constr. Co.</u>, 26 Mass. App. Ct. 401, 528 N.E.2d 142,
146 (1988) (quoting <u>Rosenfield</u>, 195 N.E. at 325); <u>see</u> <u>McCarthy</u>, 706
N.E.2d at 632.  "It is not required that all terms of the agreement
be precisely specified, and the presence of undefined or
unspecified terms will not necessarily preclude the formation of a
binding contract."  <u>Situation Mgmt. Sys., Inc.</u> v. <u>Malouf, Inc.</u>, 430
Mass. 875, 724 N.E.2d 699, 703 (2000).  "The parties must, however,
have progressed beyond the stage of 'imperfect negotiation.'"  <u>Id.</u>
(quoting <u>Lafayette Place Assocs.</u> v. <u>Boston Redev. Auth.</u>, 427 Mass.
509, 694 N.E.2d 820, 826 (1998)); <u>see</u> <u>Rosenfield</u>, 195 N.E. at 326.

    In a case such as this, with faxes, phone discussions,
and multiple draft contracts going back and forth over nearly eight
months, it is worth taking a step back to recall that "[t]here is
no surer way to find out what parties meant, than to see what they
have done."  <u>Pittsfield & N. Adams R.R. Corp.</u> v. <u>Boston & Albany
R.R. Co.</u>, 260 Mass. 390, 157 N.E. 611, 614 (1927) (quoting <u>Brooklyn
Life Ins. Co. of N.Y.</u> v. <u>Dutcher</u>, 95 U.S. 269, 273 (1877))
(internal quotation marks omitted); <u>see</u> <u>T.F.</u> v. <u>B.L.</u>, 442 Mass.

522, 813 N.E.2d 1244, 1248 (2004).  With this in mind, we note two things about the instant case.

First, at no point did either party behave as if it had a contract.  Indeed, negotiations continued for nearly six months after the date TLT claims a contract was formed.  TLT does not appear to have taken any action in reliance on a contract having been formed.  See Novel Iron Works, 528 N.E.2d at 146-47 (party successfully asserting contract formation was told it was the general contractor, came up with drawings and specifications, solicited bids from subcontractors, was authorized to purchase materials, obtained a building permit, etc.).  TLT appears to have first approached litigation from a theory of a general contractor's reliance on a subcontractor's bid.  See Loranger Constr. Co. v. E.F. Hauserman Co., 376 Mass. 757, 384 N.E.2d 176, 179 (1978).  It ultimately pursued the contract theory after it became clear that Loranger did not apply.

Second, the record shows that obtaining signed contracts was important to TLT.  TLT repeatedly pressed Seating for executed contracts, stating that it would not proceed with the project without them.  This suggests that the parties did not intend to be bound before executing a final written agreement.  See Rosenfield, 195 N.E. at 325; see also Salem Laundry Co. v. N.E. Teamsters & Trucking Indus. Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987) ("Parties can agree on every term in a contract, yet not be bound

-11-

until they sign a written agreement, if they so indicate."); Bates v. Southgate, 308 Mass. 170, 31 N.E.2d 551, 553 (1941) ("Even though previous oral conversations would be enough in themselves to establish an oral contract the parties may, nevertheless, by mutual understanding postpone the culmination of their negotiations into a contract to the later preparation and delivery of a written instrument."); Tull v. Mister Donut Dev. Corp., 7 Mass. App. Ct. 626, 389 N.E.2d 447, 451 (1979) ("Businessmen would be undesirably inhibited in their dealings if expressions of intent and the exchange of drafts were taken as legally binding agreements.").

Neither of these points necessarily precludes a holding that a contract had formed. But neither will a failed negotiation, even one that causes damage to one or both parties, be necessarily a breach of contract.

Both parties acknowledge that the negotiations were drawn out and involved a series of offers and counteroffers. Seating argues that this is all it was, and that no offer was ever accepted, because each response was only a counteroffer. The May 21 draft contract was an offer, and Seating's return of it on July 5 with excisions was a counteroffer. This was followed by the July 21 draft contract from TLT, which, since it embodied different terms from the edited July 5 draft, was yet another counteroffer.

TLT argues that the July 5 edited draft that Seating returned actually embodied terms already agreed to in faxes and

-12-

discussions, and the draft was thus an acceptance of TLT's offer. But we do not see from the record how this could be, since there is no record evidence that any of the five issues raised by the July 5 edits had previously been agreed upon.  Seating had raised the issues of permits and fees, bonding, union labor, and timing of shop drawings prior to returning the draft contract on July 5, but the record shows no response from TLT on these issues before July 5.  Furthermore, the issue of insurance limits had not been raised previously at all.  The issues of permits and fees, insurance limits, and timing of shop drawings went completely unaddressed between July 5 and July 21, and the original terms remained in the supposedly "clean" July 21 draft contract that TLT sent to Seating, despite Seating's excision of those terms on July 5.

On the issue of bonding, TLT itself argues (contrary to its assertion that the July 5 agreement is binding), that the bonding issue was not agreed upon until July 12.  In a letter sent by fax on that day, Seating, according to TLT, dropped its insistence on having progress payments with 10% retainage in lieu

of bonding, and instead agreed to bond the project.[7]  We see it differently.

It is a reasonable inference -- and we take all reasonable inferences in favor of Seating -- that this was still just a step in the negotiation, rather than a final acquiescence. Seating notes that it understood that "it was agreed that 10% retainage would be held in [lieu] of bonding," thus acknowledging a continuing dispute on the issue.  Furthermore, the letter also states that "[w]hen bonding is required we reserve the right . . . to have our factory supply the required bonds."  With this last sentence Seating seems to acknowledge that bonding may or may not be required.  The letter also brings up, for the first time in the record, a request that the bonding be done through Seating's factory.  Given the importance of bonding in the construction industry, such a request could be a material change in terms, making the July 12 letter just another counteroffer.  There is no

---

[7]The district court viewed the July 12 letter as consistent with the July 5 excisions.  The court stated that "in lieu of bonding, TLT would hold 10% retainage, which Seating would then bond through its factory, Outdoor Aluminum."  First, we note that this is not consistent with the fact that the bonding language remained in the July 21 draft contract; either the language is in, or it is out -- it cannot be both.  Second, we believe that the district court's finding is internally inconsistent.  One cannot say that there is both bonding, and retainage "in lieu of bonding." It does not make sense to say that a party will bond a retainage. Therefore, we believe that the most that can be said of the July 12 letter is that it represented Seating's acquiescence on the issue of retainage and agreement to bond the project instead.  TLT takes essentially this position, in contrast to the district court's finding.

-14-

evidence of this issue being discussed further between the parties until August 18.

TLT claims that "it is [the July 5] contract[] which TLT seeks to enforce.  All of the Parties' subsequent communications merely entailed hammering out minor details."  While "[a] written contract, signed by only one party, may be binding and enforceable even without the other party's signature if the other party manifests acceptance," Haufler v. Zotos, 446 Mass. 489, 845 N.E.2d 322, 331 (2006), we see no manifestation of acceptance here.  The only communication in the record from TLT following the receipt of the July 5 draft contract is the July 21 draft contract, which on its face does not accept all of the terms of the July 5 draft contract.  In addition, there is no evidence in the record that TLT took any actions that could be construed as manifesting acceptance.  Furthermore, TLT's position that the July 5 draft contract should be binding is contrary to TLT's assertion that the inclusion of the bonding language in the July 21 agreement reflected the agreement of the parties, an agreement purportedly made after July 5.  The position that the July 5 draft was binding and the position that bonding was required cannot be reconciled.

The only issue that appears to have actually been resolved during this period was the issue of union labor.  Seating said that its bid was calculated using non-union wages, and that a union requirement would raise the price of the project.    TLT

removed the union labor requirement from the July 21 draft contract -- the only one of Seating's five requested changes that TLT made. But because there is nothing in the record showing an agreement on this issue prior to July 5, it is a reasonable inference that the July 5 excision of union terms was an offer, with the July 21 draft being TLT's acceptance (of that term alone).[8]

Thus, summary judgment in favor of TLT should not have been granted. Furthermore, even taking all reasonable inferences in favor of TLT, we hold that no contract was formed.[9] As we discussed above, there is no evidence in the record that the parties came to an agreement prior to July 5 on any of the issues raised by Seating in the July 5 draft contract. The later removal of the union language may lead to an inference that an agreement on that issue had been reached earlier, but there was still no agreement on bonding until July 12 at the earliest. Therefore, the July 5 draft cannot be viewed as an acceptance of an offer. Furthermore, by July 12, the issues of insurance limits, permits and fees, and timing of shop drawings were still unresolved. Indeed, their inclusion in the July 21 draft can only lead to the

---

[8]The affidavit of Thomas V. Kostinden, the president of TLT, does not indicate when TLT agreed not to require union labor.

[9]The parties agree that there are no material facts in dispute. Seating moved for summary judgment below and argued on appeal that it was entitled to an entry of judgment because the evidence could only lead to the conclusion that there was no contract. We agree.

-16-

conclusion that the issues had not been agreed upon.  While we do not hold that each of these terms individually was necessarily material, the fact that four out of five requested changes to the contract were not made, coupled with the fact that having a signed, written contract was clearly important to both parties, leads us to hold that there was no meeting of the minds before Seating changed its offer price on August 13.

Our decision today is in part a result of the complexity of the negotiations, which is reflected in some inconsistencies in the district court's opinion.  For example, the district court said at various points that: there was "an agreement in principle" on May 17, 2004; that the parties were beyond "imperfect negotiation" and that "[t]he essential terms of the agreement had been reached" as of July 5; and that the parties agreed to bonding terms on July 12.  These three findings show the confusion of the process and in a sense are contradictory.  Because the district court does not pinpoint with precision the point at which the contract was formed, we are inclined to view with some skepticism its conclusion.

Furthermore, the district court found that the insurance issue had been agreed to prior to July 5.  But the evidence for this, a June 28 letter, does not deal with insurance limits at all. The parties only discuss the language in the certificates and the necessity of umbrella insurance.  Finally, the district court explains the non-inclusion in the July 21 draft of Seating's

-17-

requested language on permits and fees, insurance limits, and timing of shop drawings as "apparent mistakes in editing." This despite the fact that, on the record before us, none of these three issues was ever discussed.

### III. Conclusion

For the foregoing reasons, we reverse the summary judgment order of the district court and remand with instructions that summary judgment be entered in favor of Seating.

**Reversed and remanded.** Each side to bear its own costs.

-18-

## Certification of Counsel  per FRAP 32

1.      This submission complies with the type-volume limitation of  Fed. R. App. P. 40(b) and Fed. R. App. P. 32(a)(7)(A) because it contains less than 15 pages, and

2.      This submission complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a monospaced typeface using WordPerfect 10 with "Times New Roman" Font Size 14.

TLT CONSTRUCTION CORP.,
By its Attorneys,

Dated: _5-2·07_

Patrick J. Sullivan, Esq., BBO# 548752
James G. Grillo, Esq., BBO# 638730
HEAFITZ & SULLIVAN
56 Chestnut Hill Avenue
Boston, MA 02135
(617) 562-1000

## CERTIFICATE OF SERVICE

I, James G. Grillo, hereby certify that on 2nd day of May, 2007, I filed nine

(9) hard copies of the attached Petition for ReHearing of the Appellee, TLT

Construction Corp., together with a copy on disk per FRAP Local Rules 31 and

41; and served two (2) copies of same via First Class Mail upon:

Attorney for Defendant / Appellant, RI, Inc., d/b/a Seating Solutions

Terry Klein, Esq.
Henshon Parker Vyadro, P.C.
84 State Street, Suite 760
Boston, MA 02109

James G. Grillo, Esq.
BBO# 638730

*Exhibit D*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TLT CONSTRUCTION CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     CIVIL ACTION |
| | )     NO. 05-10223-LTS |
| RI, INC. d/b/a SEATING SOLUTIONS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **ORDER**

The Court hereby ORDERS the immediate release to RI, Inc. d/b/a Seating Solutions of $45,310.94, and any other additional interest that may have accrued since March 31, 2007, held in TD Banknorth Account Number 824-4746349.

_____
Hon. Leo T. Sorokin
United States Magistrate Judge

Dated:  May __, 2007

2